# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

THE COURTLAND COMPANY, INC., a  )
West Virginia Business Corporation,  )
         )
        Plaintiff,  )
         )
        v.  )  Case No. ___2:18-cv-01230_____
         )
UNION CARBIDE CORPORATION, a New  )
York Corporation; and DOW CHEMICAL  )
COMPANY, INC., a Delaware Corporation,  )
         )
        Defendants  )

**COMPLAINT FOR: (1) RECOVERY OF RESPONSE COSTS AND DECLARATORY RELIEF UNDER CERCLA §§ 107(a) AND 113(g), 42 U.S.C. §§ 9607(a) AND 9613(g); (2) CITIZEN SUIT PURSUANT TO 42 U.S.C. § 6972(a)(1)(A) TO REDRESS VIOLATIONS OF THE HAZARDOUS WASTE MANAGEMENT PROVISIONS OF RCRA SUBTITLE C, 42 U.S.C. §§ 6921 – 6931a; (3) CITIZEN SUIT PURSUANT TO 42 U.S.C. § 6972(a)(1)(B) FOR ABATEMENT OF AN IMMINENT AND SUBSTANTIAL ENDANGERMENT TO HEALTH OR THE ENVIRONMENT; (4) JUDICIAL ABATEMENT OF A PUBLIC NUISANCE; (5) RELIEF FROM PRIVATE NUISANCE; (6) NEGLIGENCE; (7) NEGLIGENCE *PER SE*; (8) GROSS NEGLIGENCE; AND (9) STRICT LIABILITY**

Plaintiff, the Courtland Company, Inc. ("Courtland"), by and through its undersigned counsel, makes the following allegations upon knowledge as to itself and upon information and belief as to all other matters:

## A. *Nature of this Case*

1.     Through their acts, omissions, violations of federal and state environmental and public health protection laws, and breaches of common law duties owed to Plaintiff and the public at large, Defendants, Union Carbide Corporation ("UCC") and the Dow Chemical Company, Inc. ("Dow") have caused the release of toxic, noxious, harmful and hazardous contaminants into the

environment, and such contaminants have become present and threaten to become further present at, on, and under Plaintiff's property.  Accordingly, Plaintiff brings this action to, *inter alia*:  **(a)** recover its costs of responding to releases hazardous substances (*i.e.,* "response costs") incurred and to be incurred under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA" or "federal Superfund Act"), 42 U.S.C. § 9607(a); **(b)** to obtain appropriate injunctive relief pursuant to section 7002(a)(1)(A) of the Resource Conservation and Recovery Act of 1976 ("RCRA" or "federal Hazardous Waste Management Act"), 42 U.S.C. § 6972(a)(1)(A) to compel compliance with the requirements of RCRA and to redress the consequences of past and on-going violations of RCRA; **(c)** pursuant to section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B), to secure judicial abatement of an imminent and substantial endangerment to health or the environment that may be presented by the solid wastes and hazardous wastes at and emanating from the facility owned and operated by Defendants UCC and Dow as a result of their past and on-going acts and omissions; **(d)** to secure abatement of an on-going public nuisance, binding and compelling Defendants UCC and Dow, jointly and severally, timely and competently to undertake all actions necessary to address the continuing public nuisance conditions and endangerments to the public health, safety, welfare and the environment caused and contributed to by the past and on-going acts and omissions of Defendants UCC and Dow, which nuisance conditions, as a direct and proximate result of Defendants' acts and omissions, have become present and threaten further to become present at, on, and under the real property owned by Plaintiff in South Charleston, WV; **(e)** recover money damages under the laws of private nuisance, negligence, negligence *per se*, gross negligence, and strict liability, for the harms to Plaintiff's property and to Plaintiff's property rights, including loss of reasonable use and enjoyment and loss of value; **(f)** obtain recovery of plaintiff's reasonable

litigation costs, non-exclusively including plaintiff's attorney fees and costs, expert witness fees and costs and court costs incurred in obtaining such relief; **(g)** appropriate prejudgment interest; and **(h)** such other relief as this Court may deem necessary and appropriate.

### B. *Jurisdiction and Venue*

2.      This Court has **exclusive, original jurisdiction** over the subject matter of Count I of this Complaint pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), and original jurisdiction over the subject matter of Counts II and III of this Complaint pursuant to RCRA § 7002(a), 42 U.S.C. § 6972(a) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's remaining causes of action because those claims are so related to Counts I, II, and III that they form the same case and controversy under Article III of the United States Constitution.

3.      Pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), RCRA § 7002(a), 42 U.S.C. § 6972(a) and 28 U.S.C. § 1391(b)(2), venue lies in this Judicial District, since a substantial part of the acts, omissions, and events which are described herein and which give rise to Plaintiff's claims, including the releases of hazardous wastes and hazardous substances referenced herein, occurred in this judicial district, causing harmful impacts and endangerments to human health and the environment within this judicial district.

### C. *The Parties*

4.      Plaintiff Courtland is a West Virginia Business Corporation with its principal place of business in the City of South Charleston (Kanawha County), West Virginia.  Courtland is the owner, in fee simple, of approximately 13.8 acres of land on Davis Creek in the City of South Charleston, Kanawha County, West Virginia, which real property is described as real estate purchased by Courtland by deed from The Charleston National Bank as Trustee under the Will of

Lulu B. Dickenson Owens, Deceased, Kanawha County Recorder's Office, Book 1932 Page 440 ("the Courtland Property"). Courtland purchased the Courtland Property for investment purposes, particularly for potential future sale to a third party.

5.      Defendant UCC is a New York Corporation with its principal place of business in the State of Connecticut. Since 1947, UCC has owned some or all of the "UCC Facility" (described below), having purchased portions of that facility as early as 1947 and making subsequent purchases of parcels which now comprise that facility until approximately 1974. Beginning in or about 1947, UCC commenced operations at the UCC Facility, including operations involving the generation, handling, treatment, storage, and disposal of chemical wastes. In or about 2001, UCC became a wholly-owned subsidiary of the Dow Chemical Company, Inc.

6.      Defendant Dow is a Delaware Corporation having its principal place of business in the State of Michigan. In or about 2001, Dow became the sole owner of UCC and began operating and directing the operations of UCC, including operations at and of the UCC Facility.

### D. *Facts Common to All Counts*

**Part 1 - Statutory Solid Wastes and Statutory Hazardous Wastes Under RCRA**

7.      RCRA is the federal public law that creates the framework for the proper management of both hazardous and non-hazardous solid wastes, so as to assure adequate protection of Public Health and the Environment. To accomplish these broad goals, Congress included within RCRA both regulatory and remedial provisions.

8.      RCRA § 1004(27) broadly defines "solid waste" as follows:

The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved material in domestic sewage, or solid or dissolved materials in irrigation return flows or

industrial discharges which are point sources subject to permits under section 1342 of title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C. 2011 *et seq.*].

42 U.S.C. § 6903(27).

9.      RCRA § 1004(5) sets forth the statutory definition of "hazardous waste," which it expressly defines as a subset of "solid waste":

The term "hazardous waste" means a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may—

**(A)**      cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or

**(B)**      pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5).

**Part 2 - "Listed and Identified" Hazardous Wastes Under Subchapter III of RCRA**

10.     This matter also concerns the presence, within environmental media at the Courtland property of wastes released into the environment at and from the UCC Facility, which wastes meet the *regulatory* definition of "hazardous waste" under RCRA.  In addition to providing broad statutory definitions of both solid waste and hazardous waste for all purposes of RCRA, Congress, in RCRA § 3001(a), directed the Administrator of U.S. EPA:

to develop and promulgate criteria for identifying the characteristics of hazardous waste, and for listing hazardous waste, which should be subject to the provisions of this subtitle [*i.e.,* Subtitle C of RCRA, 42 USCS §§ 6921 – 6939a], taking into account toxicity, persistence, and degradability in nature, potential for accumulation in tissue, and other related factors such as flammability, corrosiveness, and other hazardous characteristics.

42 U.S.C. § 6921(a).  Thus, Congress authorized and required the Administrator of U.S. EPA to select from out of the universe of "hazardous wastes" congressionally-defined in RCRA § 1004(5)

those wastes that the Administrator determined should be subject to the Congressionally-created strict, regulatory program of RCRA Subchapter III (sometimes also known as RCRA Subtitle C--i.e., RCRA §§ 3001-3064, 42 U.S.C. §§ 6901-6964). *See* 42 U.S.C. § 6921.

11.     Those "listed or identified" hazardous wastes to be designated by the US EPA pursuant to formally promulgated federal regulations issued under 42 U.S.C. § 6921, are a subset of the "statutory" hazardous wastes defined in 42 U.S.C. § 6903(5), that are subject to the very strict RCRA Subchapter III regulatory program--a national, comprehensive "cradle to grave" "hazardous waste management"[1] system regulating, *inter alia*, the manner in which such wastes can be treated, stored, and disposed of. *See* 42 U.S.C. §§ 6921-6934. *Chi* v. *EDF*, 511 U.S. 328 (1994) ("RCRA is a comprehensive environmental statute that empowers EPA to regulate hazardous wastes from cradle to grave, in accordance with the rigorous safeguards and waste management procedures of Subtitle C, 42 U.S.C. §§ 6921-6934."). Throughout RCRA, Congress consistently refers to the wastes designated by the Administrator pursuant to his authority under RCRA § 3001(a) that are subject to the stringent regulatory and punitive requirements of RCRA Subtitle C as "hazardous wastes listed or identified by the Administrator."

12.     Moreover, pursuant to RCRA § 3006(b), 42 U.S.C. § 6926(b), a state may develop its own hazardous waste program (*i.e.,* by the enactment of appropriate statutes, creation and funding of necessary governmental infrastructure and promulgation of necessary implementing, enforceable administrative regulations).   Upon approval of such a state hazardous waste management program by U.S. EPA, the state, pursuant to express Congressional authorization,

---

[1]  RCRA § 1004(7) defines the term "hazardous waste management":

> The term "hazardous waste management" means the systematic control of the collection, source separation, storage, transportation, processing, treatment, recovery, and disposal of hazardous wastes.

42 U.S.C § 1004(7).

may operate that program "in lieu of the federal program within such state," subject to certain federal requirements, the most notable of which is that the state program must be equivalent to and consistent with the federal RCRA Subtitle C hazardous waste management program. *See* 42 U.S.C. § 6926(b). West Virginia's hazardous waste management program, which is substantially similar to the federal program, has been formally approved by the Administrator of U.S. EPA and, accordingly, operates "in lieu of" the federal RCRA program within the State of West Virginia. *See* 51 FR 17739B (May 15, 1986); 65 FR 29973 (May 10, 2000); 78 FR 70225 (November 25, 2013). The federal regulations pertaining to the listing and identification of hazardous wastes that are subject to the requirements of RCRA Subtitle C, set forth in 40 C.F.R. Part 261, are incorporated by reference into section §33-20-3 of the West Virginia Code of State Rules, with minor modifications that are not relevant herein.

**Part 3 - The Designation of CERCLA Hazardous Substances**

13.     CERCLA Section 102(a), 42 U.S.C. § 9602(a), directs the Administrator of the U.S. Environmental Protection Agency to designate "as hazardous substances . . . such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment." 42 U.S.C. § 9602(a). The Administrator's designations of the "hazardous substances" that are addressed by CERCLA are set forth in duly promulgated federal regulations codified at 40 C.F.R. § 302.4. In furtherance of its goal in enacting CERCLA to provide powerful remedial authority to address the adverse consequences to Public Health and the Environment from "hazardous substances" released into the environment, Congress, in CERCLA § 107(a), 42 U.S.C. § 9607(a), imposes strict liability upon certain defined categories of "persons" for the

payment of "response costs" incurred or to be incurred by such "persons" arising from the release or threatened release into the environment of such designated hazardous substances.

**Part 4 - The UCC Facility**

14.     Beginning no later than 1947 and continuing to 1974, UCC purchased individual parcels of land, located east of Davis Creek and south-southeast of the Chesapeake and Ohio Railway line in South Charleston, West Virginia, from the Kanawha Land Company, Westvaco Chemical Company, a dairy farm, and other parties, and began to conduct operations on those lands.  These lands, which are sometimes collectively known as the "West Virginia Regional Technology Park," the "South Charleston Technology Park," or simply the "Technology Park," are collectively referred to herein as "the UCC Facility."

15.     Prior to UCC's ownership, the UCC Facility property was undeveloped, with the exception of several brine wells which were located on the former Westvaco Chemical Company parcel and were used to extract brine for the manufacture of chlorine bleach.

16.     The UCC Facility consists of approximately 574 acres. The land use for the area surrounding the UCC Facility is primarily industrial and commercial to the north and residential to the east, south, and west of the UCC Facility.

17.     Located downgradient from the UCC Facility to the northwest are three parcels, owned by Courtland, the West Virginia Department of Transportation ("WVDOT") and CSX Transportation, respectively.  The WVDOT and CSX properties are specifically addressed in the 2012 Revised RCRA Permit and Corrective Action Report for the UCC Facility, however, the Courtland Property, which is also immediately downgradient of the UCC Facility, is not mentioned in that report.

18.     The UCC Facility includes three inactive landfills:  the Lower Ward Landfill, Ward A Landfill, and Ward B Landfill.  The three landfills were constructed primarily to receive fly ash slurry from the UCC Facility.  The landfills also received oxide tails from the UCC South Charleston facility's propylene oxide production unit, and municipal sludge from the South Charleston publicly owned treatment works.  The landfills were created by constructing upper and lower dikes across a hollow, designated as Ward Hollow.  The Lower Ward Landfill is located between the upper and lower dikes, and the Ward A and B Landfills are located south of the upper dike (Figure 1).  Use of the landfills was discontinued in 1973, after which the Lower Ward and Ward B Landfills were covered, and the Ward A Landfill was turned into a scenic pond.

19.     Between 2002 and 2003, UCC and/or Dow modified the central drainage channel at Ward B Landfill by installing perforated high-density polyethylene piping buried under aggregate cover.  The perforated piping is referred to as the central drainage line, and it discharged into Ward A Landfill until 2007, when the discharge was rerouted to Holz Impoundment and the previously uncovered aggregate was covered with soil.  Holz Impoundment is a 76-acre active solid waste impoundment that is used by UCC and the City of South Charleston but is not part of the facility.

20.     The UCC Facility was a RCRA Large Quantity Generator.  It currently reports multiple wastes as generated at the UCC Facility, including Chromium, Lead, 2-Butanoneand Acetone.

21.     During the course of UCC and Dow's ownership and operation of the UCC Facility, Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium have been used, stored, disposed of, discarded, and released to the environment at, on, and from the UCC Facility and into the environment by UCC and Dow.

**Part 5 – Regulatory Investigations and "Corrective Action" at the UCC Facility**

22.     As a facility required by RCRA § 3004, 42 U.S.C. § 6924, to be permitted as "hazardous waste treatment, storage or disposal ("TSD") facility, the owner and operator of the UCC Facility was required to conduct a RCRA Facility Assessment ("RFA") in 1988. That UCC Facility RFA identified sixty-two (62) solid waste management units ("SWMUs"). UCC later identified eight (8) additional SWMUs at the facility that were later investigated. UCC evaluated the 70 SMWUs and placed them into four priority categories:  **A**-High Priority; **B**-Low Priority; **C**-No Further Action and **D**-Not a SWMU.

23.     UCC entered into a Facility Lead agreement ("Agreement") with the United States Environmental Protection Agency ("U.S. EPA") on December 15, 1999 for conducting corrective action at the UCC Facility required by RCRA § 3004(u) and its permit as a Hazardous Waste TSD Facility. Since entering into the Agreement, UCC has conducted multiple investigations including human and ecological risk assessments, to evaluate releases from the facility.

24.     On December 17, 2010, U.S. EPA issued its "Final Decision and Response to Comments" ("Final Decision") with respect to the RCRA Corrective Action at The UCC Facility. On February 2, 2012, the West Virginia Department of Environmental Protection ("WVDEP") incorporated the Final Decision into a revised Resource Conservation and Recovery Act (RCRA) permit for the UCC Facility. Long-term groundwater monitoring in accordance with the agency-approved groundwater monitoring plan ("GWMP") is a component of the Final Decision for Corrective Action at the UCC Facility.

25.     In 2001, an RCRA Facility Investigation ("RFI") was conducted at the UCC Facility to fully investigate the extent of contamination in soil, groundwater, surface water, sediment and waste material at six Category A SWMUs. This investigation did not include

potential contaminant migration toward the Courtland Property but did identify other areas of off-site contamination from UCC activities, specifically Ward Hollow.

26.     In 2005, an RFI was conducted at the UCC Facility to fully investigate the extent of contamination in soil, groundwater, surface water, sediment and waste material at eleven Category B, C, or D SWMUs.  This investigation did not include potential contaminant migration toward the Courtland Property but did identify other areas of off-site contamination from UCC activities, specifically Ward Hollow.

27.     Based on geologic and hydrogeologic investigations of the area, groundwater contamination in Ward Hollow was determined to be related to the three landfills and the former brine wells at the UCC Facility. Contaminated groundwater is migrating from the landfills and former brine wells to the underlying weathered bedrock and then downgradient to the WVDOT property and to the CSX Transportation property.  Arsenic and barium are among the most prominent constituents within the Ward Hollow groundwater plume that are above their respective EPA Maximum Contaminant Levels ("MCLs"), codified at 40 C.F.R. Part 141 and promulgated pursuant to the federal Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300f *et seq.,* or U.S. EPA tap water Regional Screening Levels ("RSLs").  Consequently, UCC was required to perform a Human Health Risk Assessment ("HHRA") to evaluate human health risks related to exposure to contaminated groundwater downgradient of the UCC Facility.  Results of the HHRA indicated that if the contaminated groundwater was used for drinking water it would result in unacceptable human health risks.

28.     Groundwater data from two monitoring wells located in the UCC Facility's Greenhouse Area show concentrations of volatile organic compounds (VOCs) above MCLs or

adjusted EPA tap water RSLs. The full nature and extent of this contaminated plume has yet to be determined. This contaminated area is directly upgradient of the Courtland Property.

29.     The "corrective action" prescribed for the UCC Facility itself, which does not include the Courtland Property, is limited to groundwater monitoring and use restrictions, through restrictive covenants that apply only the UCC Facility. No steps have been taken to address the off-site migration of contaminants or to otherwise mitigate the risks and impacts which the presence of such contaminants in soils and groundwater pose to human health and the environment. Indeed, nothing has been done to fully delineate the vertical and lateral extent of the contamination which is at and emanating from the UCC Facility, to determine potential exposure pathways, or to fully assess all risk which such contaminants pose to human health and the environment.

30.     In 2010, as part of a planned divestiture, UCC and Dow conveyed portions of the UCC Facility to the West Virginia Higher Education Planning Commission, an agency of the State of West Virginia, reserving certain parcels, easements, and rights of way. In 2012, certain other portions of the UCC Facility were conveyed to OODA, LLC, a West Virginia limited liability company, subject also to UCC's reservation of certain parcels, easements, and rights of way.

**Part 6 - The Courtland Property**

31.     Because of Courtland's concern that contamination from the UCC Facility had migrated or may have migrated onto the Courtland Property, as it had migrated onto neighboring properties, a limited environmental investigation was conducted, at Courtland's expense, in August of 2017. As described below, this limited environmental investigation revealed the presence of certain contaminants of concern, at elevated levels, in environmental media, at and under the Courtland Property. These contaminants of concern include 2-Butanone (a.k.a. methyl ethyl ketone), Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium,

each identified below as a "solid waste," within the meaning of 40 C.F.R. § 261.2, with respect to its presence in environmental media at and emanating from the UCC Facility.

32.     In this investigation, three direct-push borings were completed into the subsurface at the Courtland Property for the purpose of collecting groundwater samples via temporary piezometers.  The location of the three borings was in the most upgradient, southeast portion of the Courtland property, directly downgradient of the UCC Facility as shown in various UCC groundwater monitoring reports.  The 3 piezometers were screened at three different depths, with the deepest completed to about 50 feet below ground surface to the underlying sandstone bedrock.

33.     Sampling of the three piezometers revealed contamination of the groundwater by both organic chemicals and toxic metals.  The organic contaminants detected included Acetone, 2-Butanone (a.k.a. methyl ethyl ketone) and Di-n-butyl phthalate.  These three contaminants are not present in natural groundwaters.  All three of these contaminants are also present in UCC Facility groundwater.  Acetone and Di-n-butyl phthalate have also been detected in UCC off-site monitoring wells.  Acetone and 2-butanone are also present in UCC landfill leachate.

## Part 7 - The Presence of Solid Wastes, Hazardous Wastes, and Hazardous Substances In Environmental Media at the UCC Facility and the Migration of Such Materials from the UCC Facility to the Courtland Property

34.     With respect to their presence at the UCC facility and their migration, through environmental media, at and from the UCC Facility to become present or to threaten to become present at the Courtland Property, the substances Acetone, 2-Butanone (a.k.a. methyl ethyl ketone), Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium, which have been released to the environment at and from the UCC Facility and which have become present or which threaten to become present on the Courtland Property, are each a "solid waste" within the meaning of 42 U.S.C. § 6903(27), in that each is a discarded material—discarded by

UCC and Dow—resulting from industrial or commercial operations of UCC and Dow.  The following is known concerning Acetone, 2-Butanone (a.k.a. methyl ethyl ketone), Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium:

(a) 2-Butanone is used as a solvent.  Acute (short-term) inhalation exposure to 2-Butanone in humans results in irritation to the eyes, nose, and throat.  Limited information is available on the chronic (long-term) effects of 2-Butanone in humans.  Chronic inhalation studies in animals have reported slight neurological, liver, kidney, and respiratory effects. Developmental effects, including decreased fetal weight and fetal malformations, have been reported in mice and rats exposed to 2-Butanone via inhalation and ingestion. Material Safety Data Sheets for 2-Butanone state that it is dangerous to aquatic life in high concentrations and may be dangerous if it enters water intakes.

(b) Acetone is used as a solvent and as a synthetic intermediate.  The substance may have adverse effects on the central nervous system, liver, kidneys and gastrointestinal tract.  The substance may also have adverse effects on the blood and bone marrow.  There are limited data that indicates acetone may adversely affect the male reproductive system.  MSDSs direct users to avoid releases to the environment.

(c) Di-n-butyl phthalate ("DBP") is a federal Clean Water Act ("CWA") Priority Pollutant.  It is a chemical that is added to plastics.  The U.S. Consumer Product Safety Commission ("CPSC") considers DBP to be systemically toxic.  Studies reviewed by CPSC provided evidence that DBP can be considered toxic to reproductive systems under the Federal Hazardous Substances Act.  The studies showed that DBP reduced fertility, mating and pregnancy rates, as well as reduced sperm concentrations in male rats.  DBP may induce adverse health effects by altering hormones.  DBP is very toxic to aquatic organisms.

(d) Arsenic is a federal Clean Water Act ("CWA") Priority Pollutant and Toxic Pollutant, and a RCRA toxicity characteristic contaminant (D004) under 40 C.F.R. § 261.24.  Arsenic concentrations in groundwater at the UCC Facility exceed the Safe Drinking Water Act ("SDWA") Maximum Contaminant Level ("MCL").   Inorganic arsenic has been recognized as a human poison since ancient times and is a carcinogen.  Arsenic exerts its toxicity by inactivating up to 200 enzymes, especially those involved in cellular energy pathways and DNA synthesis and repair.  Acute arsenic poisoning is associated initially with nausea, vomiting, abdominal pain, and severe diarrhea.   Encephalopathy and peripheral neuropathy are reported as effects of arsenic poisoning.  Arsenic is a well-documented human carcinogen affecting numerous organs.  Arsenic compounds cause short-term and long-term adverse effects in individual plants and animals and in populations and communities of organisms.

(e) Chromium is a federal Clean Water Act ("CWA") Priority Pollutant and Toxic Pollutant, and a RCRA toxicity characteristic contaminant (D007) under 40 C.F.R. § 261.24. Chromium concentrations in groundwater at the UCC Facility exceed the SDWA Maximum Contaminant Limit ("MCL"). Chromium presents a substantial threat to aquatic life.  It destabilizes the ecosystem due to toxic impacts on biota and bioaccumulation in certain organisms.  It also produces cytotoxicity and has a detrimental impact on the behavior of fish, such as hypertrophy and paraplegia at gill epithelium, uneven swimming and suspended feeding.  Various research studies indicate adverse effects of chromium in fish at hematological level similar to anemia, thrombocytopenia, decrease in hemoglobin and total erythrocytes count.  At bio-chemical level, a decline in glycogen, lipids and proteins was observed.

(f) Barium is a RCRA toxicity characteristic contaminant (D005) under 40 C.F.R. § 261.24. Barium concentrations in groundwater at the UCC Facility exceed the SDWA MCL. In humans, toxicity resulting from exposure to barium and barium compounds is associated with hypertension and renal function. Barium compounds can cause changes in heart rhythm or paralysis in humans. The aquatic Reference Toxicity Value for Barium is 4 ug/L. Fish and other fresh water life can accumulate Barium.

(g) Cadmium is a CWA Priority Pollutant and Toxic Pollutant, and a RCRA toxicity characteristic contaminant (D006) under 40 C.F.R. § 261.24. Cadmium concentrations in groundwater at the UCC Facility exceed the SDWA MCL. Cadmium is a non-essential metal with no biological function in aquatic animals. In addition to acute effects such as mortality, chronic exposure to cadmium can lead to adverse effects on growth, reproduction, immune and endocrine systems, development, and behavior in aquatic organisms. Kidney damage has long since been described to be the main problem for humans chronically exposed to cadmium, and cadmium exposure is associated with bone damage. There is some proof that cadmium exposure can cause cancer.

(h) Lead is a CWA Priority Pollutant and Toxic Pollutant, and a RCRA toxicity characteristic contaminant (D008) under 40 C.F.R. § 261.24. Lead concentrations in groundwater at the UCC Facility exceed the SDWA Action Level. Lead adversely affects algae, invertebrates, and fish. There are also limited adverse effects in amphibians, including loss of sodium, reduced learning capability, and developmental problems. Fish exposed to high levels of lead exhibit a wide-range of adverse effects including muscular and neurological degeneration and destruction, growth inhibition, mortality, reproductive problems, and paralysis.

(i) Selenium is a CWA Priority Pollutant and Toxic Pollutant, and a RCRA toxicity characteristic contaminant (D010) under 40 C.F.R. § 261.24. Selenium concentrations in groundwater at the UCC Facility exceed the SDWA MCL. Selenium undergoes bioconcentration, bioaccumulation, and biomagnification as trophic levels increase. It can enter the food web through both sediments and surface water. Elevated levels cause growth reduction in green algae. In other aquatic organisms, the following adverse effects have been observed: loss of equilibrium and other neurological disorders, liver damage, reproductive failure, reduced growth, reduced movement rate, chromosomal aberrations, reduced hemoglobin and increased white blood cell count, and necrosis of the ovaries.

35.     With respect to their presence at the UCC facility and their migration, through environmental media, at and from the UCC Facility to become present or to threaten to become present at the Courtland Property, the substances Acetone, 2-Butanone (a.k.a. methyl ethyl ketone), Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium, which have been released to the environment at and from the UCC Facility and which have become present or which threaten to become present on the Courtland Property are each a "hazardous waste," as defined by Congress in RCRA § 1004(5), 42 U.S.C. § 6903(5), since each is a "solid waste," within the meaning of 42 U.S.C. § 6903(27), which has been shown to cause or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness, and each poses a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

36.     With respect to their presence at the UCC facility and their migration, through environmental media, at and from the UCC Facility to become present or to threaten to become

present at the Courtland Property, the substances Acetone, 2-Butanone (a.k.a. methyl ethyl ketone), Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium are each a "solid waste," within the meaning of 40 C.F.R. § 261.2, in that each is a "discarded material"—discarded by UCC and Dow—within the meaning of 40 C.F.R. § 261.1(a) that is not subject to any of the exclusions set forth in that same paragraph 261.1(a). Accordingly, each such substance is a "solid waste," within the meaning of 40 C.F.R. § 261.2.

37. With respect to their presence at the UCC facility and their migration, through environmental media, at and from the UCC Facility to become present or to threaten to become present at the Courtland Property, the substances Acetone, 2-Butanone (a.k.a. methyl ethyl ketone), and Di-n-butyl phthalate ("DBP") are each a "hazardous wastes listed or identified by the Administrator" under Subchapter III of RCRA and, thus, a "hazardous waste" for RCRA Subtitle C purposes as defined by 40 C.F.R. § 261.3(a) and under Title 33, Series 20, of the West Virginia Code of State Rules.

(a) Acetone is a "hazardous waste" under 40 C.F.R. § 261.3, because it is: **(a)** with respect to its presence in environmental media at and emanating from the UCC Facility, a discarded material and "solid waste" under within the meaning of 40 C.F.R. § 261.2, **(b)** not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), and **(c)** listed as a hazardous waste under Subpart D of 40 C.F.R. Part 261 (in particular, (i) under 40 C.F.R. § 261.33, with waste code U002 when it has been, as it has been at the UCC Property, discarded into the environment, and (ii) under 40 C.F.R. § 261.31, with waste code F003, as the acetone has been used and, as a result of contamination, can no longer serve the purpose for which it was produced, without processing).

(b) 2-Butanone is a "hazardous waste" under 40 C.F.R. § 261.3, because it is: (a) with respect
to its presence in environmental media at and emanating from the UCC Facility, a discarded
material and "solid waste" under within the meaning of 40 C.F.R. § 261.2, (b) not excluded
from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), and (c) listed as a
hazardous waste under Subpart D of 40 C.F.R. Part 261 (in particular under 40 C.F.R.
§ 261.33, with waste code U159) when it has been, as it has been at the UCC Property,
discarded into the environment.

(c) DBP is a "hazardous waste" under 40 C.F.R. § 261.3, because it is: **(a)** with respect to its
presence in environmental media at and emanating from the UCC Facility, a discarded
material and "solid waste" under within the meaning of 40 C.F.R. § 261.2, (b) not excluded
from regulation as a hazardous waste under 40 C.F.R. § 261.4(b), and (c) listed as a
hazardous waste under Subpart D of 40 C.F.R. Part 261 (in particular under 40 C.F.R.
§ 261.33(a) or (b), with waste code U069) when it has been, as it has been at the UCC
Property, discarded into the environment.

38.    As noted above, the Administrator of the U.S. Environmental Protection Agency
has listed his designations of CERCLA hazardous substances at 40 C.F.R. § 302.4. The substances
Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and
Selenium, which have been released to the environment at and from the UCC Facility and which
have become present or threaten to become present at the Courtland Property, are each listed
therein. Accordingly, such substances are, for the purposes of CERCLA and its statutory scheme
of liability, "hazardous substances."

39.    In interpreting the provisions of CERCLA § 102(a) and 40 C.F.R. § 302.4, Federal
Courts have consistently held that where a waste material contains a designated hazardous

substance, like those referenced in the immediately preceding paragraph, then the entirety of that waste material is itself a hazardous substance for the purposes of CERCLA. *See, e.g., State of Arizona and the City of Phoenix v. Motorola, Inc.,* 774 F. Supp. 566 (D. Ariz, 1991) *United States v. Carolawn,* 21 Env't Rep. Cases 2124, 2126 (D.S.C. 1984). Accordingly, if and to the extent that any of the hazardous substances referenced in the immediately preceding paragraph were, prior to release, mixed with another substance, such mixture was undeniably itself a "Hazardous Substance" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

40.     Since no operation historically conducted at the Courtland property could have contributed the presence of these contaminants to the environment, the sole plausible source of these contaminants on the Courtland Property and within environmental media underlying that property is the migration of such contaminants from the UCC Facility. No other source of the contaminants found at and under the Courtland Property reasonably exists.

41.     In its 2010 Corrective Measure Proposal, UCC identified completed pathways and contaminants of concern for both human health and ecological risk. This risk assessment included off site impacts, but did not acknowledge, address or quantify human health or ecological risk at the Courtland property, known to be directly downgradient of areas of soil and groundwater contamination at the UCC facility. In the Proposal, UCC identified the contaminants of potential concern from their activities for ecological risk. These contaminants include (among others) the same toxic metals identified as elevated on the Courtland property - Arsenic, Barium, Cadmium, Chromium, Lead and Selenium. Additionally, while UCC did not evaluate the drinking water pathway due to groundwater restrictions on their property, it did conclude that there is a completed pathway for construction workers exposed to groundwater, and to indoor workers exposed to contaminated vapor intrusion into buildings on the UCC facility.

42.    The past and ongoing disposal, discarding, and release of Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium at and from the UCC Facility and into the environment has caused the contamination of environmental media at and on both the UCC Facility and on nearby properties, including (without limitation) the Courtland Property, resulting in a single, indivisible harm to human health and the environment, for which no reasonable basis of apportionment between the individual acts of disposal, individual wastes disposed of, or the parties responsible for the acts of disposal exists.

43.    Groundwater from the UCC facility is hydrologically connected to the Davis Creek watershed, a tributary of the Kanawha River.  The endangerments that may be presented from these environmental contaminants resulting from UCC activities include loss and degradation of biodiversity in the receiving streams, and contamination of sediments, soil, groundwater and surface water by contaminants released or discharged by these activities which generated, used, handled, transported, stored, discharged or released the waste, solid waste, toxic substances, hazardous substances, or hazardous materials which have already harmed and will continue to harm the environment, create and continue to create a threat to human health and the environment, and unabated will continue to migrate within the environment and onto the Courtland Property. As noted above, many of these contaminants in the groundwater - which is connected to surface water - are easily absorbed by fish and other aquatic organisms.  Small concentrations can be toxic because some contaminants bioconcentrate.  Toxicity also produces adverse biological effects on an organism's survival, activity, growth, metabolism, or reproduction.  Toxic Contaminants can be lethal or harm the organism without killing it directly.  Adverse effects on an organism's activity, growth, metabolism, and reproduction are examples of these sublethal effects.  Some of the contaminates of concern may also bio-accumulated within the plants and animals which are in

direct or indirect contact with the food chain and adversely impact the health of these organisms and organisms which feed upon those organisms.

44.     Since no institutional restrictions exist on groundwater use at the Courtland Property, it is both necessary and appropriate to consider the completed groundwater pathway to a human receptor, including the drinking and showering pathway.  Additionally, completed pathways exist for utility workers and on-site workers, including human receptors exposed to volatile organic contaminants – such as those found on the Courtland property - migrating through the subsurface.  As noted above, these currently identified contaminants of concern pose a significant threat to human health.

45.     While contaminants from UCC have been identified on the Courtland property, the full nature and extent of this contamination and the endangerments to health and the environment that may be presented by it has **not** been determined, nor has a complete Human Health and Ecological Risk Assessment for impacts to the Courtland property been performed.

46.     The contaminants which have been released at and from the UCC Facility and which have migrated or which threaten to migrate onto and under the Courtland Property have contaminated and threaten to contaminate the groundwater at and under the Courtland Property and impair Courtland's right of reasonable use of such groundwater through beneficial extraction for all purposes, including (without limitation) irrigation, human and animal consumption, recreation, and aesthetics.  Such groundwater impairment is but one manner in which Defendants' impairment of environmental media has adversely impacted the market value of the Courtland Property and Plaintiff's investment in that property.

## COUNT I
## RECOVERY OF RESPONSE COSTS AND
## DECLARATORY RELIEF UNDER CERCLA
### (42 U.S.C. §§ 9607(a) and 9613(g))

47.     Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

48.     The UCC Facility is an installation, site, or area at which one or more CERCLA hazardous substances, including Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium, have been deposited, stored, disposed of, placed, or otherwise came to be located.  Accordingly, the UCC Facility is a "facility," within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9).

49.     UCC still owns portions of the UCC Facility, including portions at which CERCLA hazardous substances have been disposed, are currently located, and from which such hazardous substances have migrated.

50.     During the time of UCC's ownership of the UCC Facility, CERCLA hazardous substances, including Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium, were disposed of at the UCC Facility.

51.     UCC and Dow have, by contract, agreement, or otherwise, arranged for the disposal or treatment of CERCLA hazardous substances owned or possessed by UCC and/or Dow at the UCC Facility.

52.     CERCLA hazardous substances which were disposed of at the UCC Facility have migrated into and through environmental media and have become located at and within the Courtland Property or threaten to become located at and within the Courtland Property.

53.     As a consequence of the foregoing disposal of hazardous substances and the release of such substances into the environment, Courtland incurred necessary costs of response during

2017, in a manner consistent with the National Oil and Hazardous Substance Contingency Plan ("National Contingency Plan" or "NCP"), 40 C.F.R. Part 300.  Such costs of response included costs associated with the limited environmental investigation described above.

54.    Pursuant to 42 U.S.C. § 9607(a), Defendant UCC, as past and present owner of the UCC Facility, and Defendants UCC and Dow, each a past and present operator of the UCC Facility, have each caused or contributed to a single, indivisible harm to health, the environment and to Courtland's reasonable, comfortable use and enjoyment of the Courtland Property for which no reasonable basis for apportioning such harm among those defendants exist.  Accordingly, Defendants UCC and Dow are each jointly and severally liable to Courtland for all costs of response to the released hazardous substances and resulting endangerments incurred and to be incurred by Courtland consistent with the National Contingency Plan.

55.    Pursuant to 42 U.S.C. § 9613(g), Plaintiff is entitled to a declaratory judgment that UCC and Dow are liable for response costs to be incurred consistent with the National Contingency Plan, which judgment will be binding on any subsequent action or actions to recover further response costs.

## COUNT II
## CITIZEN SUIT RELIEF FOR VIOLATION OF RCRA SUBCHAPTER III AND THE WEST VIRGINIA HAZARDOUS WASTE MANAGEMENT ACT
### (RCRA § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A))

56.    Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

57.    As alleged above, Acetone, 2-Butanone (a.k.a. methyl ethyl ketone), and Di-n-butyl phthalate are each a "hazardous waste identified or listed by the Administrator" under Subchapter III of RCRA and a "hazardous waste" under 40 C.F.R. Part 261 and Title 33, Series 20, of the West Virginia Code of State Rules.

58.     Both RCRA and the West Virginia Hazardous Waste Management Act prohibit the treatment, storage, and disposal of any hazardous waste listed or identified under RCRA Subtitle C at any facility which does not have a permit for such treatment, storage, or disposal. 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a).

59.     Both RCRA and the West Virginia Hazardous Waste Management Act also prohibit the operation or closure of any facility or site for the treatment, storage, or disposal of a hazardous waste listed or identified under RCRA Subtitle C without obtaining a permit for such activity.

60.     RCRA § 1004(3), 42 U.S.C. § 6903(3), defines the term "disposal" as follows:

> Disposal means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any <u>solid waste</u> or <u>hazardous waste</u> into or on any <u>land</u> or water so that such <u>solid waste</u> or <u>hazardous waste</u> or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

40 C.F.R. § 260.10.

61.     Accordingly, UCC and Dow's discharge, deposit, dumping, spilling, or leaking of such hazardous wastes to environmental media at and under the UCC Facility and onto the Courtland Property was, in fact and at law, the "disposal" of such hazardous wastes.  In view of the fact that the UCC Facility did not then have, and never has had, a permit for such activities, such disposal was and is a violation of RCRA Subchapter III, including 42 U.S.C. §§ 6924 and 6928 and W.V. Code § 22-18-8(a).  Such violations began in or about 1980 and continue to the date of filing of this complaint.

62.     Moreover, UCC and Dow's operation or closure of a facility for the treatment, storage or disposal of such hazardous wastes without obtaining a permit for such activity was also a violation of Subchapter III, including 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a).  Such violations began in or about 1980 and continue to the date of filing this complaint.

63.     As a consequence of UCC and Dow's violation of the foregoing statutory provisions, hazardous and toxic wastes have become present or threaten to become present at the Courtland Property, creating a substantial and unacceptable risk to human health and the environment.

64.     As a consequence of their violations of the foregoing statutory provisions, UCC and Dow are jointly and severally liable for the harms and risks resulting from the presence or threatened presence of such hazardous and toxic wastes at the Courtland Property and the resultant risks to human health and the environment.  Such liability extends to the appropriate and complete investigation and abatement of such harms and risks, all in a manner protective of human health and the environment and consistent with the NCP, which provides carefully considered and detailed requirements, methods, and procedures for responding to and abating releases of hazardous substances and hazardous wastes (including hazardous wastes "listed and identified by the Administrator" pursuant to RCRA § 3001(a)) that have been released into the environment. Such an NCP-compliant response to the harms caused by hazardous wastes which have become present or threaten to become present on the Courtland Property should begin with the timely and competent performance by Defendants UCC and Dow of full Remedial Investigation of all harms which have resulted or may have resulted from such contamination, pursuant to 40 C.F.R. § 300.430, under the supervision of a Special Master appointed by this Court to oversee implementation of the required injunctive relief, and with Plaintiff authorized to perform oversight and monitoring of the Defendants remedial activities as they relate to endangerments at and to the Courtland Property.

65.     Consistent with 42 U.S.C. § 6972(b)(1) and in the manner specified in 40 C.F.R. § 254.2, prior to filing this action, Plaintiff provided notice, by registered mail (return

receipt requested) of the violations set forth herein to both of the Defendants the Administrator of the U.S. Environmental Protection Agency, and the Cabinet Secretary for the West Virginia Department of Environmental Protection.  Copies of that Notice were also provided to the Attorney General of the United States, the Attorney General of the State of West Virginia, the Regional Administrator of the U.S. Environmental Protection Agency (Region III), and the Director for Waste Management of the West Virginia Department of Environmental Protection.

66.    Also consistent with 42 U.S.C. § 6972(b)(1), because this action is one respecting a violation of RCRA subchapter III, this action was commenced prior to the expiration of 60 days after Plaintiff provided the notice described in the immediately preceding paragraph.

## COUNT III
## CITIZEN SUIT RELIEF FOR JUDICIAL ABATEMENT OF AN IMMINENT AND SUBSTANTIAL ENDANGERMENT (RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B))

67.    Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

68.    The presence and threatened presence at and on the Courtland Property of Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium, each of which is both a "solid waste," within the meaning of 42 U.S.C. § 6903(27), and a "hazardous waste," within the meaning of 42 U.S.C. § 6903(5), pose an imminent and substantial endangerment to health and the environment.

69.    UCC and Dow are both "persons," as that term is defined in RCRA § 1004(15), 42 U.S.C. 6903, who have each contributed or who are contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

70.     Accordingly, UCC and Dow are jointly and severally liable for the harms and risks resulting from the presence or threatened presence of such hazardous and toxic wastes at the Courtland Property and the resultant risks and endangerment to human health and the environment. Such liability extends to the appropriate and complete investigation and abatement of such harms and risks, all in a manner protective of human health and the environment and consistent with the NCP, which, as the Congressionally-required national plan for responding to releases of hazardous substances into the environment, provides scientifically validated, carefully considered and detailed requirements, methods, and procedures for responding to and abating releases of hazardous substances and hazardous wastes (including hazardous wastes "listed and identified by the Administrator" pursuant to RCRA § 3001) that have been released into the environment. Such an NCP-compliant response to the harms caused by solid wastes and hazardous wastes which have become present or threaten to become present on the Courtland Property should begin with a full Remedial Investigation of all harms which have resulted or may have resulted from such contamination, pursuant to 40 C.F.R. § 300.430.

71.     Accordingly, UCC and Dow are both jointly and severally liable for the full and appropriate investigation and abatement of all environmental harms and endangerments resulting from the presence and/or threatened presence of Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium, in full compliance with the NCP.

72.     Consistent with 42 U.S.C. § 6972(b)(2), prior to filing this action, Plaintiff provided notice, by registered mail (return receipt requested) of the endangerments described herein to both of the Defendants and to the Administrator of the U.S. Environmental Protection Agency, the State of West Virginia (Director of the Department of Environmental Protection). Notice was also provided to the Attorney General of the United States, the Attorney General of the State of West

Virginia, the Regional Administrator of the U.S. Environmental Protection Agency (Region III), and Deputy Cabinet Secretary for Waste Management of the West Virginia Department of Environmental Protection.

73.     Also consistent with 42 U.S.C. § 6972(b)(2), because this action is one respecting a violation of RCRA subchapter III, this action was commenced prior to the expiration of 60 days after Plaintiff provided the notice described in the immediately preceding paragraph.

**COUNT IV**
**JUDICIAL ABATEMENT OF A PUBLIC NUISANCE**

74.     Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

75.     Under West Virginia law, a public nuisance is "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons." *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 595-96, 34 S.E.2d 348, 354 (1945). The Restatement (Second) of Torts § 821B defines a public nuisance as "an unreasonable interference with a right common to the general public."

76.     Where a condition "is shown by facts and circumstances to constitute a nuisance affecting public health 'no measure of necessity, usefulness or public benefit will protect it from the unflinching condemnation of the law.'" *Board of Com'rs of Ohio County v. Elm Grove Mining Co.*, 122 W.Va. 442, 9 S.E.2d 813, 817 (W.Va. 1940) (quoting 1 Wood on Nuisances, 3d Ed., § 19); *Respublica v. Caldwell*, 1 U.S. 150 (1785).

77.     The aforementioned acts and omissions of UCC and Dow caused or contributed to conditions now present in environmental media at and under the Courtland Property—*i.e.*, the presence and threatened presence of Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium in soils and groundwater at levels far exceeding any

"background" levels—which conditions are harmful to human health and offensive to the senses, such that an ordinary person would reasonably be annoyed or disturbed, and which constituted an unreasonable interference with the free use and enjoyment of such environmental media. Such conditions commenced at some point after UCC began its operations at the UCC Facility and continue to this day.

78.     The seriousness of the harm caused by such noxious and offensive conditions outweigh any social utility of the Defendants' conduct.

79.     Neither Courtland nor any of its predecessors in title to the Courtland Property has, in any way or in any manner, consented to the acts and omissions of Defendants which caused such conditions.

80.     Although the harm caused by the contamination of groundwater threatens all local groundwater downgradient from the UCC Facility, the Davis Creek, its tributaries, and ultimately the Kanawha River, the harm suffered by Courtland is different from the type of harm suffered by the general public in that the contaminants released and disposed of by Defendants are currently present in the groundwater underlying Courtland's property and are currently restricting Plaintiff Courtland's right to use that groundwater, as certain contaminants, including Arsenic and Chromium, have been found in the groundwater underlying the Courtland Property at levels exceeding SDWA MCLs, rendering such groundwater currently unusable for human consumption.

81.     The aforementioned conduct, acts, and omissions of UCC and Dow has been and continue to be a substantial factor in causing the above-described public nuisance conditions and the particular harm to Courtland, also described above.

## COUNT V
## PRIVATE NUISANCE

82.     Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

83.     Courtland has a right fully and reasonably to use and fully and reasonably to enjoy its own property without interference by Defendants with such rights of use and enjoyment.

84.     Through the aforementioned acts, UCC and Dow caused or contributed to the harmful and noxious conditions described above, which conditions constituted an unreasonable interference with Courtland's rights to operate, use, and enjoy its property.

85.     The harmful and noxious conditions caused by Defendants have continued for an unreasonable period of time, causing loss of property use and loss of property value to Courtland.

86.     As a proximate result of Defendants' acts and omissions and of the conditions which the Defendants caused or contributed to, Courtland suffered property damage, including diminution in the market value of the property, and the lost use and enjoyment of Courtland's now contaminated property.

## COUNT VI
## NEGLIGENCE

87.     Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

88.     Defendants UCC and Dow owe a duty of reasonable care to Courtland, including a duty to handle, treat, store, and dispose of various substances, including Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium in a manner which would not cause or result in the release of such substances to environmental media, which would

not result in the offsite migration of such contaminants, and which would not result in the contamination of environmental media at and underlying the Courtland Property.

89.     UCC and Dow breached their duties of reasonable care by and through a variety of acts and omissions including, but not limited to their failure to handle, treat, store, and dispose of various substances, including Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium in a manner which would not result in the release of such substances to environmental media, which would not result in the offsite migration of such contaminants, and which would not result in the contamination of environmental media at and underlying the Courtland Property.

90.     UCC and Dow's breaches of such duties proximately caused the damages complained of herein.

91.     UCC and Dow were negligent in at least the following respects:

(a) Failing to address the foreseeable risk that such contaminants could be spilled or released into the environment;

(b) Failing appropriately to prevent, address or mitigate the presence of contaminants in environmental media on and within the UCC Facility, before such contaminants could leach onto adjoining properties;

(c) Failing to prevent the migration of such contaminants from the UCC Facility and onto adjoining properties;

(d) Failing to ascertain the nature and extent of potential threats to human health and the environment following the release of such contaminants at and from the UCC Facility;

(e) Failing adequately to monitor and detect the offsite migration of such contaminants;

(f) Failing timely to advise adjacent landowners of such migration; and

(g) Failing timely to take appropriate steps after learning of such offsite migration.

92. The Defendants' negligence was the proximate cause of the above-described environmental harms, the loss of use and enjoyment of Courtland's real property, and the loss of value in such property.

93. Because the negligent act and omissions of Defendants UCC and Dow have each caused and contributed to a single, indivisible harm to the use and value of Plaintiff's property, for which no reasonable basis for apportioning that harm between the Defendants exists, they are each liable, jointly and severally, for such harms and for money damages, in an amount to be proven at trial.

## COUNT VII
## NEGLIGENCE *PER SE*

94. Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

95. Both 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a) prohibit the treatment, storage, and disposal of any hazardous waste listed or identified under RCRA Subtitle C at any facility which does not have a permit for such treatment, storage, or disposal. Such statutes also prohibit the operation or closure of any facility or site for the treatment, storage, or disposal of a hazardous waste listed or identified under RCRA Subtitle C without obtaining a permit for such activity.

96. As noted above, Acetone, 2-Butanone, and Di-n-butyl phthalate are hazardous waste listed or identified by the Administrator under RCRA Subtitle C. The UCC Facility is not and was not, at any time such substances were disposed of or released to the environment, a facility which had a permit for the treatment, storage, or disposal of such substances. Moreover, the UCC Facility is not and was not, at any time it was operated or closed as a treatment, storage or disposal facility of listed or identified hazardous wastes (including Acetone, 2-Butanone, and Di-n-butyl

phthalate), a facility which had a permit for such operation or closure. Accordingly, UCC and Dow have violated both 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a).

97. The conduct, acts and omissions of UCC and Dow constitute tortious violations of both 42 U.S.C. § 6928 and W.V. Code § 22-18-8(a), laws which were and are intended to protect Plaintiff from the harm complained of herein.

98. As a direct and proximate result of such conduct, acts, and omissions, Plaintiff suffered the harms described above, including damage to its real property, the impairment of such property and its market value, the loss of use and enjoyment of such property.

99. Accordingly, UCC and Dow have committed negligence *per se* and are liable to Plaintiff, jointly and severally, for monetary damages in an amount to be proven at trial.

### COUNT VIII
### GROSS NEGLIGENCE

100. Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

101. The conduct of Defendants as set forth herein was reckless and wanton, constituting the tort of gross negligence, which resulted in damages to plaintiffs.

102. Defendants are liable for their gross negligence because of the reckless manner in which they ignored threats to human health and the environment, in spite of known risks, in the conduct of their operations, including: their failure to address the foreseeable risk that such contaminants could be spilled or released into the environment; their failure appropriately to address or mitigate the presence of contaminants in environmental media on and within the UCC Facility, before such contaminants could leach onto adjoining properties; their failure to prevent the migration of such contaminants from the UCC Facility and onto adjoining properties; their failure to ascertain the nature and extent of potential threats to human health and the environment

following the release of such contaminants at and from the UCC Facility; their failure to monitor and detect the offsite migration of such contaminants; their failure to take appropriate steps after learning of such offsite migration; and their failure to advise adjacent landowners of such migration. Accordingly, Defendants acted with conscious, reckless and outrageous indifference to the health, safety and welfare of others.

103.    Such gross negligence was the proximate cause of the harms described above, including the invasion of toxic and harmful contaminants onto Courtland's property, causing substantial harm to such property, the loss of use and enjoyment of that property, and the loss of value of such property.

104.    As a consequence of the aforementioned harms, which have proximately resulted from such conduct, Defendants are jointly and severally liable for monetary damages, including punitive damages, in an amount to be proven at trial.

## COUNT IX
## STRICT LIABILITY

105.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

106.    From the dates on which UCC and Dow commenced operations at the UCC Facility to date, UCC and Dow have been engaged in the storage, control, use, transport, and/or disposal of bulk chemicals, including Acetone, 2-Butanone, Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead Selenium and other materials known to be hazardous to human health and the environment, in close proximity to Plaintiff's property and the Davis Creek. Such activities were and are ultra-hazardous and unreasonably dangerous activities in that the release or escape of such materials will, inevitably, endanger and/or result in damage to human health and/or the environment.

107.    Defendants UCC and Dow are strictly liable for all damages caused by such ultra-hazardous and unreasonably dangerous activities, including the damage to the property owned by Plaintiff, the loss of use and enjoyment of such property, and the loss of value to such property.

108.    Accordingly, Defendants are jointly and severally liable for monetary damages, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award the following relief:

A.    As to both Defendants, jointly and severally:  **(1)** a award, pursuant to 42 U.S.C. §9607(a) and in an amount to be proven at trial, of all costs incurred by Plaintiff consistent with the National Contingency Plan in responding to the release and migration of Hazardous Substance to and through environmental media, to the Courtland Property, as described herein; and **(2)** declaratory relief, pursuant to 42 U.S.C. §9613(g)(2)(B), 28 U.S.C. § 2201, and applicable state law, that will be binding in any subsequent action or proceeding to recover response costs or abatement costs with regard to the release and migration of Hazardous Substance to and through environmental media, to the Courtland Property, as described herein, and declaring each Defendant jointly and severally liable to Plaintiff for all necessary costs of response incurred by Plaintiff in a manner consistent with the NCP;

B.    As to both Defendants, pursuant to RCRA § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A), RCRA § 7002(a)(1)(B) (42 U.S.C. § 6972(a)(1)(B)), and the law of public nuisance, injunctive relief binding and compelling each Defendant, jointly and severally, timely and competently to undertake all actions necessary to abate appropriately the continuing harms caused by the harms, risks, nuisance conditions, and endangerments to human health and

Plaintiff further prays for trial by jury, as to all matters so triable, and respectfully requests that this Court retain continuing jurisdiction of this action to the extent necessary and for as long as necessary to enforce and interpret, and to review the Defendants' compliance with, this Court's orders entered herein.

Respectfully submitted:

**Neely & Callaghan**
**Lead Trial Counsel for Plaintiff, The Courtland Company, Inc.**

BY:   /s/ Michael O. Callaghan
      Michael O. Callaghan, Esq. WV Bar No. 5509
      NEELY & CALLAGHAN
      159 Summers Street
      Charleston, WV 25301-2134
      Telephone:  (304) 343-6500
      Facsimile:  (304) 343-6528
      E-Mail:  mcallaghan@neelycallaghan.com