UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE COURTLAND COMPANY, INC.,

      Plaintiff,

v.                        Civil Action No. 2:18-cv-01230
                               Civil Action No. 2:19-cv-00894

UNION CARBIDE CORPORATION,

      Defendant.

## MEMORANDUM OPINION AND ORDER

      Pending in Civil Action Numbers 2:18-cv-01230 ("Courtland I") and 2:19-cv-00894 ("Courtland II") are (1) Plaintiff The Courtland Company, Inc.'s ("Courtland") consolidated motion for summary judgment (ECF Nos. 299, 288), filed October 8, 2021; and (2) Defendant Union Carbide Corporation's ("UCC") motion for summary judgment (ECF Nos. 301, 296), filed October 8, 2021.  Also pending in Courtland II is Courtland's motion for summary judgment as to counterclaimant UCC's counterclaims (ECF 359), filed March 14, 2022.

## **TABLE OF CONTENTS**

**Page**

I.   Background.............................................................................................. 2

    A. The UCC Tech Park................................................................. 6
    B. Filmont and Massey Railyard............................................ 14
    C. The Courtland Property........................................................ 31
    D. Completed Environmental Testing.................................. 33
        1. August 2017 Sampling by Courtland...................... 34
        2. November 2019 Sampling by Courtland................ 35
        3. September 2020 Sampling by Courtland............... 36
        4. December 2020 Sampling by UCC........................... 40
        5. June-July 2021 Sampling by Courtland................ 41
    E. Current Litigation................................................................. 43

II.  Governing Standard........................................................................... 44

III. Discussion........................................................................................... 46
    A. CERCLA Claims........................................................................ 46
        1. UCC's Motion for Summary Judgment: Standing........ 47
           i.   Injury In Fact.......................................... 50
          ii.   Fairly Traceable Injury.......................... 65
        2. Courtland's Motion for Summary Judgment: Prima
           Facie Case.............................................................. 73
           i.   PRP and Facility...................................... 74
          ii.   Releases of Hazardous Substances............. 76
         iii.   Incurrence of Response Costs................... 79
        3. Courtland's Motion for Summary Judgment: UCC's
           CERCLA Counterclaims............................................ 90
    B. UCC's Negligence Counterclaim........................................ 107
    C. RCRA Claims............................................................................ 111
        1. Section 6972(a)(1)(A) Claim: The Tech Park........ 116
        2. Section 6972(a)(1)(B) Claim: The Tech Park........ 128
        3. Section 6972(a)(1)(A) Claim: Filmont/Massey...... 138
           i.   RCRA Subtitle C........................................ 142
          ii.   RCRA Subtitle D........................................ 156
        4. Section 6972(a)(1)(B) Claim: Filmont/Massey...... 165
    D. Remaining State Law Claims................................................ 169

IV.  Conclusion........................................................................................... 170

## I.  Background

Plaintiff, The Courtland Company, Inc., ("Courtland"), and defendant, Union Carbide Corporation ("UCC"), own nearby parcels of real property adjoining on or near Davis Creek in Kanawha County, West Virginia.

In these actions, Courtland contends that UCC has over the years conducted activities on the UCC properties that have polluted both UCC's property and Courtland's property.  UCC counterclaims that Courtland's property and UCC's property have been polluted by Courtland's own activities.

The properties are displayed on the map below which depicts Courtland's property and three UCC properties labeled Technical Center ("Tech Park"), Massey ("Massey Railyard"), and Filmont.[1]  Of the three UCC properties, Tech Park is the larger tract outlined by a black line and is separated from the other properties (Courtland, Massey, and Filmont) by the CSX Railroad. Tech Park includes the Greenhouse Area near the Courtland

---

[1] **Filmont and the Massey Railyard are separate sites that are situated on the same parcel of land.**

Property as well as Ward Hollow and the three landfill area named Ward A Landfill, Ward B Landfill, and Lower Ward Landfill.



Davis Creek is not well depicted on the above map but is located near the left or western edge of the map.  Davis Creek runs in a northerly direction as it descends, in sequence, from near the western line of the Tech Park and continuing on the western line of Courtland and Filmont on its way to the Kanawha River.  Correspondingly, the terrain generally slopes downward from the Greenhouse Area of Tech Park to Courtland to Filmont, with Massey Railyard situated between Tech Park and Filmont.  Courtland contends that hazardous waste from UCC

properties has, <u>inter</u> <u>alia</u>, found its way by groundwater to the Courtland Property.

Courtland filed Courtland I in 2018 against UCC with respect to Tech Park. Courtland filed Courtland II in 2019 against UCC with respect to Filmont and the Massey Railyard. These two actions remain grounded on similar causes of action as follows: (1) recovery of response costs and declaratory relief under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607(a), 9613(g); (2) citizen suit relief for violations of § 702(a)(1)(A) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(A), and the West Virginia Hazardous Waste Management Act; (3) citizen suit relief for judicial abatement of an imminent and substantial endangerment under § 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B); (4) judicial abatement of a public nuisance; (5) relief from a private nuisance; (6) negligence; (7) gross negligence; and (8) strict liability.[2]  In Courtland II only, Courtland brings an additional claim against UCC for judicial abatement of a public nuisance <u>per</u> <u>se</u>.

---

[2] Courtland's claims for negligence <u>per</u> <u>se</u> were dismissed in Courtland I and Courtland II on September 29, 2020, and August 26, 2020, respectively.  <u>See</u> ECF 135 (Courtland I); ECF 75 (Courtland II).

On October 22, 2021, the court granted UCC's motion in Courtland II seeking leave to file an amended answer and re-alleged counterclaims.  See ECF 302 (Courtland II).  UCC alleges that the historical and current use of the Courtland Property, and UCC's 2020 soil investigation thereon, indicate that Courtland is a source of the impacts to Courtland's groundwater and is thus at least partially responsible for the environmental impacts on the Courtland Property and potentially the UCC property.  UCC asserts the following counterclaims in Courtland II: (1) contribution from Courtland under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f); (2) declaratory relief under Section 113(g) of CERCLA, 42 U.S.C. § 9613(g); (3) negligence; (4) declaratory relief under W. Va. Code § 55-13-11; and (5) equitable indemnity.[3]

The relevant facts respecting these two actions are as follows.[4]

_____

[3] The court denied UCC leave to file Count I of its amended counterclaim seeking recovery of its response costs under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), but allowed UCC to seek contribution for similar costs.  See ECF 302 (Courtland II).

[4] The court notes that Courtland has also filed two other related actions, known as Courtland III and Courtland IV, alleging Clean Water Act claims against UCC with respect to the Filmont and Massey property discussed herein.  While the factual background of this memorandum opinion and order set forth below may contain some facts related to such claims, UCC's pending

A.  <u>The UCC Tech Park</u>

Between 1947 and 1974, UCC acquired the land on which the Tech Park now sits.  ECF 1 (Courtland I) ¶ 14.  Three inactive landfills are located on the Tech Park property: the Lower Ward Landfill, Ward A Landfill, and Ward B Landfill, as well as a historical botanical research area known as the "Greenhouse Area."  <u>Id.</u> ¶ 18; <u>see also</u> ECF 382 at 5.  The area of the Tech Park adjacent to the Lower Ward Landfill is referred to as "Ward Hollow."  The landfills were utilized for the disposal of fly ash, oxide tails, and municipal sludge from publicly owned treatment works.  <u>Id.</u>; <u>see also</u> ECF 290-2 at 8.  Use of the Tech Park landfills was discontinued in 1973.  <u>Id.</u>  It is undisputed that in the past, on certain occasions, wastes containing arsenic, 2-butatone, acetone, di-n-butyl phthalate, barium, cadmium, chromium, lead, and selenium were generated at the Tech Park.  ECF 291 at 6; <u>see also</u> ECF 288-2 at 25-30.  Each of these substances are deemed Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") hazardous substances. [5]  <u>See</u> 40 C.F.R. § 302.4.  The parties do not dispute

_____

motion for summary judgment respecting the alleged Clean Water Act violations is addressed in a separate memorandum opinion and order entered this same date in Courtland III and IV.

[5] Indeed, 42 U.S.C. § 9601(14) pertinently defines hazardous substance as "any element, compound, mixture, solution, or substance designated pursuant to [42 U.S.C. § 9602(a)]."

that hazardous substances have been released, on certain occasions, from certain locations at the Tech Park and the three landfills thereon into the environment.  Id. at 5; see also ECF 288-2 at 39-40, 77-78.  It is likewise undisputed that the groundwater underlying the Tech Park is hydraulically connected to the Davis Creek watershed.  See ECF 21 (Courtland I) at ¶ 43.

In 1990, UCC entered into a Facility Lead Agreement with the USEPA in order to conduct corrective action in regard to contamination at the Tech Park with the USEPA's oversight.  Id. ¶ 23.  Between 1990 and 2010, UCC conducted and completed multiple investigations to determine the nature and scope of the

---

Section 9602(a), in turn, authorizes and directs the Administrator of the United States Environmental Protection Agency ("USEPA") to promulgate "regulations designating as hazardous substances . . . such elements, compounds, mixtures, solutions, and substances, which, when released into the environment may present substantial danger to the public health or welfare or the environment[.]" 42 U.S.C. § 9602(a). Regulations under these statutes have been codified at 40 C.F.R. § 302.4 and include each of these substances.  Courtland requests that judicial notice be taken of Exhibit A attached to ECF 288-41, which contains a copy of excerpts of 40 C.F.R. § 302.4.  UCC responds that it does not object to such request, so long as judicial notice is taken of 40 C.F.R. § 302.4 in its entirety and not merely the selected portions by Courtland thereof.  See ECF 377 at 2.  UCC also notes that such notice does not preclude UCC from any contention or admission of evidence as to the applicability of 40 C.F.R. § 302.4 in this litigation.  See id.  Inasmuch as the accuracy of this regulation can be accurately and readily determined and cannot reasonably be questioned, the court takes judicial notice of the entirety of 40 C.F.R. § 302.4 and the hazardous substances set forth therein.  See Fed. R. Evid. 201(b).

contamination at the Tech Park.  Id.  Such investigations included several RCRA Facility Investigations ("RFI"), designed and based on individual Solid Waste Management Units ("SWMUs") existing on the Tech Park property. Id. ¶¶ 22, 25, 26.  RFIs were conducted in 2001 and 2005 at multiple SWMUs at the Tech Park to investigate the extent of contamination in soil, groundwater, surface water, sediment, and waste material.  Id.

As part of the 2001 RFI, the Greenhouse Area of the Tech Park was recommended for "No Further Action," and the USEPA approved this recommendation in 2006.  ECF 290-2 at 9-10. According to UCC, while low levels of metals, semi-volatile organic compounds ("SVOCs"), and volatile organic compounds ("VOCs") were found in the Greenhouse Area, only chlorinated solvents were observed in the groundwater at above a risk-based screening level ("RSL") or Maximum Contaminant Limit ("MCL").[6] ECF 382 at 7 (citing 290-2 at 10-11, Table 1, Figs. 6-14). Thus, according to UCC, based on "the decreasing levels of the specific VOCs detected, the chlorinated solvents, the presence of unimpacted wells on the Tech Park between impacted wells and the property line, and demonstrated lack of exposure[,] [the]

_____

[6] According to Peter de Haven's expert report, tetrachloroethene ("PCE") is "[t]he only constituent that exceeds" RCLs and MCLs.  ECF 290-2 at 11. The report further notes that PCE "has not migrated onto the Courtland Property." Id.

[US]EPA concurred that such VOCs, in addition to metals and SVOCs, did not rise to the level of concern that would warrant further delineation" in areas of the Tech Park outside of Ward Hollow.  Id. (citing ECF 290-2 at 10-11; ECF 290-6 at 7-13). The source of the Greenhouse Area contamination is unknown.  See ECF 288-8 at 69.

        The 2005 RFI concluded that groundwater contamination was primarily present in the Ward Hollow area, the sources of which include the three nearby landfills and a former brine well north of the Lower Ward Landfill, but no further investigation was warranted in areas of the Tech Park outside of Ward Hollow. ECF 290-2 at 10.  In 2010, UCC presented a Corrective Measures Proposal ("CMP") to the USEPA, which also set forth the final proposed remedy for the Tech Park.  ECF 297 at 3.  The USEPA subsequently issued its Final Decision and Response to Comments in 2010, which presented the final remediation plan and monitoring protocol for the Tech Park.  ECF 1 (Courtland I) ¶ 24; ECF 382.  Long-term groundwater monitoring in accordance with the agency approved groundwater monitoring plan was a component of the USEPA's Final Decision.  ECF 1 (Courtland I) ¶ 24.  The directives of the CMP approved by the USEPA required UCC to analyze and investigate potential offsite migration, if necessary, requiring UCC "to select a surrounding property for

investigation and analysis if it was found that an onsite groundwater plume at [the Tech Park] could potentially migrate to that offsite property based on the magnitude and extent of groundwater concentrations above" USEPA MCLs or RSLs. ECF 194-1 (Courtland I) ¶ 10.[7]  The Ward Hollow area of the Tech Park "was the only area that warranted offsite investigation based on this evaluation."  Id.

According to UCC, at the time of the USEPA's final decision in 2010, only two chemical constituents -- tetrachloroethene and chloroform -- detected in only one monitoring well were found in the Greenhouse Area exceeding screening levels.  ECF 292-34 at 12; see also 194-1 ¶ 12. Inasmuch as "[b]oth constituents had exhibited stable or declining concentration trends in the years leading up to the USEPA's final decision[,] . . . investigation to further delineate downgradient was deemed unnecessary, and groundwater monitoring and institutional controls (onsite only) were the

---

[7] ECF 194-1 consists of the sworn declaration of UCC's Rule 30(b)(6) representative, Jerome Cibrik.  The court notes that Courtland has lodged objections to paragraphs 11, 14, 15, 17, 19, 20, 21, 25, 26, 27, and 28 of Mr. Cibrik's declaration, based primarily upon Courtland's contention that the testimony he offers therein is improper and unauthorized expert opinion. See ECF Nos. 383, 389 (Courtland II) and ECF 173 (Courtland III).  To the extent that it becomes necessary, any objections to the same will be addressed in a corresponding footnote herein.

final remedy selected by [the USEPA] in the Final Decision for the Greenhouse Area."  ECF 194-1 ¶ 12.

Investigations determined that groundwater contamination in Ward Hollow had migrated downgradient to the West Virginia Department of Transportation ("WVDOT") property (the Kanawha Turnpike) and potentially the CSX Transportation property (the CSX railroad).  See ECF 292-34 at 11.  The most prominent constituents found in the Ward Hollow groundwater plume above MCLs or RSLs include 1,4-dioxane, benzene, bis(2-chloroisopropyl)ether ("BCIE"), arsenic, and barium.  Id. at 11. The offsite investigations did not include potential contaminant migration toward the Courtland Property.  ECF 1 (Courtland I) ¶¶ 25, 26.  UCC contends, based on the report of its expert Peter de Haven, that it was not required to investigate the Courtland Property because only the Greenhouse Area is topographically and geologically situated to have any potential impact on the Courtland Property.  ECF 290-2 at 4, 5, 19, 21.  According to Mr. de Haven, it is impossible, based upon the hydrogeology of the site, for groundwater originating in Ward Hollow to flow uphill and then migrate onto the Courtland Property or the Greenhouse Area.  Id.  In February 2012, the West Virginia Department of Environmental Protection ("WVDEP") incorporated the USEPA's final decision into a revised Corrective Action

11

Permit for the Tech Park, which was renewed by the WVDEP in
2019.  ECF 292-4; ECF 194-1 (Courtland I) ¶¶ 8-9.

Courtland contends, however, that it has not asserted
that contamination coming from or related to Ward Hollow has
migrated to the Courtland Property.  See ECF 395 at 4 ("UCC
falsely alleges that Courtland asserts that contamination coming
from or related to the Ward Hollow plume has migrated to
Courtland").  Instead, Courtland clarifies that its expert, Dr.
Simonton, has only opined that "it is likely that the
contamination from Ward Hollow is commingling with contamination
at the UCC Filmont/Massey [Sites], but that the appropriate
investigation related to UCC's Ward Hollow plume" has not been
completed, nor has a full delineation of the property been done.
Id. (citing ECF 288-29 ¶¶ 41-42, 68, 146); see also ECF 291 at
21 ¶¶ 9.2-9.3.  Courtland states that "UCC has not ruled out the
Ward Hollow groundwater contamination plume as a source of
contamination at or near the Courtland Property or coming onto
the Filmont/Massey facilities."  ECF 395 at 20.

Again, Courtland notes that despite that it "generally
agrees that it appears unlikely that contamination from Ward
Hollow is migrating to Courtland, the reality is that UCC has
not sufficiently investigated the Ward Hollow plume and the
upgradient source above Filmont/Massey — that is[,] [the] Tech

Park." Id.  Simply put, Courtland avers that any investigation
at the Tech Park is incomplete and "until UCC fully delineates
the Ward Hollow plume, it cannot be ruled out that the
groundwater contamination plumes from Tech Park, Ward Hollow,
Massey, and Filmont facilities have merged to form a large,
comingled plume."  Id. (citing ECF 288-29 ¶¶ 41-42, 68, 146).

Additionally, according to Courtland, "[a]rsenic,
barium, chromium, lead, 1,4 dioxane, vinyl chloride, and BCIE
have been detected in groundwater at and emanating to and from
the Greenhouse Area of the . . . Tech Park."  ECF 291 ¶ 4.9
(citing ECF Nos. 289-2; 289-6; 289-14; and 289-16).  Courtland
further contends the same contaminants "have been detected in
groundwater at and emanating to and from Ward Hollow[.]"  Id. ¶
4.10 (citing ECF Nos. 289-8; 289-14).

Courtland notes that "1,4 Dioxane contamination is
found at [the] Greenhouse Area, Ward Hollow plume, Filmont
Facility[,] and [the] Courtland Property."  ECF 380 at ¶ 6.20
(citing ECF Nos. 289-2; 289-16; 288-10 at 214-15; 288-11 at 263-
264, 314-319, 324).  Courtland further notes that "there are
elevated levels of arsenic in groundwater at UCC's Massey
Railyard Facility (sample locations FLF-0073, FLF-0074, FLF-
0075) with these sample locations being upgradient of Filmont .
. . and that the next up-gradient samples would be located on

13

the UCC Tech Park Facility." Id. ¶ 6.4 (citing 288-9 at 181-83;
ECF 289-19 at 3).  Courtland also contends that "UCC admits that
groundwater from the Tech Park . . . flows under the Courtland
Property, the Massey Railyard, and . . . Filmont . . . and that
the receiving waters for the groundwater flowing from the Tech
Park is the Kanawha River." Id. ¶ 6.32 (citing 288-9 at 33;
199).

B.  Filmont and Massey Railyard

        As a threshold matter, the court notes that the
parties' recitation of the facts related to these sites are
drastically dissimilar.  The court will thus set forth each
parties' factual contentions surrounding the properties as
proffered in their respective briefings, beginning first with
the facts set forth by Courtland.

        In or around 1946, UCC acquired the land upon which
Filmont and the Massey Railyard are located.  ECF 1 (Courtland
II) ¶ 6.  According to Courtland, Filmont received waste from
the 1950s up to at least 1987 from, inter alia, the UCC South
Charleston chemical manufacturing facility.  ECF 1 (Courtland
II) ¶ 17; ECF 176 (Courtland III) at 7.  Wastes associated with
the manufacture of Dynel -- a fiber made from vinyl chloride and
acrylonitrile -- are known to have been disposed of at Filmont,
as well as buried and dumped drums containing unknown contents.

14

Id. ¶ 17; Id. at 8.  Courtland notes that "[a]dditional research
revealed that in addition to unknown wastes and waste from Dynel
manufacturing, Filmont not only received fly ash and bottom ash
from two UCC South Charleston facility power plants that burned
primarily coal, but also 'wastes,' and wastewater treatment
plant grit" from the "UCC South Charleston chemical
manufacturing facility influent to the South Charleston
Wastewater Treatment Plant."  ECF 176 at 8 (citing ECF 289-9
(Courtland II) at § 3.2.1; ECF 288-9 (Courtland II) at 144-145).

          Additionally, industrial waste such as bottom ash,
wood, paper trash, demolition rubble, labware, glass bottles,
asbestos, drums, plastics, sewer solids from Holtz Pond, and
mercury batteries were disposed of at Filmont.  ECF 291
(Courtland II) ¶ 4.13 (citing ECF 288-6; 289-13; 289-4; 288-18;
289-11).  Courtland states that "UCC admits that all the fill
and waste used at the Filmont/Massey [Site] remains, with the
exception of investigation derived waste."  ECF 176 (Courtland
III) at 8-9.

          Relying predominately on the contents of UCC's West
Virginia Voluntary Remediation Program ("VRP") application,[8]

---

          [8] In its briefing, UCC contends that "many of Courtland's
proffered 'facts' are merely recitations of boxes checked on
UCC's VRP Application[,]" and "Courtland's assertion that UCC's
VRP Application qualifies as 'admissions' is a

filed with the WVDEP on January 29, 2021, Courtland sets forth,

what it contends to be, the relevant facts regarding Filmont and

the Massey Railyard:

> 2.3. <u>Filmont and Massey Railyard Property</u>: On January
> 29, 2021, UCC submitted a Voluntary Remediation
> Program application ("VRPA") to the West Virginia
> Department of Environmental Protection related to
> Filmont and Massey Railyard signed by Jerome Cibrik
> affirming as the remediation leader for UCC that:
> 'I affirm that the information provided in this
> application and its attachments, to the best of my
> knowledge and belief, is true, complete, and
> accurate.' VRPA012[9] § 8.

> . . . .

> 5.4. UCC admits that the groundwater at Filmont flows
> to the northwest, that the underlying aquifer is
> unconfined, and that there are 'known discharge points

---

mischaracterization of the evidence." ECF 382 at 12. UCC
further asserts that "UCC's VRP Application relies on reviews of
historical documents, not factual information based on empirical
data, regarding the Filmont and Massey sites, but does not and
cannot function as an admission of responsibility because an
independent investigation is still ongoing." <u>Id.</u> at 12-13. In
response, Courtland states that it does not claim that the VRP
Application "is an admission of <u>responsibility</u>, but it is
clearly statements against UCC's interest under Fed. R. Evid.
801(2) and 804(b)(3) on the <u>facts</u>" underlying the claims
asserted herein and such "statements in the [application] meet
all requirements of a party admission[,]" as the same was
prepared by "UCC's agent, Remediation Leader for Filmont/Massey,
[and] UCC's Rule 30(b)(6) designee[,]" Mr. Cibrik, "and UCC's
Licensed Remediation Specialist and consultant, David Carpenter"
both of whom affirmed the information contained therein was true
and correct. ECF 395 at 6 (emphasis in original). The court
finds no reason to refrain from considering the contents of the
VRP application or its attachments herein.

[9] The VRPA citations are to UCC's completed VRP application
and attachments thereto, located in the record at ECF Nos. 288-6
and 288-7.

from the underlying aquifer.' VRPA00014[10] § 1
(Groundwater).

5.5. UCC admits that Davis Creek and Wards Branch are
located zero feet from Filmont while the North
Boundary Drainage Channel and South Boundary Drainage
Channel are located an average of only 20 to 30 feet
from Filmont. VRPA00014 (Surface Water).

5.6. UCC admits that 'Industrial wastes deposited in
the landfill that includes drummed wastes' are part of
the nature of the contamination at Filmont. VRPA00016
§ 3 (Nature of Contamination).

5.7. UCC's own sampling since at least 2005 has
demonstrated contaminants at and emanating . . . from
Filmont. VRPA00016 § 3 (Contaminants). This is
supported by UCC's analytical data and figures. See
tables of data at VRPA00069-00108.

5.8. UCC admits that chlorinated solvents, metals,
petroleum, semi-volatile organic chemicals ("SVOC")
and volatile organic chemicals ("VOC") are
contaminating various environmental media and the
source of those contaminants is UCC's "burial and
dumping of wastes." VRPA00016 § 3. Those buried and
dumped wastes at Filmont include chlorinated solvents
suspected to be contaminating soil and known to be
contaminating groundwater; metals known to be
contaminating soil, groundwater, surface water, and
sediments; petroleum known to be contaminating soil;
SVOCs known to be contaminating soil, groundwater,
surface water, and sediments; and VOCs suspected to be
contaminating soil and known to be contaminating
groundwater and air. VRPA00016 § 3 (Contaminants). For
example, arsenic, barium, chromium, lead, and selenium
have been detected in groundwater samples by UCC at
and in the vicinity of Filmont with other hazardous
substances and solid wastes such as 1,4-dioxane,
bis(2- chloroisopropyl) ether ("BCIE"), vinyl
chloride, and bis (2-ethylhexyl) phthalate. Cibrik
Depo. II at 221:22-242-222:7.

5.9. Also, acetone and 2-butanone are present in
leachate from Filmont. Contaminants have been detected

by UCC in groundwater monitoring wells placed on the other side of Davis Creek from Filmont on property owned by the City of South Charleston. Cibrik Depo. II at 322:13-17.

5.10. All of these chemicals or elements are solid wastes, hazardous wastes, or hazardous substances. See 40 CFR § 261.2 (definition of solid waste); 40 CFR § 261.20 (solid waste is hazardous waste if it has certain characteristics); 40 CFR § 261.24(b) (characteristics of toxicity); see M.C. Decl. at Ex. M, Request for Judicial Notice, Ex. A.

. . . .

5.12. UCC admits that the wastes at and emanating . . . and from the Filmont facility are contaminating soil, soil gas, surface water, sediments, groundwater, and air at the Site. VRPA016 § 3 (Contaminants); VRPA018 § 5 (Affected Media).

5.13. UCC admits that the primary transport mechanisms at and from the Filmont facility for the contaminants including VOCs, metals, SVOCs, and chlorinated solvents, is leaching and that VOCs are also being transported by volatizing at and from the Filmont facility. VRPA018 § 5 (Transport Mechanisms).

5.14. UCC admits that the evidence of the contamination is supported by the analytical data and the documented drum disposal. VRPA016 § 3 (evidence of contamination); see analytical data at VRPA00075-94 (Tables 5-7 referring to groundwater); VRPA00095-96 (Table 8 referring to surface water); VRPA00097 (Table 9 referring to sediments); VRPA00098 (Table 10 referring to soil gas); VRPA00099-101 (Table 11 referring to ambient air).

5.15. UCC . . . admits that the contaminants at and emanating from Filmont have . . . current and future exposure pathways and [that current and future receptors include both human and ecological receptors] . . . . VRPA0018 § 5.

5.16. UCC admits that the surface water is used for boating, fish and wildlife habitat, and recreational fishing. VRPA0018 § 5 (Other Surface Use).

18

5.17. UCC identified exposure pathways including inhalation through vapors released from the soil, skin contact with soil and surface water, and ingestion of soil and surface water. VRPA0018 § 5 (Exposure Pathways).

5.18. UCC's identified receptors for these current and future exposure pathways include humans in residential, commercial/industrial, construction/outdoor maintenance worker, and recreational/trespasser contexts. VRPA0018 § 5 (Receptors).

5.19. UCC admits that ecological receptors for contaminants from Filmont include both aquatic and terrestrial. VRPA0018 § 5 (Receptors).

. . . .

6.36. UCC and its consultants have determined that the Filmont Facility is impacting groundwater. Weber Depo II at 87:1-21; see, VRPA018 §§ 3 and 5.

8.1. UCC admits that it knows of no environmental permits from WVDEP[11] or USEPA for the Filmont facility and admits no WVDEP or USEPA site identification code has been assigned. VRPA009 § 5. UCC also admits that it has not obtained a permit or any form of interim status under RCRA subtitle C (42 U.S.C. § 6921, et. seq.) or the West Virginia Hazardous Waste Management Act to operate or to close Filmont. UCC Ans. at ¶ 55; VRPA09 § 5.

. . . .

8.4. Despite UCC's knowledge of the actual adverse impacts to the environment and human health, UCC admits that it has taken no remedial action to contain

---

[11] It is noted that while the VRP application does state that there are no known permits from the WVDEP, it further opines that "[h]istorical records for the UCC South Charleston Facility indicate there was a State of West Virginia landfill permit for solid waste disposal from a predecessor to WVDEP at the Filmont site until its expiration in the 1980s." ECF 288-6 at 10.

> contamination, excavate contaminated soil, recover
> free product, or to remove drums. VRPA017 § 4. Despite
> admitting that there are current and future exposure
> pathways to human and ecological receptors, UCC's VRPA
> states that . . . [there are no interim remedial
> actions that have or will take place at the Filmont] .
> . . . VRPA017 § 4.
>
> 12.1. UCC admits that Filmont and Massey Railyard
> present [the following] conditions . . . VRPA014 § 1
> (admit discharge points from underlying aquifer);
> VRPA016 § 3 (admit industrial wastes impacting
> environmental media including soil, groundwater,
> surface water, sediments, and air); and VRPA018 § 5
> (admit current and future completed exposure pathways
> in affected environmental media including soil,
> groundwater, surface water, sediments, and air by
> leaching and volatilization of VOCs, metals, SVOX, and
> chlorinated solvents).

ECF 291 at 4, 11-15, 19, 20, 21, 25.

Additionally, according to Courtland, "UCC's environmental consultants have detected 1,4-dioxane, a toxic pollutant, in the groundwater underlying" Filmont, "in upgradient groundwater wells underlying" the Massey Railyard, "in the Greenhouse Area at the" Tech Park, at "the Ward Hollow plume," and in groundwater monitoring wells installed on City of South Charleston property "on the western side of . . . Davis Creek across from" the Filmont Site. ECF 176 (Courtland III) at 13 (internal citations omitted); ECF 291 ¶¶ 6.20, 6.21 (internal citations omitted). UCC's environmental consultant, Paul Weber, testified that the source for the 1,4-dioxane found in "the wells around . . . [Filmont,] . . . based on . . . evaluation

of data, [is] believe[d] [to be] from the waste material of the [Filmont Site]." ECF 288-10 at 214; see also ECF 288-11 at 327. Courtland also notes that arsenic exceedances in groundwater has been shown in two of the three monitoring wells located on the western side of Davis Creek across from Filmont. ECF 291 ¶ 6.21 (internal citations omitted). Courtland notes that "UCC's consultant, [Paul Webber], admits that 1,4-[d]ioxane is a hazardous substance and is a pollutant." Id. ¶ 6.33 (citing ECF 288-10 at 76, 77).

Courtland further notes that while the actual depth of Filmont is unknown, it is located zero feet from Davis Creek and Ward Branch, thus forming the banks thereof. ECF 176 (Courtland III) at 9. It further states that "[t]he solid waste, hazardous wastes, and hazardous substances disposed of at the Filmont [Site] were placed, at least in part, into the historic Davis Creek channels that ran through the Filmont parcel" and that "historic ariel photos show extensive work at the Filmont [Site] through the 1970s evidencing the progression of the waste disposal site expanding over time to cover and fill-in" the historic channels. ECF 291 ¶ 4.18 (citing 288-9 at 242-243; 253); ECF 176 at 11-10. According to Courtland, the Davis Creek channels "are, and have been since their filling, preferential pathways and the direct source of discharges of pollutants and

21

seeps that are releasing and discharging pollutants from those
point sources into the waters of the [United States] within the
Davis Creek Watershed, including Ward Branch, Davis Creek, and
the North and South Boundary Ditches."[12]  ECF 176 at 10 (citing
ECF Nos. 288-9 at 242-243; 289-5; 289-12; 175-1 at 136-37; 175-2
at 54-55; 65).

Courtland also notes that one or more seeps/discharges
from Filmont have been identified by UCC "for more than 15
years," including "one seep previously identified by UCC's
consultants of landfill materials flowing into the North
Boundary Ditch, on the north side of" Filmont, which "flows
westward and discharges into the Ward Branch of Davis Creek."
Id. (internal citations omitted).  The North Boundary Ditch is
estimated to be 200 feet long.  See id. at 11.

Courtland states that "[t]here are additional seeps
from UCC's Filmont [Site], from and through which UCC discharges
or permits to be discharged, on a continuous basis, various
pollutants . . . from the Filmont [Site] and into Davis Creek,
the Ward Branch of Davis Creek, the North Boundary Ditch, and
the South Boundary Ditch."  Id.  For instance, Courtland avers
its expert and environmental consultant, Dr. Simonton, "has

---

[12] The North and South Boundary Ditches are also referred to
as the northern and southern drainage ditches.

identified an additional 'seep[,]' 'Ward Branch Seep[,]' that
discharges, on a continuous basis, various leachate and liquid
dump materials from" Filmont and into Ward Branch at a point to
the west of the North Boundary Ditch seep.  Id.  Courtland
further notes that what is known as "[t]he South Boundary Ditch
(a/k/a the South Boundary Creek) flows (while on UCC property)
from the vicinity of the Massey [Railyard] then adjacent to
UCC's Filmont [Site], which discharges to such drainage ditch,
then onto and across the Courtland Property and into Davis
Creek."  Id.

        Relying on the report of its expert, Dr. Simonton,
Courtland avers that the South Boundary Ditch leaves behind
contaminated sediments from UCC discharges while on the
Courtland Property, "which sediments have accumulated and
continue to accumulate at the location within the South Boundary
Ditch and ultimately discharge into Davis Creek."  Id. (citing
Simonton Report ¶¶ 19, 28, 34, 40, 50-51, 70-71).  Courtland
notes that while "Davis Creek generally flows to the north and
away from Courtland's property, flow during certain periods
causes waters contaminated by the Filmont [Site] and their
accompanying sediments to flow southward, contaminating both
Davis Creek adjacent to the Courtland Property and the bank of
Courtland's property" and that sediments from Filmont "are

currently visible on Courtland's property not only along the South Boundary Ditch but also along the bank of Davis Creek." Id. at 11-12.

On or about October 28, 2020, the WVDEP issued a notice of violation of the West Virginia Water Pollution Control Act to UCC after reviewing Dr. Simonton's declaration setting forth his observations and results from his September 2020 sampling of Davis Creek and Ward Branch, discussed infra herein, and conducting its own investigation. See ECF 32 (Courland III) at 16-18. Thereafter, on December 8, 2020, the Director of the WVDEP's Division of Water and Waste Management issued a unilateral order asserting that, inter alia, UCC had, with respect to Filmont, permitted industrial waste and/or other wastes to discharge directly or indirectly from seeps and pipes on Filmont into Ward Branch without a valid WV/National Pollutant Discharge Elimination System ("NPDES") permit. See id; see also ECF 297 at 7-8, n.3.

On January 7, 2021, UCC appealed the unilateral order to the West Virginia Environmental Quality Board. See id. On January 29, 2021, UCC applied for Filmont and the Massey Railyard to be accepted into the West Virginia Voluntary Remediation Program ("VRP"). See ECF 292-42. The Board stayed the unilateral order on February 1, 2021. UCC entered into an

agreement with the WVDEP lifting the unilateral order to permit Filmont and the Massey Railyard to enter the VRP.  Both Filmont and the Massey Railyard were formally accepted into the VRP on September 23, 2021.  See ECF 297 at 7-8, n.3; see also ECF 292-32.[13]

As previously mentioned, UCC paints a vastly different picture of the facts surrounding its Filmont and Massey Railyard facilities.  UCC's proffered facts are as follows.

As to the Massey Railyard, UCC avers it started railyard operations in or around 1971.  ECF 297 at 6 (citing ECF 1 (Courtland II) ¶ 26).  The Massey Railyard is designated as a Very Small Quantity Generator ("VSQG"), USEPA identification number WVR000532036, and, as a VSQG, is not required to have a permit.  See id.; see also ECF 186-1.[14]  Currently, the Massey

_____

[13] ECF 292-32 is the WVDEP's September 23, 2021, Letter of Acceptance of Filmont and the Massey Railyard Sites into the VRP.  UCC notes the letter is a public record and requests that the court take judicial notice of the same.  See ECF 294 at 4-5.  Courtland filed no response.  Inasmuch as "a court may properly take judicial notice of 'matters of public record' and other information that under Federal Rule of Evidence 201, constitute 'adjudicative facts,'" the court takes judicial notice of ECF 292-32 as requested by UCC.  Goldfarb v. Mayor and City Council of Baltimore, 497 F.3d 500, 508 (4th Cir. 2015).

[14] ECF 186-1 is a copy of the Current Site Details respecting the Massey Railyard as found on the USEPA's RCRA Source website. The Current Site Details page provides, inter alia, the Massey Railyard's identification number and lists its RCRA Activities as a VSQG.  UCC requests, to which Courtland

Railyard is used for the staging and storing of railcars.  ECF 1 (Courtland II) ¶ 25.  According to UCC, "[t]here is no evidence that any portion of the Massey [Railyard] was ever used as a landfill."  ECF 297 at 6 (citing 292-1 at 63-64).

Regarding the Filmont Site, it appears to be undisputed that Filmont began operations in or around 1950.  UCC avers that Filmont "handled waste from approximately the early 1950s until about 1970."  ECF 297 at 7; see also ECF 292-5 at 2.  Then, from "the mid-1970s until approximately 1987, [Filmont] was operated as an inert waste landfill, with hazardous chemical waste sent to [a] separate landfill."  ECF 297 at 5; see also ECF 292-6 at 25; ECF 293-2[15] at 13.  Relying on the deposition

---

offered no response, that the court take judicial notice of the information found on the USEPA website for the RCRA site details for the Massey Railyard inasmuch as such judicial notice would be proper under FRE 201 "as this information: (1) 'can be accurately and readily determined from sources whose accuracy cannot be reasonably question[ed],' and (2) has been provided by UCC with all necessary specificity." ECF 186 (Courtland III) at 11, n. 2.  For these reasons, the court takes judicial notice of ECF 186-1 as requested by UCC.

[15] ECF 293-2 is a copy of UCC's "SUI Divisional EP Audit, Plant 514" from May 17, 1984.  Page 13 of the Audit pertinently reports:

Several wastes were observed at the Fillmont (sic) Landfill which do not belong there or were probably not from UCC. For example, an empty metal drum and several fiber drums with DOT hazard labels on them were observed in addition to what looked like household wastes. Disposal of chemical wastes, either inadvertently by UCC or deliberately by the public

testimony of a former UCC employee, Dennis Hanshew, UCC asserts
that Filmont operated -- prior to the creation of RCRA --
pursuant to "a then-active state or county health department
permit" and prior to the permit's expiration, "Filmont underwent
final closure under the supervision of the West Virginia
Department of Natural Resources"[16] in 1987.  Id. (citing 292-8 at
19, 24).

_____

        could violate the landfill permit or constitute
        unpermitted hazardous waste disposal.  The Plant EP
        Department is aware of the problem; control of the
        landfill is difficult because of its remote location.

ECF 292 at 13 (emphasis added).  Courtland objects to the use of
the Audit to demonstrate that Filmont operated pursuant to a
permit, primarily contending that it is not the best evidence of
the alleged permit and is hearsay within hearsay without an
exception.  See ECF Nos. 383, 389.  UCC responds that the best
evidence rule is inapplicable given that the Audit is not being
used to demonstrate the permit's contents, only its existence,
and that the Audit is an internal record of regularly conducted
activity, thus meeting the exception to the rule against hearsay
under FRE 803(6).  The court overrules Courtland's objection and
concludes that UCC may use the SUI Audit as circumstantial
evidence of the permit's existence.

        [16] Courtland objects, predominantly on hearsay grounds, to
this quoted statement contained in UCC's brief relying on ECF
292-8 in support thereof, which contains excerpts of the
deposition of Dennis Hanshew, an individual who worked in UCC's
environmental department beginning in 1986 whose role relative
to the Filmont Site was to "coordinate[] the project to put the
final cap on Filmont" in or around 1987, given that the then
"current permit for the Filmont landfill was going to expire."
ECF 292-8 (Courtland II) at 18, 29.  Mr. Hanshew further
testified that he remembered the entity or agency that had
issued the permit as "being the Department of Health."  Id. at
30.  He also testified that a DNR inspector had visited the site
when the project was taking place.  See ECF 183-1 (Courtland

According to UCC, in June 1981, "UCC submitted to the [US]EPA, pursuant to the requirements of Section 103(c) of CERCLA, a 'Notification of Hazardous Waste Cite.'"[17]   ECF 297 at

---

III) at 40.  While the court agrees that some portions of Mr. Hanshew's testimony are accurately categorized as hearsay, it is pertinent to note that UCC has identified evidence beyond the testimony of Mr. Hanshew that indicates a permit of some sort, perhaps from the West Virginia Department of Health, existed during this timeframe. See, e.g., SUI Audit, ECF Nos. 293-2, 447-1; 1984 Meeting Minutes, ECF 477-3; Site Strategy Filmont Landfill, ECF 486-4; West Virginia Solid Waste Management Plan, ECF 475-5 at 23.  Respecting Mr. Hanshew's testimony, the court concludes that he will be permitted to testify that the final cap was placed on Filmont in or around 1987 because the then current state permit was set to expire and that a DNR inspector was present when the project was taking place.  To the extent that Courtland objects to these parameters, that objection is overruled.

[17] As Courtland correctly points out in its motion, Section 103(c) of CERCLA provides that any person who knowingly fails to submit the Section 103(c) Notice of Hazardous Waste Site within one hundred and eighty days after December 11, 1980, to the USEPA "shall not be entitled to any limitation of liability or to any defenses to liability in section 9607 of the title."  42 U.S.C. § 9603(c).  The three exclusive, enumerated defenses to CERCLA liability are (1) an act of God; (2) an act of war; and (3) an act or omission by an unrelated third party.  See 42 U.S.C. § 9607(b); West Virginia Hospitality and Travel Association, Inc. v. Southern, 2:16-cv-0184, 2019 WL 2387048, at *4 (S.D. W.Va. June 4, 2019).  As explained in footnote eighteen below, a disputed fact exists as to whether UCC submitted such Notice to the USEPA.  Courtland takes the position that because, in its view, UCC failed to submit the 103(c) Notice to the USEPA as required, UCC is not entitled to any of these three defenses to CERCLA liability.  While such assertion may be true if it is determined that the Notice was not ultimately sent, such contention is of little moment herein inasmuch as UCC has not raised any of these three affirmative defenses in its briefings.

7; see also ECF Nos. 292-5; 292-6[18] at 41-45.  As a result of this notice, UCC contends "through continued discussion and correspondence with the [US]EPA and [the WVDEP], environmental work has continued on Filmont under CERCLA."  ECF 297 at 7 (citing ECF 290-28).  For instance, since 2005, UCC notes that it has monitored Filmont's groundwater, soil, and surface water and has undertaken, inter alia, various samples, a Human Health

---

[18] ECF 292-6 contains excerpts of the deposition testimony of Jack Worstell.  Courtland objects to his testimony to show that the CERCLA 103(c) Notice was actually sent to the USEPA, contending that Mr. Worstell lacks personal knowledge as to whether the notification was actually submitted given that he only testified that he assumed it was sent.  See ECF Nos. 383 at 7; 389 at 12.  Specifically, Mr. Worstell testified that "my assumption has to be [the 103(c) Notice] was sent to the [US]EPA since the [US]EPA made the request."  ECF 292-6 at 44. UCC responds that the notice was signed and dated by Mr. Worstell and while he cannot specify to whom, within the USEPA, it was sent or "whether any individual did actually receive the letter after it was mailed[,]" UCC is not required to support the admissibility of his testimony.  ECF 397 at 8.

UCC also contends that Courtland received both an internal, unsigned draft of the CERCLA 103(c) Notice (ECF 454-5) and the USEPA's Potential Hazardous Waste Site Identification and Preliminary Assessment Form (ECF 454-3), which the USEPA completes upon receipt of a CERCLA 103(c) Notice, from the WVDEP in response to a FOIA request, both of which serve as further evidence that the CERCLA 103(c) Notice for Filmont was sent to the USEPA, and thus further supports Mr. Worstell's testimony. See ECF 454 at 3 (citing ECF 454-5; 454-3).  Inasmuch as it is evident that Mr. Worstell has personal knowledge in the creation of this 103(c) Notice and based on such knowledge, it is his belief that the same was sent, Courtland's objection is overruled.  Nonetheless, it is apparent that a disputed fact remains between the parties as to whether the CERCLA 103(c) Notice was actually sent to and received by the USEPA.

Risk Assessment ("HHRA") and an Ecological Risk Evaluation ("ERA").  See ECF 297 at 7.  UCC notes that both 2015 HHRA and ERA evaluations found no risk of harm to humans or the environment.  See id. (citing ECF Nos. 292-11; 292-12).[19]

UCC further notes that it held meetings with the WVDEP in 2009, 2010, and 2012, during which UCC informed the WVDEP of the work and results of its ongoing sampling efforts at Filmont. See id. (citing ECF 290-31).  According to UCC, at no point during or after these meetings did the USEPA or the WVDEP "advise UCC of a need to deviate from the efforts undertaken at Filmont[,]" nor did either entity "require[] UCC to deviate from its current CERCLA approach."  Id. (citing ECF Nos. 290-31; 292-13 at 594).

As previously mentioned, Filmont and the Massey Railyard were accepted into the VRP on September 23, 2021.  See ECF 292-32.  UCC contends "[t]he investigation and remediation under the VRP will satisfy UCC's requirements under CERCLA as it relates to those sites."  ECF 297 at 8.

---

[19] ECF Nos. 292-11 and 292-12 consist of the contents of the 2015 ERA evaluation and attachments thereto. While UCC avers both the ERA and the HHRA "found no risk of harm to humans or the environment[,]" it appears that only the ERA has been cited to, which concluded that "based on the lines of evidence presented here, no further action is recommended to address ecological resources at the site."  ECF 292-11 at 26.

C.   <u>The Courtland Property</u>

In January 1980, "Courtland purchased the Courtland Property for investment purposes, particularly for potential future sale to a third party."  ECF 1 (Courtland I) ¶ 4; ECF 304 (Courtland II) ¶ 5.  UCC alleges that the Courtland Property "has been used in the past to store coal and as an unpermitted dump for construction debris" and that current operations "include the storage and apparent disposal of construction waste and other fill" on the property.  ECF 304 (Courtland II) ¶ 11.  UCC avers that "undisputed aerial photographs of the Courtland [P]roperty show that for decades it was covered with coal and unknown other materials, including fly ash."  ECF 297 at 9 (citing ECF 194-1 ¶ 21,[20] Exs. A-5-A-8).

---

[20] Courtland objects to paragraph 21 of Mr. Cibrik's declaration as improper and unauthorized expert opinion, which provides:

> Historical aerial photographs taken in 1950, 1955, and 1960 show coal piles on the Courtland [P]roperty. While the fact that coal is present on the Courtland [P]roperty may not be obvious to the untrained eye, I am certain that coal is present on the property in the photographs (it appears to be stored over approximately 30% of the entire property).  Attached hereto as Exhibits A-5, A-6, and A-7, consecutively are the aerial photographs of the Courtland [P]roperty upon which I have relied in drawing this conclusion. In particular, I have annotated Exhibit A-8 to show the areas where the coal is located on the Courtland Property, as well as the location where the Plaintiff

In 2008, Courtland entered into a lease regarding the Courtland Property with Raynes and Sons Excavation, LLC ("Raynes"). See ECF 292-15 at 29. Since 2008, Raynes, as lessee, has utilized the Courtland Property for, inter alia, the storage of dirt, asphalt millings, concrete, asphalt chunks, barriers and rebar, and other steel materials. Id. at 36-38, 52-55, 56-57. UCC also notes that a 1,000 gallon diesel tank, hydraulic oil and motor oil stored in five gallon buckets, and heavy equipment including a screener, crusher, bulldozer, and excavators are stored on the Courtland Property. See ECF 297 at 9 (citing ECF 292-15 at 59, 67-70).

According to UCC, "[w]ater that passes through Raynes' materials on the site typically flows into one of the several retention ponds on site[,]" which "drain directly into the ground, which would cause contaminants to seep into Courtland's

_____

has taken its samples that it contends to show contamination is present on the Courtland [P]roperty.

ECF 194-1 ¶ 21. Courtland further contends that there is no underlying foundation or authentication provided for the historical photographs but purportedly relies on the same photographs in attempting to demonstrate the historical storage of coal on the Massey Railyard. The court concludes Mr. Cibrik's statement is not based upon any specialized knowledge, but rather his personal and historical knowledge regarding the properties at issue. The objection is overruled. Furthermore, the court notes that Courtland's own expert, Dr. Simonton, confirmed in his deposition testimony that the Courtland Property has a history of being used for coal storage. See ECF 150-48 (Courtland III) at 18.

soil or groundwater." ECF 153 (Courtland III) at 9. UCC
further asserts that "whenever the detention ponds overflow, the
contaminated water is discharged from Courtland's property into
the South Boundary Drainage Ditch, South Boundary Creek, and
Davis Creek." Id. (citing ECF 150-44 at 18-30).

D.   Completed Environmental Testing

        Since the inception of these matters, environmental
testing by the parties has occurred on five occasions: (1) three
groundwater samples collected by Courtland's expert, Dr. Scott
Simonton, taken from the southeast portion of the Courtland
Property in August 2017; (2) three soil samples taken by Dr.
Simonton from an upland area between the South Boundary Creek
and the UCC property line in the vicinity of the Filmont
Landfill in November 2019; (3) two surface water samples and one
sediment sample taken by Dr. Simonton during a kayak trip up
Davis Creek and Ward Branch in September 2020; (4) a limited
soil investigation conducted by UCC on the Courtland Property in
December 2020; and (5) several groundwater samples taken from
Dr. Simonton's installation of temporary monitoring wells on the
Courtland Property in June and July 2021.

### 1.  August 2017 Sampling by Courtland

Given Courtland's concern that contamination from the Tech Park may have migrated or may be migrating onto the Courtland Property, Courtland conducted a limited environmental investigation on its property in August 2017.  According to Dr. Simonton's declaration, "three direct-push borings were completed into the subsurface for the purpose of collecting groundwater samples via temporary piezometers" at a location "in the most upgradient, southeast portion of the Courtland [P]roperty, directly downgradient of the [Tech Park] as shown in various UCC groundwater monitoring reports."  ECF 288-28 at 4-5.

Dr. Simonton reports that the three groundwater samples taken "revealed the presence of certain contaminations of concern, at elevated levels, in environmental media, at and under the Courtland Property," which included "2-Butanone (a.k.a methyl ethyl ketone), Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium, each . . . identified as a 'solid waste,' within the meaning of 40 C.F.R. § 261.2, with respect to its presence in environmental media at and emanating from [the Tech Park]."  Id. at 4.

The 2017 samples appear to only be relevant regarding the alleged contamination emanating from the Tech Park inasmuch as Dr. Simonton has conceded that neither Filmont nor the Massey

Railyard could impact the groundwater at this location on the Courtland Property.  See ECF 292-12 ¶ 44 (Dr. Simonton stating in his expert report that "no one -- including most certainly me -- has ever said, at any time, that the groundwater sampled in 2017 by Courtland in the southeastern corner of [the] Courtland Property came from UCC's Filmont Dump or Massey Railyard."); see also ECF 292-3 at 223.

### 2.  November 2019 Sampling by Courtland

According to UCC, in November 2019, Dr. Simonton attempted to take three soil samples from the Courtland Property.  See ECF 297 at 10.  UCC states, however, that Dr. Simonton admitted during his May 7, 2021, deposition that the "samples were actually taken from UCC property and showed no impact above background levels."  Id. (citing 292-13[21] at 402-404).

---

[21] ECF 292-13 contains excerpts from Dr. Simonton's May 7, 2021, deposition testimony.  While page 402 of the deposition is contained in the record, which demonstrates that the November 2019 samples were actually taken from the UCC property, the remainder of the pages cited (i.e., pages 403-404), presumably demonstrating that the samples "showed no impact above background levels" as UCC suggests, are missing from the record.

### 3.   September 2020 Sampling by Courtland

Given Courtland's concern that contamination from Filmont may have migrated or may be migrating into Davis Creek, on September 11 and 12, 2020, Courtland conducted a limited environmental investigation into Davis Creek and Ward Branch. In Dr. Simonton's unsworn declaration detailing his investigation, he states that, on September 11, 2020, he observed portions of the Filmont Site while kayaking in Davis Creek and Ward Branch.  ECF 111 (Courtland II) ¶¶ 7-17.  He observed orange sludge, consistent with deposits of iron hydroxide or oxyhydroxides, below the waterline all along the portion of the Filmont Site that forms the eastern bank of Davis Creek.  See id. ¶¶ 11-12.  Along the portion of Filmont Site forming the southern bank of Ward Branch, Dr. Simonton observed "landfill material, including broken concrete, bricks, 5-gallon buckets, and a heavy orange sludge" both on the bank and in the water of Ward Branch.  Id. ¶ 13.

Ward Brach goes North under I-64, likely in a culvert, and then comes back under I-64, likely in a culvert.  East of this material, where, travelling upstream, Ward Branch bends northward and passes under a culvert, Dr. Simonton "observed a continuous discharge of liquids and solids flowing from the Filmont [Site] and creating a blanket of orange sludge that

36

entered [Ward Branch]." Id. ¶¶ 13-14. Dr. Simonton took samples of (1) liquid from the discharge where it met the Ward Branch waterline ("Sample 1"), (2) water immediately upstream and on the opposite side of Ward Branch ("Sample 2"), and (3) orange sludge lying immediately below the discharge ("Sample 3"). See id. ¶ 15. Dr. Simonton further notes that he "could proceed no further upstream due to shallow water." Id.

Dr. Simonton had these samples tested. He states that the results showed the liquid from Sample 1 and the orange sludge from Sample 3 were "highly contaminated with toxic material" and that Ward Branch was also "highly contaminated." Id. ¶ 20. Specifically, the liquid from Sample 1 contained extremely high concentrations of iron and high concentrations of aluminum, arsenic, lead, and manganese, and it also contained beryllium, cadmium, chromium, copper, nickel, selenium, and zinc. See id. ¶ 21. The orange sludge from Sample 3 contained extremely high concentrations of iron and elevated concentrations of arsenic, copper, cadmium, lead, mercury, nickel, selenium, and zinc. See id. ¶ 25.

The water from Sample 2 contained high concentrations of aluminum and arsenic, but Dr. Simonton indicates that other sources may be responsible for higher concentration of arsenic in the water. See id. ¶¶ 22-23. Although he notes that,

according to the WVDEP, Ward Branch and Davis Creek have been
identified as being polluted with iron, see id. ¶ 22, he states
that, based on his testing and the orange sludge he observed in
Davis Creek, Ward Branch, and the southern drainage ditch, "it
is obvious . . . that high concentrations of iron" have been
added to these waters by the Filmont Site.  Id. ¶ 24.

On September 12, 2020, Dr. Simonton visited the
Courtland Property and from there observed the southern drainage
ditch, which, he notes, flows from the Massey Railyard, across
the Courtland Property, and into Davis Creek.  Id. ¶ 18.  He
observed orange materials along the eastern bank of Davis Creek
formed by the Filmont Site that "extended 30 yards or so"
southwards in Davis Creek, "upstream of [its] confluence" with
the southern drainage ditch.  Id.  He also observed orange
sludge in the southern drainage ditch "immediately upstream of
[its] confluence" with Davis Creek.  Id.  He further states that
a photograph he took of the area, which he attached to his
declaration, "shows a channel of orange staining coming from the
Filmont [Site] across the Courtland Property into the
[s]outh[ern] [drainage ditch] and discharging to Davis Creek."
Id. (citing ECF 111-1 at 8).

"Based on [his] observations . . . and related sample
results," Dr. Simonton "concluded that waste material has

contaminated groundwater and is flowing from" the Filmont Site
"from the discharge" he observed and sampled (presumably, in
Ward Branch) "and other" unidentified "locations" "in the form
of liquids and sludges containing aluminum, arsenic, beryllium,
cadmium, chromium, copper, lead, manganese, mercury, nickel,
selenium, and zinc" "into the [s]outh[ern] [drainage ditch],
Davis Creek, and Ward Branch."  Id. ¶ 27.  He further stated
that, at the discharge he sampled,

> solid and liquid landfill materials flow continuously
> through a discernable, confined, and discrete
> conveyance, which is clearly a ditch, channel, tunnel,
> conduit, or discrete fissure, from which pollutants .
> . . are discharged into Ward Branch, which flows into
> Davis Creek, a stream that flows into the Kanawha
> River.  This unmonitored and uncontrolled discharge
> does not now have and never has had an NPDES Permit
> and is, therefore, a clear violation of the federal
> Clean Water Act[.]

Id. ¶ 32.


### 4.  December 2020 Sampling by UCC


On December 16 and 17, 2020, UCC conducted a limited
soil investigation on the Courtland Property to determine the
source of environmental impacts thereon and whether the
Courtland Property could be a source of the alleged impacts to
its own groundwater.  See ECF 271-1 at 39 ¶¶ 8-9.  The
investigation was comprised of "soil borings in periphery areas

mostly on the side of the property that abuts the UCC property
and test pit borings in the interior of the operations area on
the Courtland property[.]"  Id. at 39-40 ¶ 12.  The borings
revealed evidence of coal material, and the test pits
encountered buried metal and debris.  See ECF Nos. 290-20; 290-
21; 290-3 at 3-4.  The laboratory results from the soil sampling
event on the Courtland Property identified sixteen (16) VOCs,
eighteen (18) metals, and seventeen (17) SVOCs.  See ECF 290-15
at 14.  "In all, over forty-five (45) CERCLA Hazardous
Substances were detected in one or more of the soil samples,"
including:

> 1,2 Dichloroethane, 1,2 Dibromoethane, 1,1,2
> Trichloroethane, Acetone, Benzene, Carbon
> Tetrachloride, Cyclohexane, Ethylbenzene, Methyl Ethyl
> Ketone (2-Butanone), Trichloroethene, Toluene, o
> Xylene, m,p Xylene, total Xylene, Aluminum, Antimony,
> Arsenic, Barium, Beryllium, Cadmium, Chromium, Cobalt,
> Copper, Lead, Manganese, Mercury, Nickel, Selenium,
> Sodium, Thallium, Vanadium, Zinc, 1,1 Biphenyl,
> Acenaphthylene, Anthracene, Benzo(a)anthracene,
> Benzo(a)pyrene, Benzo(b)fluoranthene,
> Benzo(g,h,i)perylene, Benzo(k)fluoranthene, Chrysene,
> Dibenzo(a,h)anthracene, Dibenzofuran, Fluoranthene,
> Fluorene, Indeno(1,2,3-cd)pyrene, Naphthalene,
> Phenanthrene and Pyrene.

Id.  UCC avers, based on the opinion of its experts, that the
constituents found in the 2020 soil samplings and the historical
use of the Courtland Property, along with the activities of the
property's lessee, suggests that Courtland itself is the likely

source of the alleged contamination on its property.  See id. at 17-18.


### 5.  June-July 2021 Sampling by Courtland


Given Courtland's concerns that contamination from Filmont may have migrated or may be migrating onto the Courtland Property, Courtland in June and July 2021, conducted another limited environmental investigation on the Courtland Property. In June 2021, Dr. Simonton installed four temporary monitoring wells on the Courtland Property, from which groundwater samples were taken throughout the months of June and July from three of the wells, with no recorded sampling taken from the fourth.  See ECF 292-20; ECF 297 at 11.

According to Dr. Simonton's sworn declaration, the 2021 sampling "described in Exhibit 6 – led to the confirmation of UCC contaminants on the Courtland Property from UCC's Filmont Facility."  ECF 288-28 ¶ 36.  According to the Limited Groundwater Study Report prepared by Ashby-Tucker Environmental, LLC, regarding these samplings, three wells were placed in a line near the UCC [Filmont]/Courtland Property boundary, and a fourth well was placed "further to the south to aid in delineating groundwater flow."  ECF 288-35 at 5.  The results of the study report that at the three linear well locations,

41

"groundwater elevation data indicates flows to the south (toward South Boundary Ditch) and west (toward Davis Creek)" and "confirms UCC data in that flow is from the Filmont [Site] onto and across Courtland." Id. at 7.  The results further provide that "3 VOC and 8 SVOC contaminants were detected in the groundwater samples[,]" and "[a]rsenic concentrations were up to 21x the MCL." Id.  "Additionally, iron — a common contaminant associated with [the] Filmont [Site] discharges to surface water and in Filmont groundwater — was elevated." Id.  The report goes on to state:

> Most noteworthy, according to the UCC 2015/2016
> Groundwater Monitoring Report for Filmont, UCC has
> identified 1,4-Dioxane, Bis(2-chloroisopropyl)ether
> (aka 2,2`-Oxybis(1-chloropropane)), and Arsenic as the
> "most prominent constituents present within the
> groundwater plume."  Both of these organic
> contaminants were found in Courtland groundwater
> immediately adjacent and downgradient of the Filmont
> [Site], and arsenic was also found at very high
> concentrations.

Id.  The report concludes that "[t]he sampling and groundwater measurements confirm UCC data that indicates contaminated groundwater flows from the Filmont [Site] onto [the] Courtland [P]roperty and that contaminants emanating from the Filmont [Site] have migrated onto [the] Courtland [P]roperty." Id.  The report notes that "[t]his limited investigation does not and was not meant to determine the nature and extent of contamination at

and emanating from the Filmont [Site][,]" and "[a]n NCP-compliant Remedial Investigation remains necessary."[22]  Id.

E.  Current Litigation

On October 8, 2021, Courtland filed its consolidated motion for partial summary judgment in Courtland I and II.  In Courtland I (Tech Park), Courtland moves for partial summary judgment on Count I of its complaint: recovery of response costs and declaratory relief under CERCLA, 42 U.S.C. §§ 9607(a) and 9613(g).  In Courtland II (Filmont and Massey), Courtland moves for partial summary judgment on the following claims: (Count I) recovery of response costs and declaratory relief under CERCLA, 42 U.S.C. §§ 9607(a) and 9613(g); (Count II) citizen suit relief for violations of § 702(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1)(A), and the West Virginia Hazardous Waste Management Act; (Count III) citizen suit relief for judicial abatement of an imminent and substantial endangerment under § 7002(a)(1)(B)

---

[22] It is noted that the "NCP" stands for the National Contingency Plan, which "is a regulatory framework promulgated by the EPA that explains how national and local entities should respond to various environmental hazards, including toxic spills." Barclay Lofts LLC v. PPG Industries Inc., Case No. 20-cv-1694-JPS-JPS, 2021 WL 3422217, at *6 (E.D. Wis. Aug. 5, 2021).  The NCP "sets forth detailed guidelines with which . . . parties must comply in order to collect the costs of a clean up of hazardous waste" under CERCLA. Weyerhaeuser Corp. v. Koppers Co., Inc., 771 F. Supp. 1406, 1414 (D.Md. 1991) (citing 42 U.S.C. § 9607(a)(4)(B)).

of RCRA, 42 U.S.C. § 6972(a)(1)(B); and (Count V) judicial abatement of a public nuisance per se.  On March 14, 2022, Courtland also filed its motion for summary judgment respecting all of UCC's asserted counterclaims in Courtland II.

On October 8, 2021, UCC filed its consolidated motion for summary judgment in Courtland I and II on all of Courtland's outstanding claims therein.  The parties have thus cross-moved for summary judgment on Courtland's CERCLA claims (Count I) in Courtland I and Courtland's CERCLA, RCRA, and judicial abatement of a public nuisance per se claims in Courtland II.[23]

## II.  Governing Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The nonmoving party must do so by offering 'sufficient proof in the form of

_____

[23] On March 30, 2022, UCC also filed its consolidated motion for summary judgment as to all of Courtland's outstanding claims pursuant to the CWA asserted in Courtland III and IV.

admissible evidence' rather than relying solely on the allegations of her pleadings." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (quoting Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993)).  The Court must "view the evidence in the light most favorable to the [nonmoving] party." Tolan v. Cotton, 572 U.S. 650, 657 (2014) (internal quotation marks omitted); Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018).

When faced with cross-motions for summary judgment, the court applies the above standard and must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotations omitted).  "The court . . . cannot weigh the evidence or make credibility determinations." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 569 (4th Cir. 2015); see also Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment.

45

III.  Discussion

A.  <u>CERCLA Claims</u>

In Count I of both Courtland I and II, Courtland seeks recovery of response costs under CERCLA § 107(a), 42 U.S.C. § 9607(a), and declaratory judgment as to any future response costs under CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).  As previously mentioned, the parties have cross-moved for summary judgment on Courtland's CERCLA claims set forth in Count I of its complaint in both Courtland I (the Tech Park) and Courtland II (Filmont and the Massey Railyard).  UCC contends it is entitled to summary judgment on Courtland's CERCLA claims inasmuch as Courtland lacks standing to bring the same given that Courtland has (1) failed to demonstrate a cognizable injury in fact in Count I of both actions as to all three areas because its purported response costs are neither necessary nor consistent with the NCP, and (2) failed to show a fairly traceable injury upon which standing can be based in regards to the Tech Park area because Courtland cannot show the alleged impacts to its property are caused by migration therefrom.[24]

---

[24] The court notes that UCC makes a traceability argument for purposes of standing with respect to the Tech Park only and does not contend that Courtland cannot show a fairly traceable injury with respect to Filmont and the Massey Railyard.  <u>See</u> ECF 297 at 18-21.

Courtland, on the other hand, contends it has standing and is entitled to summary judgment as a matter of law inasmuch as it has established a prima facie case for recovery of its response costs in both actions.  The court will first address UCC's standing contentions set forth in its summary judgment motion before turning to Courtland's motion for summary judgment respecting its CERCLA claims.

### 1.  UCC's Motion for Summary Judgment: Standing

"The standing doctrine derives from 'the Constitution's limitation on Article III courts' power to adjudicate cases and controversies'", thus "implicat[ing] the court's subject matter jurisdiction." South Carolina v. United States, 912 F.3d 720, 726 (4th Cir. 2019) (quoting Frank Krasner Enters v. Montgomery Cty., 401 F.3d 230, 234 (4th Cir. 2005)). "To establish Article III standing, 'a plaintiff must show (1) it has suffered an injury in fact . . .; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)).

"[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Wikimedia Foundation v. National Security Agency, 857 F.3d. 193, 208 (4th Cir. 2017) (quoting Lujan, 504 U.S. at 561).  Thus, "in response to a motion for summary judgment, the plaintiff can no longer rest on 'mere allegations' but 'must set forth by affidavit or other evidence specific facts . . . which for the purposes of the summary judgment motion will be taken to be true." Nelson v. Warner, 472 F. Supp. 3d 297, 304 (S.D.W. Va. 2020) (quoting Lujan, 504 U.S. at 561); see also Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017).  "If the opposing party controverts these facts at the final stage of litigation, the facts must be 'supported adequately by the evidence adduced at trial' for the party to maintain standing." Id.

"CERCLA encourages private individuals to clean up environmental hazards by permitting them to recover specified costs of cleanup from parties defined by CERCLA to be responsible for the hazards." Westfarm Assocs. Ltd. P'ship v. Wash. Suburban Sanitary Comm'n, 66 F.3d 669, 677 (4th Cir. 1995).  A private-party plaintiff establishes a prima facie case for cost recovery under CERCLA by establishing the following

elements: "(1) the defendant is a potentially responsible person ("PRP"); (2) the site constitutes a 'facility;' (3) a 'release' or threatened release of hazardous substances exists at the 'facility'; (4) the plaintiff has incurred costs responding to the release or threatened release of hazardous substances ('response costs'); and (5) the response costs conform to the National Contingency Plan." PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 167-68 (4th Cir. 2013).  The fourth element concerns causation.  See Ashley II of Charleston, LLC v. PCS Nitrogen, Inc., 791 F. Supp. 2d 431, 479 (D.S.C. 2011) (stating the element requires proof "that the release or threatened release has caused the plaintiff to incur response costs" (emphasis added)).

     A plaintiff must also show that the response costs it incurred were necessary.  See 42 U.S.C. § 9607(a)(4)(B) (imposing liability upon PRPs "for . . . necessary costs of response by any [private] person"); see also, Westfarm, 66 F.3d at 677 (noting cost-recovery elements and stating the claimant must show it incurred necessary response costs); Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 841, n.2 (4th Cir. 1992) (noting Section 9607(a)(4)(B) "provides that costs will be recoverable only if they are 'necessary'"); Ashley II, 791 F. Supp. 2d at 479-80 (noting the plaintiff must demonstrate that

"the release or threatened release has caused the plaintiff to incur response costs that are necessary and consistent with the [NCP]." (internal citations omitted)).

A more cohesive and concise version then of the elements that a private-party plaintiff must establish to succeed on a cost recovery claim under Section 107(a) of CERCLA are as follows: "(1) that the defendant falls within one of the four classes of [PRPs] subject to CERCLA liability, [one of which is the current owner of the facility] 42 U.S.C. § 9607(a); (2) that a CERCLA 'facility' exists, 42 U.S.C. § 9601(9); (3) that a 'hazardous substance' has been 'released' (or threatens to be released) from the defendant's facility, 42 U.S.C. §§ 9601(14), (22); 42 U.S.C. § 9607(a)(4); and (4) that the release or threatened release has caused the plaintiff to incur response costs that are 'necessary' and 'consistent with the [NCP],'" 42 U.S.C. § 9607(a)(4)." **Ashley II**, 791 F. Supp. 2d at 479-80.

### i.  Injury In Fact

An injury in fact "refers to the invasion of some 'legally protected interest' arising from constitutional, statutory, or common law." **Pender v. Bank of Am. Corp.**, 788 F.3d 354, 366 (4th Cir. 2015) (quoting **Lujan v. Defs. Of Wildlife**, 504 U.S. 555, 559-60 (1992)). "Indeed, the [legally

protected] interest may exist 'solely by virtue of statutes creating legal rights, the invasion of which creates standing.'" Id. (quoting Lujan, 504 U.S. at 578).  "Thus, 'standing is gauged by the specific common-law, statutory[,] or constitutional claims that a party presents.'"  Id. (quoting Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 77 (1991)).  CERCLA creates a legally protected interest in the recovery of necessary response costs, the incurrence of which may constitute a cognizable injury in fact. See City of Spokane v. Monsanto Company, 237 F. Supp. 3d 1086, 1091-3 (E.D. Wash. 2017) (concluding the incurrence of necessary response costs under CERCLA constitutes an injury in fact).

Regarding the Tech Park, UCC notes that Courtland has identified invoices totaling $36,916.25 from its environmental consultant "for the installation and laboratory testing of groundwater samples taken from [the Courtland Property] in August 2017." ECF 297 at 12; see also ECF 292-22.  UCC asserts, however, that Courtland has failed to demonstrate that such costs are necessary and consistent with the NCP.  Specifically, UCC contends Courtland has failed to "certify" its alleged response costs as compliant with the requirements of the NCP. See ECF 297 at 14-15.  UCC also contends that Courtland has failed to show "any nexus between its initial investigative

costs in 2017 and any actual clean-up of hazardous releases and thus has not demonstrated an injury in fact." Id. at 18. UCC further asserts that Courtland's "proffered evidence is not in substantial or even minimal compliance with the NCP and standard scientific methods for environmental site investigations." Id. at 16.

In support of this latter contention, UCC raises many of the same arguments it asserted in its previously denied motion to exclude the opinions and testimony of Courtland's expert, Dr. Simonton, respecting the inadequacy of his field sampling measures and documentation associated with the same. See ECF 438. Relevant to the requirements of the NCP, UCC avers Dr. Simonton failed to develop a field sampling plan and a quality assurance project plan ("QAPP") before conducting any of his preliminary investigations/samplings for which Courtland now seeks response costs. In sum, UCC contends that "[g]iven that the work upon which [Courtland's] alleged costs are based does not qualify under the NCP, [Courtland] does not have standing to seek recovery of those costs." ECF 297 at 18.

Courtland responds that there is no requirement that response costs be "certified" in a citizen suit claim pursuant to Section 107(a) of CERCLA and that UCC has confused "this action with costs sought under a CERCLA § 111 action (42 U.S.C.

§ 9611), for federal Superfund money, for which [the] [US]PA must 'certify' that costs were 'necessary and consistent with the preauthorization decision document.'" ECF 380 at 26 (citing 40 C.F.R. § 300.700(d)(8)). Additionally, relying on Dr. Simonton's declaration, Courtland contends that the environmental investigation performed in August 2017 was necessary as "a specific response to the concern that UCC was contaminating the Courtland Property from its Tech Park facility" and that the preliminary sampling performed "is clearly the type of work that must be performed to result in a CERCLA-quality cleanup." Id. at 31-32; see also ECF 288-28 ¶¶ 17-18. Courtland further avers, citing caselaw in support of its contention, that it "need not demonstrate consistency with the NCP to recover these initial monitoring and investigation costs." Id. at 33 (emphasis in original).

        CERCLA provides a private right of action for the recovery of "necessary costs of response incurred by any other person consistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(B). The NCP is a set of regulations that "establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants[.]" 42 U.S.C. § 9605(a)(7). While our court of appeals has not addressed what constitutes

"necessary" response costs, courts appear to apply two separate requirements with no apparent cohesion or consistency.

For instance, some courts are generally in agreement that "[c]osts are 'necessary' if incurred in response to a threat to human health or the environment." Reg'l Airport Auth. of Louisville v. LFG, LLC, 460 F.3d 697, 703 (6th Cir. 2006) (collecting cases); see also Carson Harbor Vill. Ltd. v. Unocoal Corp., 270 F.3d 863, 871 (9th Cir. 2001) (en banc) (collecting cases and noting courts have "generally agreed that [the 'necessary'] standard requires that an actual and real threat to human health or the environment exist before initiating a response action"); Ashley II, 791 F. Supp 2d at 480 (stating "costs are 'necessary' if incurred in response to a threat to human health or environment"). Additionally, courts have concluded that -- relying on CERCLA's broad definition of "removal[25]" -- investigatory costs such as "environmental studies

---

[25] CERCLA defines "response" as "remove, removal, remedy, and remedial action" including "enforcement activities related thereto." 42 U.S.C. 9601(25). "Removal," in turn, is defined as follows:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, disposal of removed substances, or the taking of such other actions as may be

of a facility undertaken to 'monitor, assess, and evaluate' the release of hazardous substances'" qualify as necessary response costs (emphasis added). <u>Northwestern Mut. Life Ins. Co. v. Atlantic Research Corp.</u>, 847 F. Supp. 389, 396 (E.D. Va. 1994) (concluding "[u]nder CERCLA's expansive definition of 'removal,' it follows that a 'response' includes environmental studies of a facility undertaken to 'monitor, assess, and evaluate' the release of hazardous substances[;] thus, "costs incurred for purposes of evaluation and investigation . . . qualify as 'response costs'"); <u>see also</u> <u>HRW Sys., Inc. v. Wash. Gas Light Co.</u>, 823 F. Supp. 318, 341 (D. Md. 1993) (concluding the plaintiff's investigation of the contaminated property fell "under the rubric of 'necessary costs'").

Other courts, however, have concluded that for a response cost to be considered "necessary," there must be "some nexus" between the alleged response cost and "an <u>actual</u> <u>cleanup</u> of hazardous releases." <u>Young v. United States</u>, 394 F.3d 858, 864 (10th Cir. 2005) (emphasis in original); <u>see</u> <u>also</u> <u>Ellis v.</u>

---

necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release....

42 U.S.C. § 9601(23) (emphasis added).

Gallatin Steel Co., 390 F.3d 461, 482 (6th Cir. 2004)[26]; Gussack

Realty Co. v. Xerox Co., 224 F.3d 85, 92 (2d Cir. 2000); Redland

Soccer Club, Inc. v. Dep't of Army, 55 F.3d 827, 850 (3d Cir.

1995); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 669-70 (5th

Cir. 1989).[27]  In other words, the view is that "costs cannot be

---

[26] The Sixth Circuit appears to have utilized both standards
depending upon the factual situation presented.  In Reg'l
Airport Auth. of Louisville, the court recognized that "[c]osts
are 'necessary if incurred in response to a threat to human
health or environment," ultimately concluding that "no
reasonable jury could conclude that prior to the construction
process [at issue therein], the contamination on site posed an
actual and real threat to the environment or to public health."
460 F.3d at 703, 706.  In Ellis, the court noted that "only work
that is closely tied to the actual cleanup . . . may constitute
a necessary cost of response," and "[e]ven if the monitoring time
spent by the [plaintiffs] constitute[d] proper costs incurred
under the statute (which [defendants] dispute), these costs were
not closely tied to an actual cleanup but in the end were
unrelated to any cleanup at all."  390 F.3d at 482.

[27] The court notes that the Ninth Circuit has stated that
its analysis "focus[es] . . . on . . . whether the response
action is addressed to" a "threat to human health or the
environment."  Carson Harbor Vill., 270 F.3d at 872.  It appears
that some district courts in the Ninth Circuit have understood
this requirement to mean that "'[n]ecessary costs are costs that
are necessary to the containment and cleanup of hazardous
releases,'" City of Spokane, 237 F. Supp. 3d at 1094 (internal
quotation marks omitted) (quoting United States v. Iron Mountain
Mines, Inc., 987 F. Supp. 1263, 1271 (E.D. Cal. 1997)). In a
more recent opinion, the Ninth Circuit noted in dicta that it
had "never interpreted the term 'necessary' as requiring a nexus
solely between recoverable costs and on-site cleanup
activities," noting that "[w]e instead read CERCLA's cost
recovery provisions as making no distinction between cleanup and
investigatory costs." Pakootas v. Teck Cominco Metals, Ltd., 905
F.3d 565, 581 (9th Cir. 2018).

deemed 'necessary' to the containment and cleanup of hazardous releases absent some nexus between the alleged response cost and an actual effort to respond to environmental contamination." Young, 394 F.3d at 863 ("costs for initial investigation and monitoring might be compensable if linked to an actual effort to contain or cleanup an actual or potential release of hazardous substances").

In addition to being "necessary," response costs are also required to be "consistent with the [NCP]." 42 U.S.C. § 9607(a)(4)(B). "A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in [40 C.F.R. § 300.700(c)(5)-(6)], and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). In turn, § 300.700(c)(5)-(6) sets forth an array of requirements "potentially applicable to private party response actions" regarding, inter alia, worker health and safety; documentation and cost recovery; permit requirements; reports of releases to the National Response Center ("NRC"); removal site evaluation and actions; remedial site evaluation; selection of a remedy; and providing an opportunity for public comment concerning the selection of a response action. 40 C.F.R. § 300.700(c)(5)-(6).

As recognized by the district court in **Weyerhaeuser Corp. v. Koppers Co., Inc.**, however, "[t]he bulk of the NCP guidelines appear to apply to actual removal and remedial procedures but do not logically appear applicable to the initial assessment aspects of a cleanup." 771 F. Supp. 1406, 1414 (D. Md. 1991).[28]   Cognizant of this fact, "many courts have held that initial investigation, site-assessment, and monitoring costs are recoverable under § 107(a) of CERCLA irrespective of compliance with NCP requirements." **CNH America, LLC v. Champion Environmental Services, Inc.**, 863 F. Supp. 2d 793, 809 (E.D. Wis. 2012) (collecting cases); **see also Von Duprin LLC v. Major Holdings, LLC**, 12 F.4th 751, 771 (7th Cir. 2021) (finding "no

---

[28] The court notes that the court in **Weyerhaeuser** held that "in order to prove a prima facie case of CERCLA liability, the plaintiff must prove that it has incurred at least some costs which are in compliance [with NCP] and hence recoverable." 771 F. Supp. at 141.  Recognizing that requirements of the NCP were inapplicable to the initial investigative costs sought, however, the court explained:

> CERCLA defines "response" as "remove, removal, remedy, and remedial action." 42 U.S.C. § 9601(25). "Remove" or "removal" includes "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). Thus, testing for hazardous material qualifies as a "removal" cost under the statute.

The court thus concluded that the investigative costs incurred by the plaintiff were "recoverable response costs consistent with the NCP." Id.

legal infirmity in the district court's observation that §
107(a) permits a company to recover due diligence costs incurred
in connection with the investigation of a contaminated site");
Donahey v. Bogle, 687 F.2d 1250, 1255 (6th Cir. 1993), vacated
on other grounds, 512 U.S. 1201 (1994) (concluding "[a]lthough
consistency with the NCP is a necessary element for recovery of
remedial costs, it does not necessarily follow that consistency
with the NCP is required for recovery of monitoring or
investigative costs"); Carlyle Piermont Corp. v. Federal Paper
Board Co., 742 F. Supp. 814, 821 (S.D.N.Y. 1990) (concluding
plaintiff's "substantial investigatory and response costs in
determining the scope of the contamination of the soil" were
recoverable "irrespective of" NCP compliance); Wickland Oil
Terminals v. Asarco, Inc., 792 F.2d 887, 892 (9th Cir. 1986)
(concluding costs of testing and investigation were recoverable
even where on-site cleanup costs were not sought); Artesian
Water Co. v. Government of New Castle, 851 F.2d 643, 651 (3rd
Cir. 1988) (same).

These courts have likewise concluded that these costs
are "necessary," finding that "[i]t stands to reason . . . that
such initial inquiries are necessary to enable subsequent
measures to ensure a CERCLA-quality cleanup, as CERCLA and the
NCP both contemplate." Von Duprin, 12 F.4th at 771; see also

59

<u>CNH America</u>, 863 F. Supp. 2d at 809 (concluding "because any clean-up proposal and, consequently, any clean-up of a contaminated site must first be preceded by an investigation of the nature and extent of contamination, such investigative and assessment costs need not be incurred in compliance with the NCP and are 'necessary'").

Finding this line of cases persuasive, the court concludes Courtland's August 2017 investigatory sampling costs related to the groundwater testing on the Courtland Property, -- the results of which have been explained in detail above -- incurred in direct response to Courtland's concern that contamination from the Tech Park was migrating or had migrated onto the Courtland Property, constitute "necessary" costs of response that are consistent with the NCP, irrespective of any literal compliance therewith.  Contrary to UCC's assertions, Courtland has thus established a cognizable injury in fact for purposes of standing on its CERCLA claims in Courtland I.

Regarding the Filmont Site and the Massey Railyard, UCC contends Courtland has "failed to tender any NCP compliant response costs related to the Filmont and Massey [Railyard] properties" and thus "has not demonstrated an injury-in-fact and . . . cannot recover for such non-existent costs under Section 9607(a)."  ECF 297 at 18.  Specifically, UCC alleges that during

discovery in Courtland II, Courtland only identified the $36,916.25 incurred for the well installation and laboratory testing related to the August 2017 groundwater sampling.

UCC contends Courtland has not provided any additional evidence of costs incurred in relation to Filmont and the Massey Railyard despite stating in its June 20, 2020, answers to interrogatories that such additional costs would be supplemented throughout the case.  See ECF 292-23 at 8.  Inasmuch as the August 2017 groundwater sampling is only related to Courtland's CERCLA claims in Courtland I regarding the Tech Park, UCC contends that "beyond a conclusory statement that [Courtland] has incurred other costs which will be provided later, [Courtland] has not alleged, provided in discovery, or proven any necessary response costs related to Filmont or [the] Massey [Railyard], or any costs at all."  ECF 297 at 13.

Additionally, in UCC's response brief to Courtland's motion for summary judgment, UCC notes that although Courtland includes Dr. Simonton's October 8, 2021, sworn declaration that "asserts additional costs, [Courtland] has not produced any evidence in discovery or otherwise to support these alleged costs."  ECF 382 at 31; see also ECF 288-28 ¶¶ 28, 37.  UCC further notes that although Courtland "did attach various invoices to its Consolidated Motion allegedly related to Dr.

Simonton's June/July 2021 investigation, <u>see</u> ECF 373-1,
[Courtland] failed to produce any such documents in the course
of discovery." <u>Id.</u> at 31.  UCC thus contends that "[t]o the
extent Courtland seeks any costs beyond what has been provided
in discovery, those costs should be disallowed due to the
failure to identify them during the extensive discovery in these
matters." <u>Id.</u>

Courtland responds, as UCC concedes, that Courtland
attached to its October 8, 2021, consolidated motion for summary
judgment in Courtland I and II, Dr. Simonton's October 8, 2021,
sworn declaration and invoices attached thereto verifying Dr.
Simonton's assertion that Courtland incurred costs totaling
$7,802.50 for its September 2020 investigation and $28,337.20
for its June-July 2021 investigation, both related to Filmont
and the Massey Railyard, aggregating $36,139.70. <u>See</u> ECF Nos.
288-28 at 5,6; 288-33; 288-34; 373-1.  Courtland highlights that
fact discovery in Courtland I and II did not close until
February 10, 2022, and these referenced attachments were
submitted along with its summary judgment motion on October 8,
2021.  Courtland also notes that the summary judgment filing
"was also prior to Dr. Simonton's most recent deposition on
March 24, 2022." ECF 395 at 16-17.

Furthermore, relying on Dr. Simonton's declaration, Courtland contends that the environmental investigation in September 2020 was "in direct response to learning about the Filmont facility, including [the] Massey Railyard," and the June and July 2021 samplings were also necessary as a response "to suspected releases from both the Tech Park . . . and Filmont." ECF 380 at 34; <u>see also</u> ECF 288-28 ¶¶ 23, 25, 29-38.

As a threshold matter, the court notes that on the date Courtland submitted its consolidated motion for summary judgment in Courtland I and II on October 8, 2021, the operative scheduling order governing those actions at that time closed fact discovery on June 14, 2021. <u>See</u> ECF 259 (Courtland II). On October 22, 2021, however, the court reopened discovery and extended the scheduling orders in Courtland I and II, with fact discovery to close on February 10, 2022, after permitting UCC to proceed with its amended counterclaims in Courtland II. <u>See</u> ECF 305. It appears Courtland did not provide UCC with the invoices detailing the costs associated with its September 2020 and June-July 2021 investigations/sampling events at any point during the relevant discovery period and instead, merely submitted the invoices as attachments to its consolidated motion for summary judgment filed on October 8, 2021.

While the court agrees with UCC that such invoices should have been provided to UCC during the course of discovery and not just via attachments to Courtland's summary judgment motion, it is equally noteworthy that it does not appear that UCC ever specifically sought to compel the same.[29]  Nonetheless, even assuming that Courtland failed to produce during discovery the relevant invoices it now relies upon to demonstrate its response costs in Courtland II, the court finds no real harm, surprise, or prejudice to UCC arising from such failure. Indeed, UCC was well aware that Courtland had undertaken environmental sampling of Davis Creek and Ward Branch in September 2020 and on the Courtland Property in June and July 2021, both in relation to Filmont and the Massey Railyard. While UCC may not have been provided the specific amount of the costs incurred, it was aware that Courtland had undertaken investigative efforts related to its CERCLA claims in Courtland

---

[29] In its response brief, UCC appears to suggest that it sought to compel such evidence on February 8, 2022.  See ECF 330 (Courtland II).  Upon review of UCC's motion to compel, however, the only request for production UCC sought to compel was "Request for Production No. 5," which requested "[a] current CV and all statements/invoices for services rendered by each expert retained to testify."  ECF 330-2 at 15.  It is unclear whether a request for invoices of testifying experts would encompass invoices related to the sampling done in relation to Filmont and the Massey Railyard.  Regardless, the Magistrate Judge's order regarding this motion indicates that "[t]he parties were able to reach an agreement resolving this dispute during the April 12, 2022, telephonic hearing[.]"  ECF 415 at 2.

II.  The court thus concludes Courtland has tendered evidence demonstrating proof of costs incurred in Courtland II.

To the extent that UCC avers that such response costs were neither necessary nor consistent with the NCP, the court rejects such contention for the same reasons set forth above regarding Courtland's August 2017 investigatory sampling costs. The court concludes that the September 2020 and June-July 2021 investigatory samplings and costs related thereto -- the results of which have been explained in detail above -- constitute "necessary" costs of response that are consistent with the NCP, irrespective of any literal compliance therewith.  Indeed, such investigatory samplings were taken in direct response to Courtland's concern that contaminants from Filmont may be migrating to the Courtland Property and such investigatory costs "are necessary to enable subsequent measures to ensure a CERCLA-quality cleanup, as CERCLA and the NCP both contemplate." <u>Von Duprin</u>, 12 F.4th at 771.  Courtland has thus established a cognizable injury in fact for purposes of standing on its CERCLA claims in Courtland II.

### ii.  <u>Fairly Traceable Injury</u>

The traceability prong of standing "means it must be likely that the injury was caused by the conduct complained of

and not by the independent action of some third party not before the court." <u>Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.</u>, 204 F.3d 149, 154 (4th Cir. 2000). The question then is whether a causal connection exists between the contamination on the Courtland Property from the Tech Park and Courtland's incurred response costs. Regarding only the Tech Park, UCC contends it is entitled to summary judgment on Courtland's CERCLA claims in Courtland I because Courtland "cannot show the alleged impacts to its property are caused by migration from the [Tech] Park" and thus "cannot show that it has a fairly traceable injury upon which standing can be based." ECF 297 at 21.

"Contrary to the rule followed in most areas of the law, the burden of proof as to causation in a CERCLA case lies with the defendant." <u>Westfarm</u>, 66 F.3d at 681. Indeed, as the Fourth Circuit has stated, "[t]he plaintiff must prove only that contaminants which were once in the custody of the defendant could have travelled onto the plaintiff's land, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs." <u>Id.</u> The plaintiff need not, however, "produce any evidence that the contaminants did flow onto its land from the defendant's land.

Rather, once plaintiff has proven a prima facie case, the burden of proof falls on the defendant to disprove causation." Id. Inasmuch as "the defendant bears the burden of proof as to causation, a defendant, to survive summary judgment, must come forward with sufficient evidence from which a jury could find that the defendant was not the source of the contamination." Id. (emphasis in original).

As previously mentioned, Courtland reports that the August 2017 groundwater sampling results taken on the Courtland Property "revealed the presence of certain contaminations of concern, at elevated levels, . . . which included "2-Butanone (a.k.a methyl ethyl ketone), Di-n-butyl phthalate, Arsenic, Barium, Cadmium, Chromium, Lead and Selenium[.]" ECF 288-28 at 4. It is undisputed that in the past, on certain occasions, wastes containing arsenic, 2-butatone, acetone, di-n-butyl phthalate, barium, cadmium, chromium, lead, and selenium were generated at the Tech Park. See ECF 288-2 at 25-30. It is also undisputed that the Courtland Property is downgradient of the Greenhouse Area of the Tech Park. See ECF 297 at 2-3, 4.

Regarding the Ward Hollow area of the Tech Park, it is somewhat unclear whether the parties dispute whether contaminants existing in Ward Hollow could somehow migrate to the Courtland Property. As previously mentioned, UCC's expert

Mr. de Haven opines that it is impossible as a matter of hydrogeology for groundwater originating in Ward Hollow to flow uphill and migrate to the Courtland Property or the Greenhouse Area.  See ECF 290-2 at 4, 5, 19, 21.  While Courtland states that it "generally agrees that it appears unlikely that contamination from Ward Hollow is migrating to Courtland, the reality is that UCC has not sufficiently investigated the Ward Hollow plume and the upgradient source above Filmont/Massey – that is[,] the Tech Park."  ECF 395 at 20.  Courtland notes that its expert, Dr. Simonton, has opined that "it is likely that contamination from Ward Hollow is commingling with contamination at the UCC and Filmont [Sites], but that the appropriate investigation related to UCC's Ward Hollow plume" has not been completed, nor has a full delineation of the property been done. Id. at 4 (citing ECF 288-29 ¶¶ 41-42, 68, 146); see also ECF 291 at 21 ¶¶ 9.2-9.3

In the court's estimation, the parties essentially agree that contaminants originating in the Ward Hollow area of the Tech Park cannot directly migrate to the Courtland Property given the geological layout of the two areas.  It appears, however, that a question of fact may remain as to whether it is possible that contaminants from Ward Hollow have migrated to Massey Railyard and/or Filmont, comingled with the contaminants

thereon, and then subsequently made their way to the Courtland
Property.  Regardless, this issue is of little moment with
respect to the standing inquiry inasmuch as it is undisputed
that the Greenhouse Area of the Tech Park is upgradient of the
Courtland Property and is therefore an area of the Tech Park
"with groundwater flow to Courtland," ECF 297 at 2-3, thus
demonstrating that contaminants once existing in the Greenhouse
Area "could have travelled onto . . . [Courtland's] land."
Westfarm, 66 F.3d at 681 (emphasis added).  The inquiry does not
stop there as Courtland must also demonstrate that "subsequent
contaminants (chemically similar to the contaminants once
existing in defendant's custody) on the plaintiff's land caused
the plaintiff to incur cleanup costs."  Id.

        Courtland cites to evidence, (see ECF Nos. 289-2; 289-
6; 289-14; 289-16), demonstrating that "[a]rsenic, barium,
chromium, lead, 1,4 dioxane, vinyl chloride, and BCIE" have been
detected in groundwater at and emanating to and from the
Greenhouse Area of the . . . Tech Park."  ECF 380 ¶ 4.9.
Courtland also notes that "arsenic, 2-butatone, di-n-butyl
phthalate, barium, cadmium, chromium, lead, and selenium have
all been detected in soil samples at the Tech Park."  ECF 291 at
7 ¶ 4.7 (citing ECF 288-2 at 50-55).  As mentioned, Courtland's
2017 sampling results detected the presence of, inter alia,

arsenic, barium, chromium, lead, cadmium and selenium on the Courtland Property.  See ECF 288-28 at 4.  Courtland also notes that 1,4 dioxane has also been detected on both the Greenhouse Area of the Tech Park and on the Courtland Property. See ECF Nos. 380 ¶ 6.20; 289-2; 289-16; see also ECF 288-35 at 7.

Although somewhat unclear, UCC appears to dispute whether the chemical composition of the contaminants found on the Courtland Property are similar to the chemical constituents existing at the Greenhouse Area of the Tech Park.  Relying on the report of its experts, Mr. de Haven and Elizabeth Rhine, UCC contends the metals detected on Courtland's Property are at significantly higher concentrations than those found on the Tech Park's Greenhouse Area and that as a matter of science, concentration levels of contamination constituents will almost always be higher on a source property than the receiving property.  See ECF Nos. 290-2 (Courtland II) at Table 1, Figs. 6-14, 18-21; 290-6 at 14-15.  For instance, UCC notes that arsenic, barium, selenium, and chromium levels were significantly higher on the Courtland Property than in the Greenhouse Area of the Tech Park and acetone levels were seven times higher on the Courtland Property than in the Greenhouse Area.  See id.

Additionally, Mr. de Haven reports that several
contaminants present at the Greenhouse Area are not present at
the Courtland Property, and vice versa, and if groundwater
contamination was truly migrating from the Greenhouse Area of
the Tech Park to the Courtland Property, such constituents would
necessarily be present.  See ECF 290-2 (Courtland II) at 6-14;
194-38 (Courtland I) at ¶¶ 18, 19, 25.  For example, UCC
contends that cadmium and lead, which were detected on the
Courtland Property, "have never been detected in the Greenhouse
Area in the many years . . . that it has been regulated by [the]
[US]EPA and WVDEP" and that chloroform and tetrachloroethylene
have been detected in the Greenhouse Area but not on the
Courtland Property.  ECF 382 at 9-10; see also ECF Nos. 290-2;
194-38 ¶ 25.  Simply put, UCC contends "[t]he evidence does not
support [Courtland's] assertion that the metals and organic
compounds in the August 2017 samples migrated from the
Greenhouse Area."  ECF 297 (Courtland II) at 20; see also ECF
Nos. 290-2 at 11-12; 290-6 at 14-15; 194-38 (Courtland I) ¶¶ 7-
8, 21, 25-29.

     As a threshold matter, the court does not interpret
"chemically similar" to be as stringent a standard as UCC makes
it out to be.  In the court's view, the fact that Courtland has
adduced evidence demonstrating that some of the same

contaminants found on the Tech Park have likewise been detected on the Courtland Property is sufficient.  Irrespective of any purported dispute on this point, for purposes of the standing inquiry, the court accepts Courtland's supported facts regarding the chemically similar nature of the contaminants at both the Greenhouse Area of the Tech Park and the Courtland Property as true.  See Nelson, 472 F. Supp. 3d at 304 (noting that in assessing standing at the summary judgment stage "the plaintiff can no longer rest on mere allegations but must set forth by affidavit or other evidence specific facts . . . which for purposes of the summary judgment motion will be taken to be true") (internal quotations omitted)); see also Beck, 848 F.3d at 270.  Accordingly, the court concludes that Courtland has demonstrated, for purposes of standing, that a causal connection exists between the purported contamination on the Courtland Property from the Tech Park and Courtland's incurred response costs related thereto and that such injury is redressable.  UCC is thus not entitled to summary judgment on Courtland's CERCLA claims asserted in Courtland I on this basis.

The court will now turn to Courtland's contention that it is entitled to summary judgment on its CERCLA claims in both Courtland I and II.

### 2.   Courtland's Motion for Summary Judgment: Prima Facie Case

Courtland avers summary judgment is warranted as a matter of law on its Section 107(a) cost recovery claims under CERCLA in both Courtland I and II inasmuch as it has established a prima facie case thereof in relation to the Tech Park and Filmont and the Massey Railyard and, in turn, summary judgment is proper on its Section 113(g)(2) claims under CERCLA seeking declaratory judgment as to any future response costs.

As previously mentioned, in order to succeed on a cost recovery claim under Section 107(a) of CERCLA, a plaintiff must establish the following elements: "(1) that the defendant falls within one of the four classes of [PRPs] subject to CERCLA liability, 42 U.S.C. § 9607(a); (2) that a CERCLA 'facility' exists, 42 U.S.C. § 9601(9); (3) that a 'hazardous substance' has been 'released' (or threatens to be released) from the defendant's facility, 42 U.S.C. §§ 9601(14), (22); 42 U.S.C. § 9607(a)(4); and (4) that the release or threatened release has caused the plaintiff to incur response costs that are 'necessary' and 'consistent with the [NCP],'" 42 U.S.C. § 9607(a)(4)." Ashley II, 791 F. Supp. 2d at 479-80.

"CERCLA Section 113(g)(2) requires that, once a party is found liable, the court 'shall enter a declaratory judgment

on liability for response costs or damages that will be binding
on any subsequent action or actions to recover further response
costs or damages.'"   United States v. Godley, -- F. Supp. 3d --,
3:19-cv-00202-RJC-DSC, 2021 WL 5242855, *6 (W.D.N.C. Nov. 10,
2021) (quoting 42 U.S.C. § 9613(g)(2)).

### i.  PRP and Facility

CERCLA sets forth four categories of PRPs liable for
costs incurred in response to a release of hazardous substances:
"(1) the current 'owner' or 'operator' of a 'facility'; (2) any
'person' who 'owned' or 'operated' the 'facility' at the time of
disposal of a hazardous substance; (3) any 'person' who
'arranged for disposal or treatment' of hazardous substances at
the 'facility'; and (4) any 'person' who accepts hazardous
substances 'for transport to disposal or treatment facilities,
incineration vessels or sites.'"   PCS Nitrogen, 714 F.3d at 172
(quoting 42 U.S.C. § 9607(a)(1)-(4)).   "The statutory definition
of 'owner and operator' refers to 'any person owning or
operating [a] facility.'"   Ashley II, 791 F. Supp. 2d 431 at 477
(quoting 42 U.S.C. § 9601(20)(A)).   The term person includes a
corporation.   See 42 U.S.C. § 9601(21).   UCC is a CERCLA PRP.

A CERCLA "facility" is defined as:

> (A) any building, structure, installation, equipment, pipe, or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come[s] to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9); see also Westfarm, 66 F.3d at 678. "The term 'hazardous substance' is defined . . . as any substance that appears on any one of six statutory lists of substances." Ashley II, 791 F. Supp. 2d at 480 (citing 42 U.S.C. § 9601(14)).

UCC admits in its answer that the Tech Park, Filmont, and the Massey Railyard each constitute "a facility within the meaning of CERCLA § 101(9), 42 U.S.C. § 9601(9)."[30]  ECF 304 (Courtland II) at 6, ¶ 14; see also ECF 21 (Courtland I) at 22, ¶ 48.  As the current owner of such facilities and/or as a person who owned or operated such facilities at the time of disposal of hazardous substances, UCC is a PRP subject to CERCLA

---

[30] The court notes that UCC states in its response brief that it "has not admitted that Filmont and [the] Massey Railyard are each a facility within the meaning of CERCLA 101(9)," as the same "is a legal conclusion[.]"  ECF 382 at 11 (internal quotations omitted).  Such assertion, however, is directly belied by paragraph 14 of UCC's answer to Courtland's complaint in Courtland II wherein it states "[i]n response to Paragraph 14 of Plaintiff's Complaint, Defendant admits that the UCC Tech [Park], Massey Railyard, and former Filmont Landfill are a facility within the meaning of CERCLA 101(9), 42 U.S.C. 9601(9)."  ECF 304 at 6, ¶ 14.

liability pursuant to 42 U.S.C. § 9607(a)(1).  <u>See</u> ECF 304 at
18, ¶ 60.  It is also noted that UCC does not appear to dispute
that it is a PRP subject to CERCLA liability in its briefing as
it only contests the fourth element of Courtland's CERCLA
claims.  Accordingly, the court concludes that Courtland has
established the first two elements of its cost recovery claims
in Courtland I and II.

    ii.  <u>Releases of Hazardous Substances</u>

        Courtland must next demonstrate that a "'hazardous
substance' has been 'released' (or threatens to be released)
from" the facilities at issue.  <u>Ashley II</u>, 791 F. Supp. 2d at
479.  Under CERCLA, a "release" is pertinently defined as
follows:

> any spilling, leaking, pumping, pouring, emitting,
> emptying, discharging, injecting, escaping, leaching,
> dumping, or disposing into the environment (including
> the abandonment or discarding of barrels, containers,
> and other closed receptacles containing any hazardous
> substance or pollutant or contaminant) . . . .

42 U.S.C. § 9601(22).

        Respecting the Tech Park, Courtland asserts in its
briefing that UCC admits "that a release (or threatened release)
of hazardous substances has occurred" inasmuch as UCC admits the
following: "(1) hazardous substance [including, but not limited

to, arsenic, 2-butatone, acetone, di-n-butyl phthalate, barium, cadmium, chromium, lead, and selenium,][31] have come to be located in certain locations on the UCC Tech Park Facility; (2) the groundwater contamination at the UCC Tech Park Facility is related to the three landfills on that facility; (3) a plume of groundwater contamination that includes arsenic and barium is migrating offsite from the UCC Tech Park Facility; (4) groundwater concentrations of various hazardous substances have at times exceeded [Safe Drinking Water Act] MCLs; (5) groundwater concentrations of acetone and DBP have at times been detected in offsite monitoring wells; and (6) UCC agreed to perform assessment of offsite groundwater." ECF 291 at 41 (citing statement of facts ¶¶ 4.1, 4.2, 4.6, 4.7, 4.9, 4.10, 4.11, 4.12, 4.22, 6.2, 6.3, 6.4, 6.7, 6.8, 6.9, 6.10). Courtland further asserts that "the admitted presence and migration of solid waste and hazardous waste and hazardous substance contaminants in groundwater can lead to only one reasonable conclusion – there has been a 'release' of hazardous substances at and from the Tech Park Facility." Id. at 41-42.

Respecting the Filmont/the Massey Railyard, Courtland likewise asserts in its briefing that a release or threatened

---

[31] Each of these contaminants qualify as a CERCLA hazardous substance. See 40 C.F.R. § 302.4; see also, supra, n. 1.

release of hazardous substances has occurred "at and from UCC's Filmont facility" inasmuch as "(1) hazardous substances have come to be located at Filmont; (2) a plume of groundwater contamination that includes 1,4-dioxane, BCIE, vinyl chloride, and bis(2-ethylhexyl) phthalate[32] is migrating offsite from Filmont on to Courtland's Property; (3) groundwater concentrations of various hazardous substances have at times exceeded MCLs; (4) groundwater concentrations of 1,4-dioxane, BCIE, vinyl chloride, and bis(2-ethylhexyl) phthalate have at times been detected in offsite monitoring wells across Davis Creek; (5) UCC performed assessment of offsite groundwater; and (6) contaminants have been detected in seeps from Filmont." Id. at 42 (citing statement of facts ¶¶ 5.1, 5.3, 5.9-5.12, 6.12-6.31, 6.33-6.37).  Courtland further asserts that "[t]he admitted presence and migration of solid waste and hazardous waste and hazardous substance contaminants in groundwater means there has been a 'release' of hazardous substances at and from Filmont." Id. at 43.  Courtland also notes that UCC states [in its VRP application concerning Filmont and the Massey Railyard] that VOCs, metals, SVOCs, and chlorinated solvents are leaching and/or volatizing in soil, groundwater, surface waters,

---

[32] Each of these contaminants qualify as a CERCLA hazardous substance. See 40 C.F.R. § 302.4.

sediments, and air at and from the Filmont facility." Id. (citing statement of facts ¶¶ 5.8, 5.12, 5.13).

In its briefings, UCC does not appear to contest Courtland's contention that it has established that a release or threatened release of hazardous substances has occurred at the Tech Park or the Filmont Site/Massey Railyard. Instead, UCC contests only the fourth element of Courtland's CERCLA claims, contending that Courtland has failed to meet its burden to demonstrate that its "response costs were both necessary and consistent with the NCP." ECF 382 at 30. Accordingly, the court concludes that Courtland has satisfied its burden with respect to the third element of its CERCLA claims in both Courtland I and II: that a release or threated release of hazardous substances has occurred from the facilities at issue.

iii.   Incurrence of Response Costs

Lastly, Courtland must demonstrate "that the release or threatened release has caused [Courtland] to incur response costs that are 'necessary' and 'consistent with the [NCP]." Ashley II, 791 F. Supp. 2d at 479-80. Identical to the contentions raised in its own motion for summary judgment, UCC first contends that Courtland has failed to demonstrate (1) that its purported response costs of $36,916.25 in Courtland I are

necessary and consistent with the NCP, and (2) any response costs at all in Courtland II as it failed to produce invoices of the same in discovery, and even assuming such costs had been produced, that the same are likewise neither necessary nor consistent with the NCP.

For the same reasons set forth in detail in Section III(A)(1)(i) of this opinion, the court rejects these contentions and concludes that Courtland has incurred response costs in both Courtland I and II in direct response to Courtland's concern that contaminants from the Tech Park and Filmont Site may be migrating or may have migrated to the Courtland Property and that such initial investigatory costs were "necessary to enable subsequent measures to ensure a CERCLA-quality cleanup, as CERCLA and the NCP both contemplate." Von Duprin, 12 F.4th at 771.

In addition to demonstrating that response costs are necessary and consistent with the NCP, Courtland must also show that the releases or threatened releases from the Tech Park and Filmont caused Courtland to incur such costs. As previously mentioned, however, "[c]ontrary to the rule followed in most areas of the law, the burden of proof as to causation in a CERCLA case lies with the defendant." Westfarm, 66 F.3d at 681. Indeed, "[t]he plaintiff must prove only that contaminants which

were once in the custody of the defendant could have travelled onto the plaintiff's land, and that subsequent contaminants (chemically similar to the contaminants once existing in defendant's custody) on the plaintiff's land caused the plaintiff to incur cleanup costs." Id.  The plaintiff need not, however, "produce any evidence that the contaminants did flow onto its land from the defendant's land.  Rather, once plaintiff has proven a prima facie case, the burden of proof falls on the defendant to disprove causation." Id.  Inasmuch as "the defendant bears the burden of proof as to causation, a defendant, to survive summary judgment, must come forward with sufficient evidence from which a jury could find that the defendant was not the source of the contamination." Id. (emphasis in original); see also id. at 682 & n.8 (explaining that summary judgment for the plaintiff is inappropriate if the defendant's evidence "create[s] a genuine issue of material fact as to whether the defendant could disprove that it was the source of contamination at [the] plaintiff's site").

Regarding the Tech Park, UCC chiefly contends that it has satisfied its burden to come forward with evidence from which the trier of fact could find that the Tech Park was not the source of contamination on the Courtland Property, thus creating a genuine dispute of material fact on this issue.  See

ECF 382 at 37-39.  It is unclear from UCC's briefing whether it also avers this same evidence serves to demonstrate that Courtland has failed to meet its burden to show that contaminants which were once in the custody of UCC's Tech Park could have travelled onto the Courtland Property, and that subsequent contaminants (chemically similar to the contaminants once existing on the Tech Park) on the Courtland Property caused Courtland to incur response costs.

Assuming that UCC does raise such contention, however, the court rejects the same and concludes that Courtland has satisfied its limited burden.  As explained in detail in Section III(A)(1)(ii) herein, it is undisputed that the Greenhouse Area of the Tech Park is an area upgradient of and with groundwater flow to the Courtland Property.  Courtland has also pointed to evidence that some of the same contaminants existing on the Tech Park have also been detected on the Courtland Property and that it has incurred response costs, namely, those costs associated with the August 2017 samplings, uncovering the existence of such contaminants as a result.  The burden thus shifts to UCC to disprove causation.

With respect to the Ward Hollow area of the Tech Park, UCC points to the expert report of Mr. de Haven who opines that it is impossible as a matter of hydrogeology for groundwater

originating in Ward Hollow to flow uphill and migrate to the Courtland Property or the Greenhouse Area.  See ECF 290-2 at 4, 5, 19, 21.  With respect to the Greenhouse Area, which is upgradient from the Courtland Property, UCC points to the reports and declarations of its experts, Mr. de Haven and Ms. Rhine, stating that any flow of contamination from the Greenhouse Area, "based on chemical detections at EPA-required monitoring wells[,] is exceedingly remote." ECF 382 at 37; see also ECF Nos. 194-38 (Courtland I) ¶¶ 21, 43; 290-2 (Courtland II) at 11-12; 290-6 (Courtland II) at 7-15.  UCC notes that it is for this reason that the EPA concluded UCC was not required to investigate potential contamination of the Courtland Property.  See ECF 194-1 ¶¶ 7-8, Ex. A-1; A-2.[33]

As further evidence that the Greenhouse Area is not a source of contamination on the Courtland Property, as explained in detail in Section III(A)(1)(ii) above, UCC points to the composition of contaminants found at the Greenhouse Area with those found on the Courtland Property.  Again, relying on the report of its experts Mr. de Haven and Ms. Rhine, UCC contends the metals detected on Courtland's Property are at significantly higher concentrations than those found on the Tech Park's

---

[33] Courtland does not object to paragraphs 7 and 8 of Mr. Cibrik's declaration.

Greenhouse Area and that as a matter of science, concentration levels of contamination constituents will almost always be higher on a source property than the receiving property.  See ECF Nos. 290-2 at Table 1, Figs. 6-14, 18-21; 290-6 at 14-15. Mr. de Haven also reports that several contaminants present at the Greenhouse Area are not present at the Courtland Property, and vice versa, and if groundwater contamination was truly migrating from the Greenhouse Area of the Tech Park to the Courtland Property, such constituents would necessarily be present.  See ECF Nos. 290-2 at 6-14; 194-38 (Courtland I) at ¶¶ 18, 19, 25.  Simply put, UCC contends "[t]he evidence does not support [Courtland's] assertion that the metals and organic compounds in the August 2017 samples migrated from the Greenhouse Area."  ECF 297 (Courtland II) at 20; see also ECF Nos. 290-2 at 11-12; 290-6 at 14-15; 194-38 (Courtland I) ¶¶ 7-8, 21, 25-29.

Additionally, UCC contends it has presented evidence demonstrating that the Courtland Property itself is the most likely source of its contamination.  For instance, UCC points to its December 2020 soil sampling results from the Courtland Property, which its experts have opined indicate that soil on the Courtland Property is contaminated due to the activities taking place thereon.  See ECF Nos. 290-3 at 38-39; 290-15 at

Op. 1.  UCC also points to evidence, as described in Mr. Cibrik's declaration, that historical activities on the Courtland Property include, for over seventy-five years, its use as a coal storage facility and the presence of deposits of fly ash, and that both of these activities can contain the contaminants detected in Courtland's August 2017 sampling.  <u>See</u> ECF 194-1 ¶¶ 22-24.[34]  UCC also notes that other conditions on the Courtland Property include piles of scrap metal, concrete debris, and fuel storage containers, all of which could be potential sources of the contaminants detected in the August 2017 samplings.  <u>See</u> ECF 290-2 at 13-17.

     Viewing this evidence, along with all reasonable inferences drawn therefrom, in the light most favorable to UCC, the court concludes that sufficient evidence exists from which a trier of fact could find that the UCC Tech Park was not the source of the contamination on the Courtland Property. Accordingly, summary judgment in favor of Courtland on its Section 107(a) and 113(g)(2) CERCLA claims asserted in Count I of its complaint in Courtland I (Tech Park) is unwarranted.

---

[34] The court notes that Courtland does not object to paragraphs 22, 23, or 24 of Mr. Cibrik's declaration.

Regarding Filmont and the Massey Railyard, Courtland cites to evidence demonstrating that arsenic, barium, chromium, lead, selenium, 1,4 dioxane, BCIE, vinyl chloride, and bis(2-ethylhexyl) phthalate have all "been detected in groundwater and surface water samples at and emanating to and from the Filmont [Site] and the Massey Railyard."  ECF 291 at ¶ 4.8 (citing ECF Nos. 288-7 at 58-77; 288-14; 288-15; 289-3; 289-4; 289-9 at 7; 289-10; 289-11; 289-12;289-13; 289-15; 289-18).  As mentioned, Courtland's June-July 2021 sampling of groundwater on the Courtland Property detected arsenic concentrations at 21 times the MCL and detected iron — an alleged "common contaminant associated with [the] Filmont [Site] discharges to surface water and in Filmont groundwater" — at elevated levels.  ECF 288-35 at 7.  The report regarding this sampling also states:

> Most noteworthy, according to the UCC 2015/2016 Groundwater Monitoring Report for Filmont, UCC has identified 1,4-Dioxane, Bis(2-chloroisopropyl)ether (aka 2,2`-Oxybis(1-chloropropane)), and Arsenic as the "most prominent constituents present within the groundwater plume."  Both of these organic contaminants were found in Courtland groundwater immediately adjacent and downgradient of the Filmont [Site], and arsenic was also found at very high concentrations.

Id.  The court notes that UCC's expert, Charles MacPherson, states in his second supplemental expert report that Courtland's 2021 sampling event also detected the following hazardous substances on the Courtland Property: 1,2 dichloroethane,

chloroform, 1-4 dioxane, methylene chloride, barium, cobalt, manganese, nickel, selenium, thallium, vanadium, zinc, bis(2-ethylhexyl) phthalate, butyl benzel phthalate, dimethyl phthalate, and napthalene.  See ECF 290-42 at 13.  Mr. MacPherson further reported that the following chemical substances were also detected during Courtland's 2021 sampling: 2-butanone, magnesium, calcium, potassium, 3&4 methyl phenol, di-n-butyl phthalate, and methyl phenol.  Id.

Courtland cites to Dr. Simonton's declaration, in which he opines that the plausible source of these contaminants on the Courtland Property is the Filmont Site.  See ECF 291 at 44 (citing 288-28 ¶¶ 30, 31).  Courtland further points to the deposition testimony of Mr. Cibrik, Mr. Weber, and UCC's VRP application as supporting its contentions that "[t]he Filmont facility includes deposits of hazardous materials on the Courtland Property by UCC and the Courtland Property is downgradient of the groundwater from Filmont," (ECF 291 ¶ 5.11 (citing ECF Nos. 288-8 at 198:11-15; ECF 288-6 at 17, § 3; ECF 288-10 at 161), and that "UCC admitted that it disposed of hazardous substance contaminants on the Courtland Property as part of discharges from Filmont."  ECF 291 at 44 (citing statement of facts ¶ 5.11).

As to the VRP application, the court notes that Section 3 thereof merely demonstrates that contaminants exist on Filmont and the Massey Railyard.  Respecting the portion of Mr. Cibrik's deposition testimony to which Courtland cites, Mr. Cibrik states in regard to Filmont "[w]e had found some limited files that deal with this facility and they mentioned disposal, mainly nonhazardous materials and DYNEL.  That's about all we know for sure what went there from the South Charleston Facility."  ECF 288-8 at 198:11-15.  As to Mr. Weber's testimony, Courtland cites to the following exchange:

> Q. Is [the] [G]reenhouse [A]rea upgradient or downgradient or cross gradient from the Filmont disposal site?
>
> A.  Tech [Park] is upgradient from the Filmont site.
>
> Q.  Including the [G]reenhouse Area, right? Tech [Park], including the [G]reenhouse Area?
>
> A.  Well, to clarify, Filmont is down — yeah.  A portion of the Tech Park is upgradient of Filmont.  But Tech Park is a large facility.  Not all of the facility is upgradient of Filmont.

ECF 288-10 at 161:9-17.

Thus, the evidence cited by Courtland in paragraph 5.11 of its "Statement of Facts" does not appear to support Courtland's statement that "UCC admitted that it disposed of hazardous substance contaminants on the Courtland Property as part of discharges from Filmont."  ECF 291 at 44 (citing

statement of facts ¶ 5.11).  The court notes that UCC's response brief regarding this element of Courtland's claim is primarily, if not entirely, focused on the Tech Park.  Nonetheless, in other sections of its briefing, UCC appears to dispute Dr. Simonton's opinions arising from the 2021 samplings and points to the reports of its experts who opine that the Courtland Property is the source of the contamination as opposed to Filmont and the Massey Railyard.  See, e.g., ECF 382 at 39-41.

For instance, relying on Mr. MacPherson's second supplemental expert report, UCC asserts Dr. Simonton's June-July 2021 sampling method "utilized an authoritarian bias" skewing the results by utilizing "no-representative samples from the Courtland Property to justify his conclusion on groundwater flow reached before collecting data."  ECF 382 at 41 (citing 290-42 at 8-9).  Additionally, UCC points to Mr. MacPherson's report in support of its assertion that the primary detections "in metals are for substances found across the much closer Courtland Property in UCC's December 2020 soil sampling therein."  Id. (citing 290-42 at 15-19).  UCC again points to the results of its 2020 soil samplings of the Courtland Property -- detecting sixteen VOC, eighteen metal, and seventeen SVOC compounds -- and the historic and current activities taking place thereon as evidence that Courtland itself is the source of contamination on

its own property, not UCC.  See ECF Nos. 290-3 at 38-39; 290-15 at Op. 1, 14.  UCC also notes Dr. Simonton's deposition testimony wherein he testified it was "highly unlikely but possible" that Courtland is contaminating its own groundwater. ECF 292-3 at 288.

Viewing this evidence, and all reasonable inferences drawn therefrom, in the light most favorable to UCC, the court concludes that disputed facts remain respecting this element that renders summary judgment in favor of Courtland inappropriate on both of its Section 107(a) and 113(g)(2) CERCLA claims asserted in Count I of its complaint in Courtland II (Filmont and the Massey Railyard).

### 3.  Courtland's Motion for Summary Judgment: UCC's CERCLA Counterclaims

In addition to various state law counterclaims, UCC asserts two CERCLA counterclaims against Courtland in Courtland II for (1) contribution pursuant to 42 U.S.C. § 9613(f)(1), Section 113(f)(1) of CERCLA (Counterclaim II); and (2) declaratory relief pursuant to 42 U.S.C. § 9613(g), Section 113(g)(2) of CERCLA (Counterclaim III).  Courtland has moved for summary judgment respecting UCC's counterclaims.

Section 113(f)(1) of CERCLA provides:

90

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C. § 9613(f)(1).

Section 113(f)(1) thus permits "[a]ny person [to] seek contribution from another person who is liable or potentially liable under section [107(a)] . . . during or following any civil action . . . under section [107(a)]." PCS Nitrogen, 714 F.3d at 186; see also Cooper Industries, Inc. v. Aviall Services, Inc., 543 U.S. 157, 168 (2004). And so, Section 113(f)(1) permits a PRP to seek "contribution against 'any other person who is liable or potentially liable under section [107(a)]' for response costs." Crofton Ventures Ltd. P'ship v. G & H P'ship, 258 F.3d 292, 296 (4th Cir. 2001).

To establish a prima facie case for contribution under Section 113(f)(1), a claimant must establish essentially the same elements as required for a cost-recovery claim under Section 107(a). See Blasland, Bouck & Lee, Inc., v. City of N.

<u>Miami</u>, 283 F.3d 1286, 1302 (11th Cir. 2002) (noting "[i]n either a section 107 direct cost recovery action or a section 113 contribution action, the elements of the [claimant's] prima facie case are the same."); <u>N.J. Turnpike Auth. v. PG Indus., Inc.</u>, 197 F.3d 96, 104 (3d Cir. 1999) (stating "the elements of both claims are essentially the same."); <u>Prisco v. A & D Carting Corp.</u>, 168 F.3d 593, 603 (2d Cir. 1999) (noting "[t]he elements of an action under § 113 are the same as those under § 107."). Thus, to establish a Section 113(f)(1) contribution claim, the claimant must show: (1) the counterclaim defendant is a PRP; (2) the site is a CERCLA facility; (3) a hazardous substance has been released or threatens to be released from the facility; and (4) the release or threatened release has caused the claimant to incur response costs that are necessary and consistent with the NCP.  See <u>Ashley II</u>, 791 F. Supp. 2d at 479-80.

Courtland first contends that summary judgment is warranted inasmuch as UCC has failed to establish any liability on the part of Courtland, which may entitle UCC to contribution or indemnity.  Specifically, Courtland asserts that UCC's investigation on the Courtland Property was limited to soil sampling, and UCC has failed to conduct an independent examination or testing of groundwater or surface water on the Courtland Property to support its assertion that Courtland is

jointly and severally liable for any release of hazardous substances into such water sources.

Simply put, Courtland avers that because "UCC has only done analyses of soil samples" on the Courtland Property, it has not established "a causal connection between any allegation for groundwater and surface water contamination and the conduct of Courtland . . . as a PRP." ECF 360 at 9. Courtland contends that "the failure to establish the essential causation element is fatal to UCC's [c]ounterclaims for [n]egligence, [d]eclaratory judgment, and [e]quitable [r]elief."[35] Id. at 6.

The court does not agree. While Courtland is correct that UCC's December 2020 investigation on the Courtland Property was limited to soil sampling, UCC cites to Mr. MacPherson's deposition, wherein he explained that soil sampling was done as opposed to groundwater sampling to first "see if there were potential soil sources on [the] Courtland Property" for the contamination already detected thereon (i.e., the groundwater contamination), presumably by Courtland's own August 2017 groundwater sampling on the Courtland Property. ECF 376-2 at 84; see also id. at 89-92.

---

[35] Aside from this single sentence, Courtland's briefing makes no other mention of UCC's claims for declaratory and equitable relief.

In his expert reports, Mr. MacPherson cross references the contaminants found in UCC's 2020 soil sampling of the Courtland Property with the contaminants found in Courtland's own 2021 groundwater sampling, noting that eleven of the thirteen metals detected by Courtland in its groundwater were also detected in Courtland's soil by UCC.  See ECF Nos. 290-15 at 23; 290-42 at 13-16.  Based on the 2020 sampling, Mr. MacPherson opined that "the impact soils and groundwater known to exist on the Courtland Property are 100% attributable to . . . Courtland . . . and/or it[s] historical and/or current operations."  ECF 290-15 at 23; see also id. at 19-21.  In other words, UCC avers that the purpose of its 2020 soil sampling was to determine if the soil on the Courtland Property "could be a source of the alleged impacts" to Courtland's groundwater.  ECF 376 at 7.  The results of the 2020 soil samplings and the historic and current activities taking place on the Courtland Property create a genuine dispute of material fact as to whether Courtland itself is the source of contamination to its own groundwater.[36]

Next, although somewhat unclear, it appears Courtland contends that UCC has failed to adduce evidence showing that

---

[36] Such conclusion likewise precludes an award for summary judgment in favor of Courtland on UCC's declaratory and equitable relief counterclaims (Counterclaims V and VI).

Courtland is a PRP at fault for any release of hazardous substances.  See ECF 360 at 5-6 ("Without supporting evidence to show that Courtland . . . is also at fault for the release of Hazardous Substance[s], which would thereby trigger 113(f)'s contribution remedy, UCC has failed to establish contribution is warranted in this case.").

As previously mentioned, CERCLA defines "release" as

> any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . .

42 U.S.C. § 9601(22).

As the current owner of the Courtland Property -- where hazardous substances have come to be located -- Courtland is a PRP subject to CERCLA liability pursuant to 42 U.S.C. § 9607(a)(1).  UCC avers that contrary to Courtland's assertion, "the evidence shows numerous releases have occurred at Courtland's property, which contaminated Courtland's soil, groundwater, and downstream waterways."  ECF 376 at 15.  For instance, UCC contends when rain soaks through the piles of exposed metals and materials on the Courtland Property -- including, inter alia, dirt, asphalt millings, concrete, asphalt chunks, barriers and rebar, and other steel materials --  "the contaminated water either absorbs directly into the ground. . .,

runs into retention ponds [on the Courtland Property] where it is absorbed directly into the ground, or is discharged into the South Boundary Drainage Ditch or Davis Creek."  ECF 376 at 17; see also id. at 15.

In support of this contention, UCC cites to the somewhat equivocal deposition testimony of Clyde Raynes, owner of the lessee of the Courtland Property, Raynes and Sons Excavation, LLC ("Raynes"):

Q. Where --- where --- where does the water from this pond go?

A. It drains --- most of it gets sucked out of the ground. It very rarely would go underneath that little roadway and towards the --- that South Drainage Ditch.

Q. Okay. So it would find its way down --- the South Drainage Ditch runs mostly --- sort of like right --- right where the --- the hand is running now, more or less? It's kind of ---?
A. Yes, yes.

Q. So it makes its way down to the South Boundary Ditch. What about the one more northwest on the --- the other side of the --- the active area there, where I got my hand now?
A. I've never seen it overflow ---

Q. Does it --- does it not ---

A. --- because it soaks in the ground.

. . . .

Q. So if --- if --- if there was --- if water was to come out of this pond and discharge out, would it also head down to the South Boundary Creek that's down here?

A. I --- I guess it --- it could. I guess if it got high enough it --- out of that berm.

Q. Yeah, I --- and --- and I --- I understand it may --- it may not get over the berm. But if --- but if --- if it did, its --- its --- its two choices would either --- would essentially be uphill onto your active area or downhill to the Boundary Creek. Right?

A. Right.

Q. Yeah. And we --- and we know it's not going to go uphill. So definitely, it would get down to the Boundary Creek.

A. Right.

Q. Okay. And what --- what about --- what about the --- the [re]tention pond that's more on the --- the southern part of the site over here on the other side of --- you know, over near --- closer to the topsoil piles, where does that go?

A. Okay. The --- it goes out toward the tree line there.

Q. So that --- that would be in --- once you get up in this area, that --- that would be Davis Creek. Right?

A. Yes.

ECF 376-6 at 27-30.

As further evidence of the alleged "numerous releases" that have occurred on the Courtland Property, UCC cites to Mr. de Haven's "Analysis of On-Site Contaminant Sources on the Courtland Property," which "focuses on demonstrating proof that historical and current use of the Courtland [P]roperty are sources of the Courtland [c]onstituents of interest (COIs) named

in its complaint." citing ECF 376-3 at 2.  Therein, Mr. de

Haven pertinently opines:

> The findings of the 2020 Courtland [P]roperty site
> investigation confirm the predictions of the
> literature study performed previously.  Asphalt, coal,
> and [coal combustion residuals] were observed on and
> beneath the surface in site soils.  Of the six metal
> COIs named in the complaint, five of the metals[37] were
> found in soil/waste directly overlying the previously
> sampled Courtland groundwater at concentrations
> estimated to cause groundwater contamination at levels
> exceeding federal MCLs.
>
> The sixth metal named in the complaint, chromium, does
> not appear in soil/waste at levels likely to cause
> dissolved-phase leaching above MCLs.  However, the
> low-quality groundwater sampling method employed by
> Courtland in its 2017 sampling, which entrains
> soil/waste particulate matter into groundwater
> samples, readily explains the presence of chromium in
> the groundwater, as the 2020 investigation showed that
> chromium is present in all 33 of the collected
> soil/waste samples.

Id. at 7.  Mr. de Haven goes on to opine that "[t]he recently

completed December 2020 Courtland investigation data demonstrate

that the impacts in groundwater were highly likely derived from

Courtland-specific sources such as coal, coal ash, asphalt

stockpiling, or other activities on the Courtland [P]roperty"

and that "Courtland's facility is more likely to be impaired

through unacceptable risks in soil/waste, which are entirely the

fault of Courtland's poor site management practices."  Id.

---

[37] These five metals are arsenic, barium, cadmium, lead, and
selenium.  See ECF 376-3.

Viewing this evidence, and all reasonable inferences drawn therefrom, in the light most favorable to UCC, UCC has adduced at least some evidence from which a reasonable trier of fact could find that releases alleged to be responsible for the contamination found in Courtland's soil and groundwater have occurred on the Courtland Property.

Courtland next contends that summary judgment is warranted in its favor on UCC's CERCLA counterclaims inasmuch as UCC has failed to (1) demonstrate that it is entitled to any recoverable response cost, or (2) meet the "public participation" requirements of the NCP for a valid CERCLA claim.

Regarding recoverable response costs, Courtland notes that UCC's prayer for relief in Item F seeks "reasonable costs and attorneys' fees and experts' fees incurred to identify PRPs and to monitor, assess, and evaluate the release or threat of release of hazardous substances in and at the Courtland Property and as a result of having to respond to and bring this action." ECF 304 at 47, ¶ F.  Courtland asserts that UCC is attempting to disguise its $200,917.50 incurred costs as "NCP compliant cost[s]" when such costs are "clearly a litigation expense related to their defense of Courtland['s] . . . claims, and the factually unsupported [c]ounterclaims it has pled against Courtland."  ECF 360 at 8.  For instance, Courtland cites to two

invoices for $13,975.00 and $17,550.00, both presumably included
within the $200,917.50 request and submitted in support of the
second supplemental report of UCC's expert, Mr. MacPherson,
which states:

> Litigation Support Services, The Courtland Company vs.
> Union Carbide Corporation, U.S. District Court for the
> Southern District of West Virginia, Case No. 2:19-cv-
> 00894

ECF 363-16 at 21.  Relying on the Supreme Court's decision in
Key Tronic Corp. v. United States, 511 U.S. 809 (1994),
Courtland contends that inasmuch as litigation expenses and
attorney's fees are generally not recoverable under CERCLA,
UCC's CERCLA counterclaims and "prayer for relief for attorneys'
fees and experts' fees should be dismissed with prejudice, and
summary judgment granted" in favor of Courtland.  ECF 360 at 9.

UCC responds, citing to multiple invoices, that it has
incurred costs of $169,391.58 for its December 2020
investigation and soil sampling and analysis on the Courtland
Property and this amount has increased since July 2021 to
$200,917.50 for additional related work.  See ECF Nos. 290-41;
292-42 at 16.  UCC notes that while Courtland is correct in its
assertion that attorney's fees are typically not recoverable
under CERCLA, UCC is only seeking response costs and "explicitly
has not and will not seek attorney's fees as its damages."  ECF
376 at 19.  UCC avers that "Courtland focuses on the lone phrase

of the prayer of relief (Item F), ignoring the actual allegations of the [c]ounterclaims and the remaining prayers for relief which focus exclusively on costs incurred in relation to the investigation of the contamination on Courtland's property."[38]  Id. at 19-20.  UCC further notes that "the [c]ourt can strike Item F of the prayer for relief without impacting the counterclaims."  Id. at 20.  Succinctly stated, UCC asserts that its response costs were "incurred to investigate the nature, source, and extent of the contamination, identify [PRPs], comment on the proposed remedy and propose alternative remedial measures that more effectively address the contamination" and "were necessary given Courtland's refusal to investigate its soil for potential sources of contamination prior to or throughout this litigation."  Id. at 19 (citing ECF Nos. 290-39; 376-2 at 87-92).  To the extent that Mr. MacPherson's invoices contain a notation of "litigation support services," UCC avers the same "is an indication that he is

---

[38] The court notes that Item A of UCC's prayer for relief seeks "contribution, damages, and/or restitution under CERCLA for Response Costs that UCC has or will incur in responding to the release or threatened releases of Hazardous Substances on, in, or from facilities owned and/or operated or formerly owned and/or operated by Courtland, including but not limited to the Courtland Property, in an amount to be proven at trial."  ECF 304 at 46, ¶ A.

working with legal counsel rather than independently and has nothing to do with what the costs are." Id. at 19, n.4.

In Key Tronic, the Supreme Court "held that CERCLA did not authorize an award of attorney fees associated with litigating a private party's cost recovery action under CERCLA." Sealy Connecticut, Inc. v. Litton Industries, Inc., 93 F. Supp. 2d 177, 190 (D. Conn. 2000) (citing Key Tronic, 511 U.S. at 819). "However, Key Tronic distinguishes between a traditional attorney litigation fee award and the recoverability of fees for work directly related to and advancing the remediation efforts." Id. Indeed, in making such distinction, the Supreme Court noted:

> [S]ome lawyer's work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B). The component of Key Tronic's claim that covers work performed in identifying other potentially responsible parties falls in this category . . . [T]hese efforts might well be performed by engineers, chemists, private investigators, or other professionals who are not lawyers. As the Tenth Circuit has observed, the American rule [requiring statutory authority for fee shifting] . . . does not govern such fees because they are not incurred in pursuing litigation . . . Tracking down other responsible solvent polluters increases the probability that a cleanup will be effective and get paid for. Key Tronic is therefore quite right to claim that such efforts significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs. These kinds of activities are recoverable costs of response clearly distinguishable from litigation costs.

**Key Tronic**, 511 U.S. at 820-21.  Whether the attorney fees sought by UCC are recoverable as costs of response or barred as litigation fees is yet to be determined.

Nevertheless, UCC has adduced evidence of at least some recoverable costs under CERCLA, namely, those costs incurred for UCC's December 2020 preliminary soil investigation on the Courtland Property, which were expended to assess and evaluate the contamination thereon and determine whether Courtland itself could be a source of that contamination. Indeed, such preliminary investigative sampling is the type of work that is closely tied to and must be performed in order to identify other responsible parties and result in a CERCLA-quality cleanup.

It is apparent that disputed facts remain as to whether all of UCC's asserted costs will ultimately be found to be recoverable costs of response as asserted by UCC or if the same are, in reality, nothing more than litigation costs as asserted by Courtland, rendering summary judgment on this point in favor of Courtland inappropriate.  The ultimate determination on this issue is best suited for trial.

Lastly, Courtland contends that UCC has failed to meet the "public participation" requirements of the NCP for a valid CERCLA claim inasmuch as the record is devoid of any evidence

demonstrating that UCC "interviewed local officials, residents, or interested/affected parties to learn of their concerns[,] [n]or is there evidence demonstrating that a community relations plan was prepared to ensure public involvement with at least one local information repository to make information available to the public." ECF 360 at 12. Additionally, Courtland contends that "UCC has failed to publish and provide an opportunity for submission of comments on the proposed plan, provide an opportunity for public meeting, make a transcript of the meeting available to the public, and prepare a written summary of significant comments and responses to those comments," all of which are fatal to UCC's CERCLA counterclaims. Id.

UCC responds that the NCP's "public participation requirement is not invoked until after the contamination on site has been fully investigated" and that it "can take several years to get to this point and neither UCC nor Courtland has reached this stage yet." ECF 376 at 20. UCC further avers that "it is inconsequential that the site remediation has not already been fully delineated or carried out, as CERCLA § 113(g)(2) explicitly authorizes the [c]ourt to enter a declaratory judgment detailing each party's respective responsibilities for remediation costs going forward." Id. Simply put, UCC contends Courtland's "fixation on the fact that UCC is too early in its

CERCLA response to invoke the public's participation is
immaterial."  Id.

As previously mentioned, "[a] private party response
action will be considered 'consistent with the NCP' if the
action, when evaluated as a whole, is in substantial compliance
with the applicable requirements in [40 C.F.R. § 300.700(c)(5)-
(6)], and results in a CERCLA-quality cleanup."  40 C.F.R. §
300.700(c)(3)(i).  In turn, § 300.700(c)(5)-(6) sets forth an
array of requirements "potentially applicable to private party
response actions" including, but not limited to, providing an
opportunity for public comment concerning the selection of a
response action.  40 C.F.R. § 300.700(c)(6).  Specifically,
Section 300.700(c)(6) provides that "[p]rivate parties
undertaking response actions should provide an opportunity for
public comment concerning the selection of the response action
based on the provisions set out [in 40 C.F.R. §
300.700(c)(6)(i)-(v)], or based on substantially equivalent
state and local requirements."  40 C.F.R. § 300.700(c)(6).  The
provisions "regarding public participation are potentially
applicable to private party response actions, with the exception
of administrative record and information repository requirements
stated therein[.]"  Id.  The court notes that Courtland takes
issue with the fact that UCC has produced no evidence "that a

community relations plan was prepared to ensure public involvement with at least one local information repository to make information available to the public." ECF 360 at 12. However, as just noted, the information repository requirements are explicitly inapplicable to private party response actions.

As recognized by the district court in Weyerhaeuser Corp. v. Koppers Co., Inc., "[t]he bulk of the NCP guidelines appear to apply to actual removal and remedial procedures but do not logically appear applicable to the initial assessment aspects of a cleanup." 771 F. Supp. 1406, 1414 (D. Md. 1991). Such appears to be true for the public participation requirements of the NCP. See PMC Inc. v. Sherwin-Williams Co., 151 F.3d 610, 618-17 (7th Cir. 1998) (noting that while the plaintiff had failed to comply with the NCP's public participation requirement, requiring "that the proposed clean-up method in which the costs will be incurred be submitted for public comment before it is implemented" such ruling did "not affect . . . site-assessment costs, which are not subject to the requirement of submission for public comment[.]"); see also United Alloys, Inc. v. Baker, 797 F. Supp. 2d 974, 997 (C.D. Cal. 2011) (concluding that "public participation is not a prerequisite to the recovery of investigatory costs"). Accordingly, UCC's failure to comply with the NCP's public

participation requirements does not provide a ground upon which
to grant summary judgment in favor of Courtland on UCC's CERCLA
counterclaims (Counterclaims II and III).

B.   UCC's Negligence Counterclaim

          In light of the previous discussion respecting UCC's
CERCLA counterclaims, the court finds it pertinent to next
address UCC's counterclaim for negligence, on which Courtland
has also moved for summary judgment.

          To prevail in a negligence claim in West Virginia, the
counter-claimant must establish three elements by a
preponderance of the evidence: (1) a duty that the counter-
defendant owes to the counter-claimant, (2) a breach of that
duty by an act or omission, and (3) injuries proximately caused
by that breach of duty.  Wheeling Park Comm'n v. Dattoli, 787
S.E.2d 546, 551 (W. Va. 2016).  "Under West Virginia law, a
[counter-claimant] alleging negligence or gross negligence is
required to prove that he or she sustained an injury caused by
the [counter-]defendant's allegedly negligent conduct."  Rhodes
v. E.I. du Pont de Nemours & Co., 636 F.3d 88, 94 (4th Cir.
2011).  "Generally, such injury must already have occurred,
although a [counter-claimant] sometimes may recover for future
effects of a present injury that are reasonably certain to
occur."  Id.  Whether the counter-defendant owed the counter-

claimant a duty of care is a legal question for the court.  **See**
Syl. Pt. 5, <u>Aikens v. Debow</u>, 541 S.E.2d 576, 578 (W. Va. 2000).
The court has previously determined that, "[u]nder the
circumstances of this case . . . UCC owed a duty of care to
Courtland to prevent harm resulting from the hazardous waste
stored on UCC's property."  ECF 75 at 45.  The inverse would
likewise be true: Courtland owes a duty of care to UCC to
prevent harm resulting from any hazardous waste stored or
emanating from Courtland's property, other than any such waste,
if any, for which UCC is responsible.

        In its reply brief, Courtland contends that UCC's
negligence counterclaim fails as a matter of law inasmuch as it
has suffered no damages.  Courtland cites to the following
excerpt from the deposition testimony of Mr. MacPherson, UCC's
expert:

> Q.  You talked about your work on Courtland.  Let me
> revisit that for one second.  Did your work in (sic)
> Courtland produce any evidence that any hazardous
> substances released on or at Courtland had impacted
> Union Carbide property in any way?
>
> A.  No.
>
> Q.  Did your work produce any evidence that hazardous
> substances released on or at Courtland had comingled
> in any way with any hazardous substances released on
> or from any UCC property?
>
> A.  Not yet.

ECF 381-2 at 116.[39]

In UCC's response brief, it maintains that "Courtland irrefutably had a duty to prevent contaminants from leaving its property and infiltrating both nearby waterways and downstream properties, including UCC's" and that Courtland has breached the same by failing "to take precautions against contaminating its own property and UCC's property." ECF 376 at 16. Again, relying on the somewhat equivocal deposition testimony of Clyde Raynes, owner of the lessee of the Courtland Property, Raynes and Sons Excavation, LLC, as set forth in detail in Section III(A)(3) above, UCC avers that Courtland's negligence in permitting its lessee to maintain piles of debris "in open, exposed conditions, without so much as a verification from its [lessee] that these materials are non-hazardous or not contaminated has contributed not only to the contamination of Courtland's property, but also the condition of nearby waterways." ECF 376 at 17. UCC thus contends that as a result of Courtland's negligence, "UCC has incurred substantial expenses in investigating and remediating the sources of

---

[39] It is noted that the citation Courtland provided in its briefing to the above quoted deposition testimony was not the accurate citation. See ECF 387 at 7 (citing Ex. A (ECF 422-1), pp. 127-40). Nonetheless, after scouring the record, the court was able to locate the same on its own accord in a different exhibit.

contamination on both UCC property and Courtland's property."
Id. at 18.

While UCC is correct that the court has previously
concluded that neighboring landowners owe each other a duty of
care to prevent harm resulting from the hazardous waste stored
on the landowner's property, UCC has produced no evidence
demonstrating that any of its properties have been harmed or
damaged by the contaminants or alleged releases thereof existing
on the Courtland Property.  Indeed, in its briefing, UCC's only
asserted damages are the "substantial expenses" it has incurred
"investigating and remediating the sources of contamination on
both UCC property and Courtland's property."  ECF 376 at 18.  In
support of this assertion, UCC cites to various invoices from
its expert, Mr. MacPherson.  See id. (citing ECF Nos. 290-39 –
290-41).  Furthermore, while UCC has produced some attenuated
evidence that the alleged releases on the Courtland Property may
be impacting downstream waterways, aside from bare assertions,
UCC has cited to no evidence explaining how such impact would
ultimately affect or harm any of the UCC properties.

Accordingly, the court concludes UCC's negligence
counterclaim (Counterclaim IV) fails as a matter of law, and
Courtland is entitled to summary judgment thereon.

C.   <u>RCRA Claims</u>

In Counts II and III of both Courtland I and II, Courtland seeks citizen suit relief for violations of § 702(a)(1)(A) of RCRA, 42 U.S.C. § 6972(a)(1)(A), and the West Virginia Hazardous Waste Management Act ("WVHWMA") and citizen suit relief for judicial abatement of an imminent and substantial endangerment under § 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B).

As previously mentioned, the parties have cross-moved for summary judgment on Courtland's RCRA claims asserted in Counts II and III of Courtland's complaint in Courtland II (Filmont and the Massey Railyard).  Additionally, UCC alone has moved for summary judgment on Courtland's RCRA claims asserted in Counts II and III of Courtland's complaint in Courtland I (the Tech Park).  The court will first address Courtland's RCRA claims asserted in Courtland I regarding the Tech Park before turning to Courtland's RCRA claims in Courtland II regarding Filmont and the Massey Railyard.

"RCRA is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste."  <u>Goldfarb</u>, 791 F.3d at 504 (quoting <u>Meghrig v. KFC W., Inc.</u>, 516 U.S. 479, 483 (1996)).  The primary purpose of RCRA is "to reduce the generation of hazardous waste and to

111

ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, so as to minimize the present and future threat to human health and the environment." Meghrig, 516 U.S. at 483 (internal quotation marks omitted) (quoting 42 U.S.C. § 6902(b)).

Subchapter III, or Subtitle C, of RCRA concerns the management of hazardous waste, and directs the USEPA to promulgate federal standards and permit requirements for its treatment, storage, and disposal.  See 42 U.S.C. §§ 6921-6934. Subtitle C also grants states the authority to establish their own hazardous waste management programs, subject to the review and approval of the USEPA.  See 42 U.S.C. § 6926(b); see also 40 CFR §§ 271.1 to 271.27 (detailing requirements for state programs).  Where a state has an approved program, it is authorized to carry out its program in lieu of the federal program.  42 U.S.C. § 6926(b); Safety-Kleen, Inc. (Pinewood) v. Wyche, 274 F.3d 846, 863 (4th Cir. 2001); see also Sierra Club v. Virginia Elec. & Power Co., 903 F.3d 403, 407 (4th Cir. 2018) ("When a State elects to establish its own program, the EPA suspends its federal permit program and defers to the State's, allowing the state discharge permit to authorize effluent discharges under both state and federal law.").

The USEPA approved West Virginia's hazardous waste program on May 15, 1986, and granted the State the "primary enforcement responsibility" for permitting treatment, storage, and disposal facilities within its borders and carrying out the other aspects of the RCRA program.  See West Virginia: Final Authorization of State Hazardous Waste Management Program, 51 Fed. Reg. 17739-01 (May 15, 1986); see also West Virginia: Final Authorization of State Hazardous Waste Management Program Revision, 65 Fed. Reg. 29973-01 (May 10, 2000); West Virginia: Final Authorization of State Hazardous Waste Management Program Revisions, 78 Fed. Reg. 70225-01 (Nov. 25, 2013).

West Virginia implemented its hazardous waste program through the WVHWMA, W. Va. Code § 22-18-1 et seq.  See W. Va. Code § 22-18-2(b)(4) ("Therefore, it is hereby declared that the purposes of this article are: ... (4) to assume regulatory primacy through Subtitle C of [RCRA]."); id. § 22-18-4 ("The [Department of Environmental Protection] is hereby designated as the hazardous waste management lead agency for this state for purposes of Subtitle C of [RCRA]...."). The USEPA retains the right to conduct inspections under section 3007 of RCRA and to take enforcement actions under sections 3008, 3013, and 7003 of RCRA. 51 Fed. Reg. 17739.

RCRA and the WVHWMA define "hazardous waste" as:

[A] solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may -- (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5); W. Va. Code § 22-18-3(6) (using "waste" instead of "solid waste").  The USEPA Administrator and the Secretary of the WVDEP are responsible for developing and promulgating criteria for identifying the characteristics of hazardous waste, and for listing such hazardous waste.  See 42 U.S.C. § 6921(a); W. Va. Code § 22-18-6(a)(2).

"Within this regulatory scheme are a set of twin citizen suit mechanisms." Lovejoy v. Jackson Resources Company, 2:20-cv-00537, 2021 WL 3025454, *5 (S.D.W. Va. July 16, 2021). The first authorizes suit "against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA.]" 42 U.S.C. § 6972(a)(1)(A).  "In such an action, the plaintiff must allege that the defendant's violation of either a state or federal standard that became effective pursuant to RCRA is current and ongoing." 307 Campostella, LLC v. Mullane, 143 F. Supp. 3d 407, 413 (E.D.Va.

114

2015) (citing Goldfarb, 791 F.3d at 504).  "While the violation must be continuous or ongoing, however, the defendant's conduct causing the violation need not be ongoing."  Id. (citing Goldfarb, 791 F.3d at 513).  Rather, "the proper inquiry centers on 'whether the defendant's actions – past or present – cause an ongoing violation of RCRA.'"  Goldfarb, 791 F.3d at 513 (quoting S. Rd. Assocs. v. IBM Corp., 216 F.3d 251, 255 (2nd Cir. 2000)).

The second provision permits citizen suits to be commenced "against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or is contributing to the past or present handling, storage, treatment, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).  "While an (a)(1)(A) claim requires a violation of some obligation under RCRA, without regard to its effects or severity, an (a)(1)(B) claim requires the presence of an imminent and substantial endangerment to health or the environment, but need not be

predicated on any violation." <u>Schmucker v. Johnson Controls,</u>
<u>Inc.</u>, 90 F. Supp. 3d 786, 791 (N.D. Ind. 2015).

### 1.   Section 6972(a)(1)(A) Claim: The Tech Park

RCRA and the WVHWMA prohibit the treatment, storage,
or disposal of any hazardous waste listed or identified under
RCRA Subtitle C at any facility without a permit for such
treatment, storage, or disposal.  <u>See</u> 42 U.S.C. § 6925(a); W.
Va. Code § 22-18-8(a).  Both RCRA and the WVHWMA also prohibit
the operation or closure of any facility for the treatment,
storage, or disposal of a hazardous waste listed or identified
under RCRA Subtitle C without a permit.  The term "disposal" is
defined as follows:

> [T]he discharge, deposit, injection, dumping,
> spilling, leaking or placing of any solid waste or
> hazardous waste into or on any land or water so that
> such hazardous waste or any constituent thereof may
> enter the environment or be emitted into the air, or
> discharged into any waters, including groundwaters.

42 U.S.C. § 6903(3); W. Va. Code § 22-18-3(2).

Pursuant to RCRA regulations, compliance with a RCRA
permit constitutes compliance with Subtitle C for enforcement
purposes.  <u>See</u> 40 C.F.R. § 270.4(a)(1).  Indeed, 40 C.F.R. §
270.4(a) provides:

(1) Compliance with a RCRA permit during its term constitutes compliance, for purposes of enforcement, with subtitle C of RCRA except for those requirements not included in the permit which:

(i) Become effective by statute;

(ii) Are promulgated under part 268 of this chapter restricting the placement of hazardous wastes in or on the land;

(iii) Are promulgated under part 264 of this chapter regarding leak detection systems for new and replacement surface impoundment, waste pile, and landfill units, and lateral expansions of surface impoundment, waste pile, and landfill units.  The leak detection system requirements include double liners, CQA programs, monitoring, action leakage rates, and response action plans, and will be implemented through the procedures of § 270.42 Class 1 permit modifications; or

(iv) Are promulgated under subparts AA, BB, or CC of part 265 of this chapter limiting air emissions.

40 C.F.R. § 270.4(a)(1)(i)-(iv).  Section 270.4(c) provides that "[t]he issuance of a permit does not authorize any injury to persons or property or invasion of other private rights, or any infringement of State or local law or regulations."  40 C.F.R. § 270.4(c).  The term "permit" is defined as follows:

an authorization, license, or equivalent control document issued by EPA or an approved State to implement the requirements of this part and parts 271 and 124 of this chapter.  Permit includes permit by rule (§ 270.60), emergency permit (§ 270.61) and standardized permit (subpart J of this part).  Permit does not include RCRA interim status (subpart G of this part), or any permit which has not been the subject of final agency action, such as a draft permit or a proposed permit.

40 C.F.R. § 270.2.

While 40 C.F.R. § 270.4(a) is not specifically set forth in the implementing regulations of the WVHWMA, the regulations of the WVHWMA do provide that "[t]he provisions of 40 C.F.R. Part 270 . . . are hereby adopted and incorporated by reference with the modifications, exceptions, and additions set forth in this section." W. Va. Code St. R. § 33-20-11. This incorporation by reference would presumably include the "permit-as-a-shield provision" set forth in 40 C.F.R. § 270.4(a) as quoted above.[40] The WVHWMA regulations further note that "[f]or purposes of this section, the term 'RCRA permit' means "West Virginia Hazardous Waste Management Permit." W. Va. Code St. R. § 33-20-11.

---

[40] As set forth in the USEPA's September 2005 Training Module, entitled "Introduction to Permits and Interim Status (40 CFR Part 270)," 40 C.F.R. § 270.4(a) is known as the "permit-as-a-shield provision." ECF 292-24 at 12. The same can be found at http://www.epa.gov/sites/production/files/2015-09/documents/permits05.pdf. Inasmuch as it is generally appropriate for courts to take judicial notice of policy guidance documents issued by the USEPA and records from government websites, UCC requests judicial notice be taken of ECF 292-24. See ECF 294 at 4. Courtland did not respond to UCC's request. Given that the accuracy of ECF 292-24 can be accurately and readily determined and cannot reasonably be questioned, the court takes judicial notice of same. See Fed. R. Evid. 201(b).

UCC contends that it is entitled to summary judgment on Courtland's RCRA § 6972(a)(1)(A) claim in Courtland I inasmuch as the Tech Park "has been operating under a RCRA Corrective Action Permit since the 1980s, when UCC initiated the first of numerous investigations at the Tech Park."[41]  ECF 297 at 21.  In support of this assertion, UCC points to Mr. de Haven's expert report, which pertinently provides, regarding the Tech Park, as follows:

> UCC applied for a RCRA Part B Permit to operate a RCRA hazardous waste incinerator in 1983. In September 1985, WVDEP Office of Waste Management and WVDEP Office of Air Quality issued permits to operate. Several investigations and associated corrective actions have been conducted at the UCC Technology Park under RCRA. The initial RCRA Facility Assessment (Kearney 1989) was conducted in accordance with a Corrective Action permit issued to UCC by the U.S. Environmental Protection Agency (USEPA) Region III in 1985. The assessment identified 62 SWMUs, 18 of which were later found to not meet the definition of a SWMU. An additional eight SWMUs were identified by UCC. In October 1997, UCC committed to the Voluntary Corrective Action Program. As a requirement of the Voluntary Corrective Action Program, all 70 SWMUs were re-evaluated.
>
> . . . .

---

[41] UCC states in its briefing that the Tech Park "also operates pursuant to a Large Quantity Generator Permit" but cites to evidence in support of this assertion.  ECF 297 at 21.  The court notes, however, that Courtland states in its complaint in Courtland I that the Tech Park "was a RCRA Large Quantity Generator," and "[i]t currently reports multiple wastes as generated at the [Tech Park], including Chromium, Lead, 2-Butanone and Acetone."  ECF 1 (Courtland I) at ¶ 20.

> UCC entered the Facility Lead Program through an
> agreement signed by the USEPA and UCC effective 15
> December 1999.

ECF 290-2 at 9.  UCC also points to Mr. Cibrik's declaration,

which further explains that "[b]etween 1990 and 2010, UCC

completed numerous investigations to determine the nature and

boundary contamination associated with the [Tech Park] and

documented this in the 2010 Corrective Measures Proposal

("CMP").  The CMP also proposed the final remedy for the [Tech

Park]."  ECF 194-1 at ¶ 7.  Mr. Cibrik goes on to explain as

follows:

> USEPA issued the Final Decision and Response to
> Comments (the "Final Decision") for the [Tech Park]
> later in 2010, which documents that investigation is
> complete and describes the final remedy for the UCC
> Facility. The public had the opportunity to review the
> final remedy prior to USEPA issuing the Final
> Decision; no public comments were received. The final
> remedy, including a robust monitoring plan, is
> enforced by WVDEP through a Corrective Action Permit
> issued for the [Tech Park]. A true and correct copy of
> the U.S. EPA's Final Decision is attached hereto as
> Exhibit A-2.
>
> The remedy for the UCC Facility was reviewed by U.S.
> EPA as part of the long-term stewardship program in
> 2018 and was found to be effective. The WVDEP RCRA
> Corrective Action permit was renewed in 2019, which
> included a public comment period, during which no
> comments were submitted by the public. Through this
> process, the EPA determined that the site
> investigation performed was sufficient to characterize
> the site and characterize the nature and boundaries of
> the contamination.

ECF 194-1 at ¶¶ 8-9.  A copy of the WVDEP Corrective Action

Permit ("CAP") exists in the record at ECF 292-4.  The court

notes that the permit does not appear to be the most recent version thereof as the same is dated April 2, 2012, and that the permit states that "[t]his permit shall remain in effect until February 10, 2019, unless suspended, revoked, revoked and reissued, or terminated or continued in accordance with 40 C.F.R. 270.51." ECF 292-4. As evidenced by Mr. Cibrik's declaration, however, the CAP was renewed in 2019. See ECF 194-1 at ¶ 9.

Further, pointing to the deposition testimony of Courtland's expert, Dr. Simonton, UCC notes that Dr. Simonton "agrees that the [CAP] . . . covers and controls the issues raised in the [c]omplaint and that UCC is in compliance with the permit." ECF 297 at 22 (citing ECF 292-3 at 315-17). The court notes the following exchange during Dr. Simonton's deposition:

> Q. So to the extent that DEP and USEPA have approved all the work that's happened on Tech Park and are still in -- as we speak, still actively managing everything that's going on at the site, to the extent they are doing that and they have decided or approved -- however you want to phrase it -- that UCC does not need to do anything further with respect to various things on this property, you're still saying that that would be a violation of something?
>
> A. No. I keep saying they have not violated the permit. They certainly have not delineated. And just because EPA and DEP said you don't have to delineate doesn't mean it has been delineated. They've given them permission to not fully delineate for whatever reason. It doesn't mean it's been delineated.

> Q. Even though you disagree with the decision, you'd agree with me that at least that decision falls under this permit?
>
> A. Yes.

ECF 292-3 at 316-17.  UCC avers that because the Tech Park "has been operating and complying with a RCRA permit since the 1980s, and because UCC has met and exceeded the [US]EPA requirements for Greenhouse Area characterization in the RCRA process, summary judgment must be granted on Count II" in Courtland I. ECF 297 at 22-23.  UCC further contends that summary judgment is warranted inasmuch as its compliance with the Tech Park's CAP shields it from citizen suit enforcement under RCRA's permit-as-a-shield provision set forth in 40 C.F.R. § 270.4(a).

First, Courtland responds that the CAP cannot act as a liability shield given that 40 C.F.R. § 270.4(c) provides that "the issuance of a permit does not authorize any injury to persons or property or invasion of other private rights, or any infringement of State or local law or regulations" and that UCC has admitted that contamination from the Tech Park has impacted "the property of third parties."  ECF 380 at 37.  Courtland further contends that "the lack of delineation of contamination at the Tech Park . . . and its impacts to the Courtland Property . . . means that the [CAP], which does not cover Courtland, cannot shield the Tech Park from further liability."  <u>Id.</u> at

380.  Such contentions are unavailing inasmuch as the essence of Courtland's § 6972(a)(1)(A) claim is not that UCC violated RCRA by causing injury to Courtland's property or the properties of third parties; rather, it is that UCC is violating RCRA by operating the Tech Park for the treatment, storage, or disposal of hazardous waste <u>without a permit</u>.

Second, without much elaboration, Courtland contends that UCC's compliance with its CAP does not protect it from liability because the CAP is not a "TSD permit."[42]  ECF 380 at 38.  In support of this assertion, Courtland cites to the following paragraph from the First Circuit opinion in <u>W.R. Grace & Co. v. United States EPA</u>:

> RCRA regulates facilities that treat, store, or dispose of hazardous materials ("TSD facilities"). As a condition of operation, TSD facilities must obtain from EPA a "TSD Permit."  RCRA § 3005(a), 42 U.S.C. § 6925(a). The Hazardous and Solid Waste Amendments to RCRA, enacted in 1984, require TSD permits to prescribe "corrective action," or cleanup, for "releases of hazardous waste or constituents" detected at TSD facilities.  RCRA § 3004(u), 42 U.S.C. § 6924(u). Where EPA detects such releases <u>after</u> issuing the TSD permit—or suspects their existence—it may issue the owner or operator of the facility a separate "corrective action" permit. <u>See</u> <u>id.</u> and RCRA § 3005, 42 U.S.C. § 6925.  The corrective action permit will

---

[42] Courtland does not define "TSD permit," nor has the court located a definition for the same in the RCRA regulations. It appears, however, that "TSD" stands for the "treatment, storage, or disposal" of hazardous materials, and thus a TSD permit merely means a permit to "treat, store, or dispose" of hazardous materials.

> direct the permittee to conduct a series of
> investigations in accordance with a "schedule[ ] of
> compliance," RCRA § 3004(u), 42 U.S.C. § 6924(u), to
> determine whether any hazardous release exists at the
> facility.

959 F.2d 360, 361 (1st Cir. 1992) (emphasis in original).

Courtland contends that UCC has not demonstrated that its CAP

"is a permit to treat, store, or dispose of hazardous waste"

(i.e., a "TSD" permit).  Courtland thus asserts that because UCC

has disposed of hazardous waste at the Tech Park, as

demonstrated by the hazardous wastes detected in Ward Hollow and

the Greenhouse Area thereof and has never had a "TSD permit" for

such disposal, UCC has been and continues to be in violation of

RCRA Subtitle C and the WVHWMA.

        Our court of appeals has not addressed RCRA's permit

shield provision in any great detail.  See, e.g., West Virginia

State University Board of Governors v. Dow Chemical Co., 23 4th

288, 302 (4th Cir. 2022) (quoting 40 C.F.R. § 270.4 in passing

in a parenthetical citation).[43]  However, other courts that have

specifically addressed such provision have determined the same

to be enforceable and applicable to not only USEPA enforcement

actions, but also enforcement actions brought by citizens

---

[43] The court notes that the Fourth Circuit in dicta therein, noted that the "EPA issued a CA Permit to the Institute Facility which constitutes compliance with [RCRA] . . . ."  West Virginia State University Board of Governors, 23 4th at 310 (citing 40 C.F.R. § 270.4).

through RCRA's citizen suit provisions.  See, e.g., Shell Oil Co. v. E.P.A., 950 F.2d 741, 762 (D.C. Cir. 1991) (noting the shield applies to "enforcement actions brought by States and by citizens through RCRA's citizen-suit provision"); see also Families Concerned About Nerve Gas Incineration v. U.S. Dept. of Army, 380 F. Supp. 2d 1233, 1245 (N.D. Ala. 2005) (rejecting plaintiff's argument that the Alabama Hazardous Waste Management and Minimization Act's identical permit shield provision was inapplicable to citizen suit actions and noting that "RCRA creates the cause of action for citizens to remedy violations, while the permit shield regulation defines what constitutes a RCRA violation").

The relevant question here then is whether UCC's CAP constitutes a RCRA permit, i.e., "an authorization, license, or equivalent control document issued by EPA or an approved State to implement the requirements of this part and parts 271 and 124 of this chapter."  40 C.F.R. § 270.2.  As mentioned, the WVHWMA regulations define "RCRA permit" as a "West Virginia Hazardous Waste Management Permit."  W. Va. Code St. R. § 33-20-11.

The copy of the Tech Park's 2012 CAP that exists in the evidentiary record provides as follows:

> This Corrective Action Permit is a revision of the Hazardous Waste Management Renewal Permit issued on February 10, 2009.

This Permit is revised based on the information in the administrative record.

This Corrective Action Permit is revised by the West Virginia Department of Environmental Protection, Division of Water & Waste Management, Hazardous Waste Program in accordance with the provision of the West Virginia Hazardous Waste Management Regulations, 33 CSR Series 20 and Article 18, Chapter 22 of the [W]est Virginia Code.  The Permittee must comply with all terms and conditions of this permit as are enforceable by the applicable regulations.

This permit shall remain in effect until February 10, 2019, unless suspended, revoked, revoked and reissued, or terminated (40 CFR 270.41, 270.43) or continued in accordance with 40 CFR 270.51.

ECF 292-4.  The USEPA's 2010 Region III Final Decision and Response to Comments report, which sets forth the "final remedy" for the Tech Park, notes that the USEPA "anticipates that the [Tech Park's] RCRA Permit will be modified to include implementation of the corrective measures selected in this Final Decision[.]"  ECF 194-3 at 16 (emphasis added).  As explained by Mr. Cibrik in his declaration, the USEPA's "final remedy, including a robust monitoring plan, is enforced by [the] WVDEP through a [CAP] issued for the [Tech Park]" and that the CAP "was renewed in 2019, which included a public comment period, during which no comments were submitted by the public."  ECF 194-1 at ¶ 9.

Based on this evidence, it appears that the Tech Park's CAP would constitute a RCRA and/or WVHWMA permit.

Nonetheless, there appears to be some dispute that has not been adequately fleshed out between the parties respecting whether a "TSD permit" is a pre-requisite to a CAP or whether the CAP is in fact a "TSD permit."  If the former is true, UCC has not produced a "TSD permit."  If the latter is true, it appears that Courtland's RCRA Section 6972(a)(1)(A) claim alleging UCC to be in violation of RCRA by operating the Tech Park for the treatment, storage, or disposal of hazardous waste without a permit would ultimately fail as a matter of law.

Moreover, given that Courtland has not alleged UCC to be in violation of any of the terms of its permit and, in fact, Courtland's own expert concedes that UCC has not violated the same, it would also appear that UCC is correct in its assertion that its compliance with the Tech Park's CAP would shield it from citizen suit enforcement under RCRA's permit shield provision.  See Simonton Dep., ECF 292-3 at 316 ("I keep saying they have not violated the permit"); see also 40 C.F.R. § 270.4(a)(1) ("Compliance with a RCRA permit during its term constitutes compliance, for purposes of enforcement, with subtitle C of RCRA").

In an abundance of caution, the court will permit Courtland's RCRA Section 6972(a)(1)(A) claim as asserted in Count II of the complaint in Courtland I (the Tech Park) to

proceed to trial given the uncertainty as to whether a "TSD permit" is a pre-requisite to a CAP or whether the CAP is in fact a "TSD permit."  This apparent issue will need to be further developed by the parties at trial given their lack of adequate exploration of the same in their summary judgment briefings.

### 2. Section 6972(a)(1)(B) Claim: The Tech Park

A citizen may bring suit pursuant to RCRA Section 6972(a)(1)(B) "against any person including . . . any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  42 U.S.C. § 6972(a)(1)(B).  Unlike claims brought pursuant to Section 6972(a)(1)(A), Section 6972(a)(1)(B) claims "may be brought regardless of whether the plaintiff can demonstrate that the defendant's actions violated a specific RCRA-based permit."  Goldfarb, 791 F.3d at 505.  Section 6972(a)(1)(B) "applies retroactively to past violations, so long as those violations are a present threat to health or the

environment." Parker v. Scrap Metal Processors, Inc., 386 F. 3d 993, 1014 (11th Cir. 2004).

A plaintiff must prove the following elements to prevail on a claim pursuant to § 6972(a)(1)(B): "(1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of a solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment." Id. (quoting Cox v. City of Dallas, 256 F.3d 281, 292 (5th Cir. 2001).

The focus of the parties' briefing is centered around the third element. To survive UCC's motion for summary judgment then, Courtland need only point to evidence demonstrating that the waste disposed of at the Tech Park "may present" an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B). "The operative word in the statute is the word 'may.'" Parker, 386 F.3d at 1015. This is "expansive language that confers upon the courts the authority to grant affirmative equitable relief to the extent necessary to

eliminate any risk posed by toxic wastes." Id. (internal quotations omitted). Although broad, "there is a limit to how far the tentativeness of the word may can carry a plaintiff." Crandall v. City & Cty. of Denver Co., 594 F.3d 1231, 1238 (10th Cir. 2010) (emphasis in original).

The "term 'endangerment' means a threatened or potential harm, and does not require proof of actual harm." Parker, 386 F.3d at 1051. "By combining 'probabilistic' words like may and endanger, Congress signified 'a reasonable prospect of future harm is adequate to engage the gears of [an endangerment claim] so long as the threat is near-term and involves potentially serious harm.'" Miller v. City of Fort Myers, 424 F. Supp. 3d 1136, 1143-44 (M.D. Fla. 2020) (quoting Me. People's All. & Nat. Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 296 (1st Cir. 2006). "An endangerment is 'substantial' if it is 'serious.'" Cox, 256 F.3d at 300.

"The endangerment must also be imminent." Id. "An endangerment can only be 'imminent' if it 'threatens to occur immediately.'" Meghrig, 516 U.S. at 485 (internal citations omitted). "[W]aste which 'may present' imminent harm quite clearly excludes waste that no longer presents such a danger." Id. at 485-86. Thus, "the endangerment must be ongoing, but the conduct that created the endangerment need not be." Cox, 256

F.3d at 299.  Simply put, "there must be a threat which is
present now, although the impact of the threat may not be felt
until later."  Meghrig, 516 U.S. at 486 (internal citation
omitted).

        Lastly, the endangerment must also be substantial;
"[a]n endangerment is 'substantial' if it is 'serious.'"  Cox,
256 F.3d at 300.  "Courts seldom quantify the necessary level of
harm with any precision."  Miller, 424 F. Supp. 3d at 1144
(internal citation omitted).  "Instead, substantiality looks to
formulations like whether 'there is a reasonable cause for
concern that someone or something may be exposed to risk of harm
by release, or threatened release, of hazardous substances in
the event remedial action is not taken.'"  Id. (quoting
Burlington N. & Santa Fe Ry. v. Grant, 505 F.3d 1013, 1021 (10th
Cir. 2007)).  "This risk of harm cannot be 'remote in time,
completely speculative in nature, or de minimis in degree.'"
Id. (quoting Little Hocking Water Ass'n. v. E.I. Du Pont Nemours
& Co., 91 F. Supp. 3d 940, 967 (S.D. Ohio 2015)).

        Relying on the reports of its experts, UCC contends
that the evidence shows there is no such endangerment at the
Tech Park inasmuch as, inter alia, (1) UCC's compliance with the
Tech Park's CAP demonstrates that it has worked in conjunction
with the USEPA and WVDEP to minimize any human health or

environmental risks; (2) none of the three organic compounds
listed in the complaint are present on the Tech Park or
Courtland Property at levels exceeding groundwater cleanup
standards or risk screening levels and would thus be deemed <u>de</u>
<u>minimis</u> by the WVDEP;  (3) Courtland's own soils are the more
likely source of the COIs found in Courtland's groundwater; (4)
Courtland has not shown that contaminants from the Tech Park
have migrated onto its property, "and groundwater potentially
reaching the Courtland property from the Tech Park, which most
likely represents background conditions, would not have
detectable quantities of COIs;" and (5) based on flow systems,
scientific and analytical data, it cannot be concluded that the
Tech Park or the Greenhouse Area thereof is "the source of metal
contamination" on the Courtland Property.  ECF 297 at 31-33.

          Citing to the report of its expert, Mr. de Haven, UCC
also notes that "human health and ecological risk[s] have been
evaluated in surface water and sediment in several areas of the
Tech Park," namely, Ward B Landfill, Ward A Landfill, Ward
Branch, and Davis Creek.  ECF 290-4 at 27.  According to Mr. de
Haven, the findings of such assessments were as follows:

> • Ward B Landfill: A SLERA [Screening Level Ecological
> Risk Assessment] was conducted, and USEPA concluded
> that there was no unacceptable risk from constituents
> of potential concern (COPCs), and no further action

was required to address risk to the ecological
resources of the landfill (USEPA, 2010).

• Ward A Landfill: The analytical results from
investigations conducted for Ward A Landfill were
compared to human health risk-based screening values.
The results of the human health risk screening
indicated potentially complete exposure pathways in
Ward A Pond; therefore, this area was evaluated as
part of a HHRA [Human Health Risk Assessment]. The
HHRA concluded that for current land use and likely
future land use (assuming recreational use), exposure
to surface water and sediment at Ward A Landfill would
not result in unacceptable human health risks
(CH2MHill, 2010).

• A SLERA and a BERA [Baseline Ecological Risk
Assessment] were both conducted at Ward A Landfill to
evaluate ecological risk. The assessments concluded
that there is limited potential for adverse effects to
ecological receptors from exposure to COPCs in surface
water or sediment (CH2MHill, 2010).

• Ward Branch — Human Health: The analytical results
from investigations conducted for Ward Branch on the
UCC Property were evaluated as part of a HHRA.
Potential exposure pathways and scenarios that were
evaluated as part of the HHRA for Ward Branch include
trespassers (adult and child) and maintenance workers
(adult). The HHRA concluded that for current and
future land use (assuming limited access to site
workers with potential trespassing), exposure to
surface water and sediment in Ward Branch would not
result in unacceptable human health risks (USEPA,
2010).

• Ward Branch — Ecological: In 2010, UCC conducted a
SLERA to evaluate pathways and receptors for surface
water and sediment. Based on the results of the SLERA,
USEPA and WVDEP concluded that no further action is
required to address risk to the ecological resources
of Ward Branch (USEPA, 2010).

• Davis Creek: A 2007 SLERA also evaluated constituents
detected in the surface water and sediment of a

> tributary[44] to Davis Creek. There were no exceedances
> of conservative ecological screening values observed
> in either the surface water or sediment therefore
> indicating that there was no potential for
> unacceptable ecological risk (USEPA, 2010).

Id. at 27-28.  In sum, Mr. de Haven states "numerous risk

assessments have been performed throughout the history of the

investigation and remediation at the [Tech Park].  USEPA adopted

the results of these findings while approving the Site remedy,

as discussed in the Final Decision and Response to Comments

regarding the Final Remedy at the Tech Park (USEPA, 2010)."  Id.

at 29.  UCC further points to the report of its expert, Lance

Fontenote, in which Mr. Fontenote opined, "based on the

available data, no complete exposure pathways exist that result

from migration from the UCC Technology Park to the Courtland

[P]roperty[,]" and "[w]ithout exposure, there is no human health

risk from exposure to groundwater."  ECF 290-9 at 15.

Courtland responds that UCC's reliance on Mr. de

Haven's report is flawed inasmuch as the health and ecological

risks assessments cited therein fail to address the Greenhouse

Area of the Tech Park, which UCC admits is upgradient of the

Courtland Property, and that UCC has not investigated the Tech

Park in relation to the Courtland Property.  Courtland also

---

[44] It is unclear from the record which tributary this
reference encompasses.

134

notes that while UCC claims it has taken steps to minimize any risk to human health or the environment, the same "does not dictate whether contamination presents or may present an imminent and substantial endangerment."  ECF 380 at 46. Courtland cites to evidence, (see ECF Nos. 289-2; 289-6; 289-14; 289-16), demonstrating that "[a]rsenic, barium, chromium, lead, 1,4 dioxane, vinyl chloride, and BCIE have been detected in groundwater at and emanating to and from the Greenhouse Area of the . . . Tech Park."  ECF 380 at 47.  As mentioned throughout this opinion, Courtland's 2017 groundwater sampling results on the Courtland Property detected the presence of, inter alia, arsenic, barium, chromium, lead, cadmium and selenium thereon at elevated levels.  See ECF 288-28 at 4; see also ECF 288-29 at 10.  Additionally, in support of its imminent and substantial endangerment claim as to the Tech Park, Courtland regurgitates the following paragraph from its statement of facts without any elaboration or explanation:

> The UCC "abandoned" "clean sewer" blue line runs, in part, from the Tech Park Facility under the Kanawha Turnpike and Chesapeake & Ohio Railroad tracks, then to the west along the edge of Massey Railyard, and then turns towards Davis Creek on the Filmont Facility but near the bo[rder] between the Courtland Property and the Filmont Facility. Cibrik Depo. II at 42:11-44:13; ECF 288-16 (MC Decl. Ex. O), UCC Sewer Drawing Index Map from Exh. 1004, Bates No. Jacobs00059168. Sewer pipes and fill or backfill materials can be preferential pathways. Cibrik Depo. II at 49:19-50:16, 51:3-53:7, 65:1-7, 65:8-66:6. Sewer pipes are located on the Filmont Facility and run under the Massey

Railyard facility. Cibrik Depo. II at 53:8-24; ECF
288-17 (MC Decl. Ex. P) (UCC Plant Plot Plan
contaminated & Clean Sewer Routing – Exh. 317); ECF
288-11 (MC Decl. Ex. J) ("Weber Depo. II") at 195:11-
196:21. Gravel and drainage within Massey would also
be a potential preferential pathway for groundwater
and contamination. Cibrik Depo II at 60:14-61:3.
Anything that went into the Clean Sewer connected to
the outfall labeled as "to Davis Creek 003" went to
Davis Creek. Cibrik Depo II at 67:15-60:14-61:3. The
"Clean Sewer" was connected to Solid Waste Management
Units located at the Tech Park Facility. Cibrik Depo
II at 68:9-20, 333:11-336:9; ECF 288-21 (MC Decl. Ex.
CC), at § 2.3 which states: "The clean sewer (SWMU 61)
receives runoff from waste accumulation pads (SWMUs
10, 11, 14, and 17), drum storage areas (SWMU 29),
tank drains (SWMU 54), Ward A Pond (SWMU 4) and
cooling tower basins (SWMUs 37 through 45). It also
receives stormwater runoff from the facility. Water
from the clean sewer discharges to Outfalls 003, 008,
010 and 012."

ECF 380 at 47-48; see also id. at 12 ¶ 4.23.  It is unclear how

such information, which appears to be predominately focused on

Filmont and the Massey Railyard, ties into Courtland's Section

6972(a)(1)(B) regarding the Tech Park.  Nonetheless, based on

the foregoing, Courtland contends that "the contamination at and

migrating from the Tech Park . . . presents or may present an

imminent and substantial endangerment to human health or

environment."  ECF 380 at 49.

As noted, UCC has moved for summary judgment on

Courtland's endangerment claim in Courtland I; thus, the court

construes the facts, and all reasonable inferences drawn

therefrom, in the light most favorable to Courtland.  As

explained above, and in further detail in Sections III
(A)(1)(ii) and (A)(2)(iii) of this opinion, there is a genuine
dispute of material fact as to whether contaminants existing at
the Tech Park have migrated to the Courtland Property via
groundwater.  Such dispute, in turn, creates a disputed fact as
to whether the migration of contaminated groundwater from the
Tech Park presents or may present an imminent and substantial
endangerment to health or the environment.  The court makes no
findings herein respecting whether Courtland will ultimately be
able to satisfy its burden on its endangerment claim respecting
the Tech Park at trial.  Accordingly, the court concludes that
disputes of material fact preclude summary judgment in favor of
UCC on Courtland's Section 6972(a)(1)(B) claim in Courtland I
regarding the Tech Park.[45]

---

[45] The parties' briefing with respect to this claim is less
than informative and is lacking in any meaningful discussion of
the legal authority surrounding endangerment claims.  Moreover,
it is abundantly unclear from Courtland's briefing as to how, it
contends, the contaminated groundwater allegedly emanating from
the Tech Park presents or may present an imminent and
substantial endangerment to health or the environment.  The only
discernable theory upon which Courtland appears to base its
claim seems to be that the alleged migration of contamination
from the Tech Park has caused the contamination of Courtland's
groundwater and thus the presence of that contamination may
present an endangerment to the environment.  The court notes,
however, that the mere presence of contamination alone "does not
equate to an imminent and substantial endangerment to the
environment." Schmucker, 477 F. Supp. 3d at 810; see also
Miller, 424 F. Supp. 3d at 1146-47 (noting "[t]he mere presence
of contamination alone is not enough to constitute an imminent

3. <u>Section 6972(a)(1)(A) Claim: Filmont/Massey</u>

UCC and Courtland have cross moved for summary judgment on Courtland's RCRA Section 6972(a)(1)(A) claim alleged in Count II of Courtland's complaint in Courtland II respecting Filmont and the Massey Railyard.

As previously mentioned, to establish a violation under Section 6972(a)(1)(A) Courtland must prove that UCC is a "person" "in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter." 42 U.S.C. § 6972(a)(1)(A). UCC does not appear to dispute that it is a "person" under the statute. <u>See</u> ECF 304, at 4 (admitting that it is a New York corporation). Accordingly, the arguments surrounding Courtland's Section 6972(a)(1)(A) claim relate to whether UCC is "in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective

---

and substantial endangerment. This is true even for groundwater – the simple existence of contaminated groundwater does not automatically impel an endangerment claim"). It may very well be that UCC is ultimately entitled to judgment as a matter of law on Courtland's Section 6972(a)(1)(B) claim in Courtland I but given the dubious nature of Courtland's briefing and the parties' evident dispute as to whether contaminants existing at the Tech Park have migrated to the Courtland Property via groundwater at all, summary judgment will be denied in an abundance of caution.

pursuant to this chapter."  With regard to Filmont,[46] Courtland

alleges violations of both Subtitle C, which regulates hazardous

waste, and Subtitle D, which regulates non-hazardous solid

waste.  See Environmental Defense Fund v. U.S.E.P.A., 852 F.2d

1309, 1310 (D.C. Cir. 1988).

As previously mentioned, RCRA and the WVHWMA define

"hazardous waste" as:

> [A] solid waste, or combination of solid wastes, which
> because of its quantity, concentration, or physical,
> chemical, or infectious characteristics may -- (A)
> cause, or significantly contribute to an increase in
> mortality or an increase in serious irreversible, or
> incapacitating reversible, illness; or (B) pose a
> substantial present or potential hazard to human

---

[46] As UCC points out in its briefing, Courtland's briefing
appears to refer to Filmont and the Massey Railyard collectively
as either "Filmont" or the "Filmont facility."  ECF 291 at 2.
UCC notes, however, that while both sites are situated on the
same parcel of land, each are distinct "in their history and
operations."  ECF 382 at 20, n. 5.  UCC contends there is no
evidence that the Massey Railyard has ever been utilized as a
landfill and does not fall under RCRA aside from "generating a
small amount of waste due to rail maintenance operations and
properly disposes of that waste under Massey's RCRA Very Small
Quantity Generator status. (EPA ID Number WVR000532036)."  Id.;
see also ECF 186-1.  Courtland does not allege, at any point in
its briefing, that the Massey Railyard is not in compliance with
its RCRA Very Small Generator Status.  See 40 C.F.R. § 262.14
("Provided that the very small quantity generator meets all the
conditions for exemption listed in this section, hazardous waste
generated by the very small quantity generator is not subject to
the requirements of parts 124, 262 (except §§ 262.10 through
262.14) through 268, and 270 of this chapter, and the
notification requirements of section 3010 of RCRA and the very
small quantity generator may accumulate hazardous waste on site
without complying with such requirements").  The focus of this
section thus pertains to Filmont alone.

> health or the environment when improperly treated,
> stored, transported, or disposed of, or otherwise
> managed.

42 U.S.C. § 6903(5); W. Va. Code § 22-18-3(6) (using "waste"

instead of "solid waste").  RCRA and the WVHWMA define "solid

waste" or "waste" as:

> any garbage, refuse, sludge from a waste treatment
> plant, water supply treatment plant, or air pollution
> control facility and other discarded material,
> including solid, liquid, semisolid, or contained
> gaseous material resulting from industrial,
> commercial, mining, and agricultural operations, and
> from community activities, but does not include solid
> or dissolved material in domestic sewage, or solid or
> dissolved materials in irrigation return flows or
> industrial discharges which are point sources subject
> to permits under section 1342[47] of Title 33, or source,
> special nuclear, or byproduct material as defined by
> the Atomic Energy Act of 1954, as amended (68 Stat.
> 923).

42 U.S.C. § 6903(27); W. Va. Code § 22-18-3(16).  Courtland's

allegations under Subtitles C and D are addressed separately

below.

       As a threshold matter, UCC devotes a considerable

amount of its briefings contending that it cannot be held liable

under RCRA because it has been accepted into and is in

compliance with the West Virginia VRP.  See ECF 297 at 31-33;

---

[47] It is noted that the WVHWMA definition differs slightly
in language at this point stating " . . . which are point
sources subject to permits under Section 402 of the federal
Water Pollution Control Act, as amended, or source, special
nuclear or by-product material as defined by the federal Atomic
Energy Act of 1954, as amended."  W. Va. Code § 22-18-3(16).

ECF 382 at 26-29.  On this subject, the court's November 23, 2021, memorandum opinion and order made two points worth repeating.  First, the court noted that UCC's participation in the VRP did not strip the court of jurisdiction over Courtland's claims.  ECF 319 at 6-7.  Second, to the extent participation in the VRP may moot any injunctive relief, the court noted "[w]hile a defendant's post-suit cessation of the alleged violation has the ability to moot claims for injunctive relief, the same does not moot citizen-suit claims for civil penalties." Id. (citing Friends of Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc., 528 U.S. 167, 174 (2000)).

While UCC has been accepted into the VRP, no remediation has yet taken place.  UCC cites Schmucker v. Johnson Controls, Inc., No. 3:14-CV-1593 JD, 2019 WL 718553 (N.D. Ind. Feb. 19, 2019), for the proposition that participation with a voluntary remediation program "establish[es] a party's obligation under federal cleanup statutes."  ECF No. 382 at 27.  This case, however, is distinguishable from Schmucker.  In Schmucker, the court concluded that a corporation that "complied with and satisfied each of its closure obligations," and participated in Indiana's Voluntary Remediation Program for nearly twenty-years, was not in violation of RCRA § 6972(a)(1)(A).  2019 WL 718553 at *15.  Indeed, the court

therein agreed that entry into a voluntary remediation program is not sufficient to "relieve a party of its RCRA obligations;" instead it noted, in that instance, compliance with the program had become the company's obligation under RCRA.  Id. at 18.

Here it is important to note that UCC has only been accepted into the program, and no remediation has occurred. Accordingly, until a compliance schedule has been put in place, the court simply cannot conclude that compliance with the VRP necessarily equates to compliance with RCRA.[48]  The court will now turn to UCC's alleged violations of Subtitles C and D of RCRA as asserted by Courtland.

    i.   RCRA Subtitle C

Courtland submits that UCC is liable under Section 6972(a)(1)(A) because it has violated Subtitle C of RCRA and the

---

[48] UCC also repeatedly submits that "cleanup of any given site or area at a facility under RCRA correcti[ve] action or CERCLA will substantively satisfy the requirements of both programs."  See, e.g., ECF No 382, at 21 (quoting MPM Silicones, LLC v. Union Carbide Corp., No. 111CV1542BKSATB, 2016 WL 3962630 (N.D.N.Y. July 7, 2016), vacated and remanded, 966 F.3d 200 (2d Cir. 2020), as amended (Aug. 13, 2020)).  It very well may be that cleanup under CERCLA of the Filmont and the Massey Railyard would be sufficient cleanup under RCRA.  That proposition, however, does not lend to a finding that only one of the statutory schemes is applicable to the site.  Such argument is better addressed with respect to remedies, should violations of both acts be found.

corresponding provisions of West Virginia law in four separate ways:

> UCC has violated RCRA and WV law [(1)] by not having a permit to dispose of hazardous waste at Filmont, [(2)] by not taking the monitoring and corrective actions required by 40 CFR Part 264, Subpart F with respect to the releases of Hazardous Wastes from the Filmont Facility and by allowing it to leach from the facility into surface waters and groundwater, [(3)] by its failure to properly close Filmont, including those requirements under RCRA's Closure and Post Closure requires [sic] set forth in 40 CFR Part 265, Subpart G,[49] and [(4)] by its failure to have proper financial assurances in place for Filmont.

ECF 291 at 27.[50]

---

[49] While this paragraph from Courtland's briefing cites to the closure and post-closure requirements set forth in 40 C.F.R. Part 265, Subpart G, in the remainder of Courtland's briefing, Courtland cites to the closure and post-closure requirements set forth in 40 C.F.R. Part 264, Subpart G.  See, e.g., ECF 291 at 29.  Part 264 applies to owner and operators of facilities that are permitted under RCRA and part 265 sets forth the standards applicable to facilities operating under interim status. See United Techs. Corp. v. U.S. E.P.A., 821 F.2d 714, 717 (D.C. Cir. 1987) (noting that "[t]he EPA has promulgated several sets of regulations implementing Subtitle C of the RCRA[,]" and "[t]he section 3004 standards applicable to facilities with permits are set forth in Part 264[,]" while "Part 265 sets forth the standards applicable to facilities operating under interim status").

[50] The court notes that in Courtland's complaint in Courtland II, Courtland also asserted UCC had violated RCRA Section 6972(a)(1)(A) by failing to provide to the USEPA or the WVDEP "the notification required by the first sentence of 42 U.S.C. § 6930(a) with respect to either the Filmont Landfill or the [Massey] Railyard."  ECF 1 (Courtland II) at ¶ 74.  RCRA Section 6930(a) pertinently provides "[n]ot later than ninety days after promulgation of regulations under section 6921 of this title identifying by its characteristics or listing any

Courtland states that UCC admits that it is the current owner of the Filmont property, and that Filmont "has received solid waste, industrial waste, and hazardous waste and that waste is still at the Filmont facility."  Id. at 28. Moreover, Courtland claims that these wastes include hazardous wastes that are enumerated by regulation under RCRA Subtitle C. Id.

Courtland further submits that 40 C.F.R. § 270.1(c) "unambiguously brings Filmont into the ambit of the RCRA Subtitle C permitting program[.]"  This regulation provides, in pertinent part,

> RCRA requires a permit for the "treatment," "storage," and "disposal" of any "hazardous waste" as identified or listed in 40 CFR part 261. The terms "treatment," "storage," "disposal," and "hazardous waste" are defined in § 270.2. Owners and operators of hazardous waste management units must have permits during the active life[51] (including the closure period) of

_____

substance as hazardous waste subject to this subchapter, any person generating or transporting such substance or owning or operating a facility for treatment, storage, or disposal of such substance shall file with the Administrator (or with States having authorized hazardous waste permit programs under section 6926 of this title) a notification stating the location and general description of such activity and the identified or listed hazardous wastes handled by such person."  42 U.S.C. § 6930(a).  Courtland's summary judgment briefings, however, make no mention of this alleged violation.

[51] Active life is defined as "the period from initial receipt of hazardous waste at the facility until the [USEPA]

144

> the unit. Owners and operators of surface
> impoundments, landfills, land treatment units,
> and waste pile units that received waste after
> July 26, 1982, or that certified closure
> (according to § 265.115[52] of this chapter) after
> January 26, 1983, must have post-closure permits,
> unless they demonstrate closure by removal or
> decontamination as provided under § 270.1(c)(5)
> and (6), or obtain an enforceable document in
> lieu of a post-closure permit, as provided under
> paragraph (c)(7) of this section.

40 C.F.R. § 270.1(c).  As previously mentioned, the entirety of

part 270 has been incorporated by reference into the

implementing regulations of the WVHWMA.  See W. Va. Code St. R.

§ 33-20-11 ("The provisions of 40 C.F.R. 270 . . . are hereby

adopted and incorporated by reference with the modifications,

exceptions, and additions set forth in this section").  The term

"disposal" is defined as follows:

_____

Regional Administrator receives certification of final closure."
40 C.F.R. § 260.10.

   [52] Section 265.155 provides "[w]ithin 60 days of completion
of closure of each hazardous waste surface impoundment, waste
pile, land treatment, and landfill unit, and within 60 days of
completion of final closure, the owner or operator must submit
to the Regional Administrator, by registered mail, a
certification that the hazardous waste management unit or
facility, as applicable, has been closed in accordance with the
specifications in the approved closure plan.  The certification
must be signed by the owner or operator and by a qualified
Professional Engineer.  Documentation supporting the
Professional Engineer's certification must be furnished to the
Regional Administrator upon request until he releases the owner
or operator from the financial assurance requirements for
closure under § 265.143(h)."  40 C.F.R. § 265.155.

> [T]he discharge, deposit, injection, dumping,
> spilling, leaking or placing of any solid waste or
> hazardous waste into or on any land or water so that
> such hazardous waste or any constituent thereof may
> enter the environment or be emitted into the air, or
> discharged into any waters, including groundwaters.

42 U.S.C. § 6903(3); W. Va. Code § 22-18-3(2).

Courtland argues that Filmont falls within this RCRA permitting scheme because (1) it is a "hazardous waste management unit,"[53] and (2) it received wastes after July 26, 1982.  ECF 291 at 29.  Moreover, Courtland submits that because Filmont received wastes after July 26, 1982, UCC is required by 40 C.F.R. § 270.1(c) to have a "Post-Closure Permit," which UCC admits that it does not have.  Id. (citing Amended Ans. ¶ 55 ("Defendant admits that it has not obtained a permit or any form of interim status under RCRA subtitle C (42 U.S.C. § 6921, et.

---

[53] RCRA's promulgated regulations define a hazardous waste management unit as:

> a contiguous area of land on or in which
> hazardous waste is placed, or the largest area in
> which there is significant likelihood of mixing
> hazardous waste constituents in the same area.
> Examples of hazardous waste management units
> include a surface impoundment, a waste pile, a
> land treatment area, a landfill cell, an
> incinerator, a tank and its associated piping and
> underlying containment system and a container
> storage area. A container alone does not
> constitute a unit; the unit includes containers
> and the land or pad upon which they are placed.

40 C.F.R. § 260.10.

seq.) or the West Virginia Hazardous Waste Management Act to operate the former Filmont Landfill or to close the former Filmont Landfill under those provisions.")).  Similarly, Courtland asserts that UCC failed to obtain a permit under the WVHWMA.  Id. at 30.

Courtland also claims that UCC has failed to meet any of the requirements for closure or post-closure care as laid out in 40 C.F.R. §§ 264.110-120 or "to fulfill any of the required closure/post-closure obligations and required steps including putting financial assurance instruments in place," as required by 40 C.F.R. §§ 264.140–151.  Id. at 29–30.  The entirety of part 264, with minor exceptions[54] which Courtland avers are not herein relevant, has been adopted and incorporated by reference into the implementing regulations of the WVHWMA.  See W. Va. Code St. R. § 33-20-7.2; ECF 291 at 30, n.14.

Further, because the facility was not properly closed, Courtland alleges that the violations are ongoing.  To bolster this position, Courtland avers that UCC added to or modified Filmont in 2014 by adding "cover soil" without a permit.  Id. at 32; see Weber Dep. I, ECF 288-10, at 297-98 (noting that soil

---

[54] Such minor exceptions are presumably the exclusion of 40 C.F.R. §§ 264.149 and 264.150 which "are excepted from incorporation by reference" under the implementing regulations of the WVHWMA.

generated during the "730 sump improvement project" at Tech Park was used to cover "ecological exceedances at Filmont"); Cibrik Dep. II, ECF 288-9 at 86–87.

Courtland describes UCC's actions at Filmont as the "ongoing and continuous disposal of <u>regulated</u> RCRA Subtitle C hazardous wastes . . . beginning in or about 1980 and continuing to date through the admitted and known leaching of hazardous wastes into the soil, groundwater, and surface water."  ECF 291 at 30 (emphasis in original).  Courtland notes that such hazardous wastes include 1,4 dioxane and mercury, "which are among those 'listed or identified' under both RCRA Subtitle C and the WVHWMA."  <u>Id.</u> at 30-31 (citing 40 C.F.R. § 261.24(b)[55]). Courtland contends that to do so without a permit, is in direct violation of both RCRA and the WVHWMA.  <u>See</u> <u>id.</u> at 31 (contending "UCC continues its failure to meet its obligations related to the presence of RCRA Subtitle C regulated . . .

---

[55] **40 C.F.R. 261.24(b) provides that "[a] solid waste that exhibits the characteristics of toxicity has the EPA Hazardous Waste Number specified in Table 1 which corresponds to the toxic contaminant causing it to be hazardous."  The court notes that 1,4 dioxane does not appear in Table 1, the only substance listed in Table 1 remotely close is "1,4 Dichlorobenzene." <u>See</u> <u>id.</u>  It is unclear from the record whether these two substances are the same.  It is further noted that while mercury is listed in Table 1, it is deemed to be hazardous at concentrations equal to or greater than the regulatory level provided in Table 1 (i.e., 0.2 mg/L).  <u>See</u> <u>id.</u>  Courtland does not assert in its briefing the regulatory level of either purported hazardous substance.**

148

hazardous waste at the Filmont facility and continues to knowingly allow the on-going release and disposal of such waste from the facility without a permit").

Courtland further contends as follows:

In view of the fact that RCRA Subtitle C regulated hazardous waste remains at Filmont after the effective date of RCRA Subtitle C (i.e., November 19, 1980) and continues to leach out into the environment, as admitted by UCC in its VRP[] [application] to the WVDEP, and that facility has never been properly permitted or closed (SF# 8.1-8.4, VRPA09 § 5; VRPA016 § 3; VRPA018 § 5), and none of the required closure and post-closure monitoring and reporting procedures or financial assurance instruments are in place to assure its proper closure and post-closure care[,] UCC is and continuously has been since the effective date of 40 C.F.R. 270.1(c)(3) in violation of at least two separate requirements of RCRA Subtitle C, and following it becoming effective pursuant to RCRA § 3006 within the State of West Virginia 'in lieu of' RCRA Subtitle C, the West Virginia Hazardous Waste Management Act, in a continuing and ongoing basis."

Id. at 32.  Simply put, Courtland avers "UCC is and has: (1) illegally disposed of RCRA Subtitle C regulated hazardous waste at and from Filmont after the effective date of RCRA Subtitle C without timely taking the reporting and corrective actions required by 40 CFR Par[t] 264, Subpart F, and without the required federal or state RCRA permit and (2) in direct violation of the express requirement of 40 C.F.R. § 270.1(c)(3) and W. Va. C.S.R. § 33-20-11 that requires UCC to have a RCRA post-closure permit and to close Filmont in compliance with the terms and conditions of that permit, because it is the owner of

Filmont that received waste of any kind after July 26, 1982 (the date upon which all hazardous waste disposal facilities were to have permits pursuant to RCRA)." Id. at 32-33 (emphasis in original)(citing statement of facts ¶¶ 5.1, 8.1-8.4).

UCC does not dispute ownership of the Filmont and Massey sites. Moreover, UCC's VRP application also notes that the source of the contamination at the site is "[i]ndustrial wastes deposited in the landfill that includes drummed wastes." VPR Application, ECF 288-6 at 17. UCC also does not appear to contest that the wastes identified by Courtland are hazardous wastes regulated under Subtitle C. Finally, UCC does not attempt to dispute Courtland's assertion that it has never obtained a RCRA post-closure permit, nor does it suggest that it complied with the closure/post-closure procedures set forth in the federal regulations.

Instead, UCC maintains, that it is not regulated under RCRA and thus cannot be liable under Section 6972(a)(1)(A). See ECF 297 at 27-31; ECF 382 at 21-24. Inasmuch as "[t]he [US]EPA, the WVDEP, and UCC have chosen to regulate and manage Filmont and Massey under CERCLA," UCC submits, without any citation to caselaw, regulation, or statute, that "there is no need or justification for it to be regulated under RCRA." ECF 297 at 27.

To this end, UCC submits that Filmont operated, beginning in the mid-1970s, as an "inert waste landfill, with hazardous chemical waste sent to a separate landfill." ECF 382 at 23.[56] UCC further contends that in 1981, it submitted a CERCLA § 103(c) Notice of Hazardous Waste Site for the Filmont property to the USEPA, and that "[a]s the RCRA and CERCLA regulatory schemes came became [sic] active, UCC chose to close the Filmont inert waste landfill before RCRA regulatory authority superseded the health department-issued permit, with the final closuring taking place in concert with the WVDNR [, i.e., the West Virginia Department of Natural Resources,] in 1987." Id. Despite the 1981 notice, UCC notes that the USEPA "took no action." Id. at 21. UCC further asserts that as a result of the 103(c) Notice, which it contends was given in 1981, environmental work has continued on Filmont pursuant to CERCLA, noting that "[i]n 2005, [it] initiated a CERCLA-based investigation of Filmont, which is ongoing to the present day" and has now been accepted into the WVVRP. ECF 382 at 27 (citing MacPherson Report, 290-28 at 33). UCC avers that "[n]either [the] [US]EPA nor WVDEP has required UCC to deviate from its

---

[56] Elsewhere UCC concedes that Filmont operated as a landfill that handled "waste" from the early 1950s until 1970. See ECF 297 at 10. Although the court cannot say with certainty, it appears that UCC suggests the hazardous materials were disposed of in the landfill during that twenty-year period.

current CERCLA approach." ECF 297 at 29. Reduced to its essence, UCC contends "since UCC ceased active operations on Filmont and provided notice for the site under CERCLA, RCRA does not apply here." ECF 297 at 24. Relying predominately on the report of its expert, Mr. MacPherson, UCC avers that RCRA's regulatory scheme is no longer applicable to Filmont, and any remediation would be governed solely by CERCLA. See id. (citing Feb. 2021 MacPherson Report, ECF 290-28 at 18-19); see also ECF 382 at 23.

UCC further notes that even if RCRA were to apply to Filmont, "Courtland's argument for UCC's liability under RCRA largely rests upon the assertion that it did not 'properly permit or close Filmont in compliance with the requirements of RCRA, . . . however, there is substantial evidence showing that Filmont was in fact closed under the supervision of the WVDNR, which was the overseeing agency at that the time." ECF 382 at 24. UCC cites to Mr. MacPherson's February 2021 expert report, in which he opines:

> The State's older system of landfill permits being
> issued by state/county health departments certainly
> acknowledges that UCC followed the requirements in
> place at that time regulating landfills. As the UCC
> CERCLA 103(c) notice to address the Filmont property
> under CERCLA had been made in 1981 to the Agency, and
> subsequent to the enactment of RCRA, UCC consciously
> decided, in concert with the WVDEP (Worstell Depo
> 10.21.20, Hanshew Depo 1.14.21 and UCC Memo from J

> Worstell to D. Liebeskind &.B. Watkins, dated 5.17.84)
> to close the landfill before RCRA regulatory authority
> superseded the county issued landfill.

ECF 290-28 at 22.

First, the court notes that UCC's assertion that because it "chose" to regulate and manage Filmont and Massey under CERCLA, there is no need or justification for it to be regulated under RCRA, is wholly unsupported by any citation to caselaw, statute, or regulation. Nor is the court aware of any such authority supporting the proposition that individuals can simply choose which regulatory scheme to be governed by.

Second, while UCC claims to have "substantial evidence" that it operated under a state permit, the admissible evidence supporting this permit's existence is minimal. See, e.g., ECF 447-1 at 13 (the 1984 SUI Divisional Audit[57] document, which fleetingly makes reference to the existence of a Filmont "landfill permit"); ECF 447-3 at 3 (meeting minutes from a September 1984 UCC meeting with the WVDNR, which provide that "the existing permit for Fillmont [sic] (held by 514[58]) does not

---

[57] The cover page of the document refers to the same as the "Action Plan for Comprehensive Environmental Audit[,] Silicones and Urethane Intermediates Division[,] South Charleston Plant." ECF 477-1 at 2. "SUI" presumably stands for "Silicones and Urethane Intermediates."

[58] It appears "514" is a reference to the "plant number" for the South Charleston Plant. See, e.g., ECF 477-1 at 1-2.

allow the disposal of industrial waste").[59]  Although this evidence suggests that some type of permit existed for Filmont, neither the contents or quality of such permit has been established with any discernable certainty.

More significantly, it is unclear what the relevance of any alleged state permit would be.  Indeed, any state license or permit would have presumably been for the operation of Filmont as an inert landfill, not for the disposal of hazardous waste.

Similarly, the only evidence of UCC's purported closure in concert with the WVDNR stems from the deposition testimony of former UCC employee, Dennis Hanshew.  As noted in footnote sixteen herein, Mr. Hanshew worked in UCC's environmental department beginning in 1986 and his role relative to the Filmont Site was to "coordinate[] the project to put the final cap on Filmont" in or around 1987 given that UCC's purported permit was about to expire.  ECF 292-8 at 18.  Mr. Hanshew testified that a trucking firm had been hired "to haul clean fill" and a company called Relco had been hired to spread the fill.  Id. at 19.  He further testified that a DNR inspector

---

[59] UCC acknowledges that it has been unable to locate the operational permit itself, despite its diligent search.  See ECF 475.

had visited the site when the project was taking place.  <u>See</u> ECF
183-1 (Courtland III) at 40 ("I recall that [the DNR inspector]
did visit while dump trucks were placing the dirt and the
bulldozer was spreading it").  Mr. Hanshew could not recall the
DNR inspector's name.

       While Mr. Hanshew's testimony provides evidence of the
fact that Filmont was closed at some point in 1987, the court is
unable to conclude with any certainty the type of closure that
occurred and whether such closure was in accordance with any
terms or conditions of the alleged permit.  Simply put, the
court is unable to make any determinations at this time
respecting the nature or finality of the closure of Filmont.

       In sum, UCC's contention that RCRA is inapplicable
here given its decision to seek regulation of Filmont under
CERCLA after purportedly submitting a 103(c) CERCLA Notice of
Hazardous Waste Site in 1981 and closing Filmont in 1987, and
that Filmont is not governed by Subtitle C of RCRA inasmuch as
it contends it operated from the mid-1970's as a non-hazardous
"inert waste landfill" as opposed to a hazardous waste
treatment, storage, or disposal facility as alleged by
Courtland, thereby raises genuine issues of material fact,
precluding an award of summary judgment in favor of either
party.  The court makes no definitive findings herein respecting

whether Courtland will ultimately be able to satisfy its burden at trial on its alleged Subtitle C violations respecting Filmont.

ii.   RCRA Subtitle D

        In addition to liability under Section 6972(a)(1)(A) for violations of RCRA Subtitle C, Courtland submits that UCC is further liable under Section 6972(a)(1)(A) on the ground that Filmont is an "open dump" under RCRA Subtitle D and West Virginia law.  ECF 291 at 33-34.

        RCRA § 4005(a) prohibits "open dumping of solid and hazardous waste."  42 U.S.C. § 6945.  Section 6945(a) provides:

> Upon promulgation of criteria under section 6907(a)(3) of this title, any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited, except in the case of any practice or disposal of solid waste under a timetable or schedule for compliance established under this section. The prohibition contained in the preceding sentence shall be enforceable under section 6972 of this title against persons engaged in the act of open dumping. For purposes of complying with section 6943(a)(2) and 6943(a)(3) of this title, each State plan shall contain a requirement that all existing disposal facilities or sites for solid waste in such State which are open dumps listed in the inventory under subsection (b) shall comply with such measures as may be promulgated by the Administrator to eliminate health hazards and minimize potential health hazards. Each such plan shall establish, for any entity which demonstrates that it has considered other public or private alternatives for solid waste management to comply with the prohibition on open

> dumping and is unable to utilize such alternatives to
> so comply, a timetable or schedule for compliance for
> such practice or disposal of solid waste which
> specifies a schedule of remedial measures, including
> an enforceable sequence of actions or operations,
> leading to compliance with the prohibition on open
> dumping of solid waste within a reasonable time (not
> to exceed 5 years from the date of publication of
> criteria under section 6907(a)(3) of this title).

An "open dump" is defined as "any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste." 42 U.S.C. § 6903(14). Pursuant to 40 C.F.R. § 257.1(a)(1), "[f]acilities failing to satisfy any of the criteria in §§ 257.1 through 257.4 or §§ 257.5 through 257.30 or §§ 257.50 through 257.107 are considered open dumps." Under this subpart, a facility is defined as "all contiguous land and structures, other appurtenances, and improvements on the land used for the disposal of solid waste." 40 C.F.R. § 257.2.

Courtland argues that UCC's Filmont "facility" is an "open dump" because it has failed to satisfy the criteria set forth in 40 C.F.R. § 257.3-1, 40 C.F.R. § 257.3-3, and 40 C.F.R. § 257.3-4. Section 257.3-1 states, in pertinent part,

> Facilities or practices in floodplains shall not
> restrict the flow of the base flood, reduce the
> temporary water storage capacity of the floodplain, or
> result in washout of solid waste, so as to pose a
> hazard to human life, wildlife, or land or water
> resources.

40 C.F.R. § 257.3-1.

Courtland claims that Filmont "sits at least partially within the original Davis Creek floodplain and has therefore drastically reduced the storage capacity of that flood plain," as evidenced by UCC's filling of historical channels.  ECF 291 at 34.[60]  Additionally, Courtland submits that "[b]y encroaching into the floodplain in this manner, Filmont has restricted the flow of the base flood."  Id.  Moreover, relying on the deposition testimony of Mr. Cibrik, Courtland states that Filmont sits within the 100-year floodplain of Davis Creek and that "flood waters along the Davis Creek recharge the groundwater zone at the Filmont facility and thus those flood waters are in contact with the contaminants at the Filmont Open Dump."  Id. (citing ECF 288-9 at 208).  In the event of a flood, Courtland suggests these contaminants are "highly likely" to wash into the adjacent neighborhood.  Id. at 35-36.  According to Courtland, all of these features render Filmont a "hazard to human life, wildlife, land, and water resources as they become a

---

[60] As evidence of this violation, Courtland cites to Mr. Cibrik's deposition, wherein Mr. Cibrik testifies that historical channels of Davis Creek on the Filmont property were filled, at least in part, with waste.  Cibrik Dep. II, ECF 288-9 at 242-43.  Courtland also cites to the deposition testimony of Dean Dawson, an individual with the firm The Real Property Consulting Group, who testified that a portion of the Filmont property is within the 100-year floodplain.  See ECF 288-12 at 52.

source of exposure to additional hazardous contaminants and materials during high-water events." Id. at 36.

Section 257.3-3 provides, "[f]or purposes of section 4004(a) of the Act, a facility shall not cause a discharge of pollutants into waters of the United States that is in violation of the requirements of the National Pollutant Discharge Elimination System (NPDES) under section 402 of the Clean Water Act, as amended."  40 C.F.R. § 257.3-3.

Courtland submits that UCC has violated this criterion because Filmont discharges pollutants into the waters of the United States, as asserted in the Clean Water Act claims in Courtland III and IV.[61]  While not raised by either party in their briefings,[62] Section 257.3-3 "is not enforceable under RCRA because § 4004(a) of the Act is not enforceable via citizen suits but exists only to guide State governments in the development of solid waste management programs."  Hackensack Riverkeeper, Inc. v. Delaware Ostego Corp., 450 F. Supp. 2d 467, 486 (D.N.J. 2006) (concluding plaintiffs had "improperly commenced a citizen suit pursuant to RCRA seeking to remedy a

---

[61] The court notes that UCC's liability as to Courtland's Clean Water Act claims in Courtland III and IV has yet to be determined.

[62] The court notes that the lack of cited caselaw in the parties' respective briefings is unimpressive and concerning.

violation of § 257.3-3"). Such unenforceability is confirmed by the EPA regulations explaining Section 4004(a) of the Act, and the EPA's commentary addressing these criteria, which explained as follows:

> ... today's amendments . . . modify the surface-water criterion of 257.3-3. As originally promulgated, that standard would have made discharges violating requirements under Section 402 or Section 404 of the Clean Water Act open dumping practices as well. A party causing such a violation could simultaneously be subject to penalties under the CWA and a citizen suit to enjoin 'open dumping' under RCRA. Today's amendment eliminates this double liability. However, since the open dump inventory classification for purposes of the State planning program does not impose legal sanctions under RCRA, the Criteria retain the provision that a violation of Section 402 or Section 404 makes a facility an open dump . . . EPA believes that the CWA enforcement mechanisms are sufficient to handle violations under Sections 402 and 404.

46 Fed. Reg. 47048, 47050 (Sep. 23, 1981). In this same vein, the district court in Long Island Soundkeeper Fund v. New York Athletic Club, No. 94-0436, 1996 WL 131863, *11 (D.N.Y. Mar. 22, 1996), held:

> ... the language of the regulations and the accompanying EPA commentary make it clear that the EPA did not intend for the surface water criteria promulgated under section 4004(a) of RCRA (42 U.S.C. 6944(a)) to authorize citizen suits for open dumping practices in violation of section 4005(a) of RCRA (42 U.S.C. § 6945(a)). This conflicts with Plaintiff's contention that it can bring suit for violation of section 4005(a) of RCRA (42 U.S.C. § 6945(a)) alleging violations of surface water criteria promulgated for purposes of section 4004(a) of RCRA (42 U.S.C. § 6944(a)). Because Congress explicitly delegated to the EPA the authority to

develop criteria concerning actionable open dumping
practices, the EPA's construction of RCRA's
prohibition of open dumping must be given controlling
weight unless it is "arbitrary, capricious, or
contrary to the statute." (citing Chevron U.S.A. Inc.
v. Natural Resources Defense Council, Inc., 467 U.S.
837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

Long Island Soundkeeper Fund, 1996 WL 131863, at *11.  Based on

the foregoing, it is evident that Section 257.3-3 cannot serve

as a basis to support a violation of Subtitle D of RCRA.

        Finally, Section 257.3-4 provides that "[a] facility

or practice shall not contaminate any underground drinking water

source beyond the solid waste boundary[.]"  Contaminate is

defined as elevations of concentrations above set "maximum

contaminant levels."  40 C.F.R. § 257.3-4(c)(2)(i)-(ii).  An

"underwater drinking water source" is: "(i) An aquifer supplying

drinking water for human consumption, or (ii) An aquifer in

which the ground water contains less than 10,000mg/1 total

dissolved solids."  40 C.F.R. § 257.3-4(c)(4)(i)-(ii).

Courtland so submits, without any citation to the evidentiary

record, that the relevant aquifer in this case fits the second

definition.  ECF 291 at 35 n.17.

        UCC does not directly respond to any of these

assertions.  Instead, UCC focuses on the provisions of West

Virginia's Solid Waste Management Act ("WVSWMA"), which also

prohibits open dumping.  W. Va. Code § 22-15-10(a) ("Open dumps

are prohibited and it is unlawful for any person to create, contribute to, or operate an open dump or for any landowner to allow an open dump to exist on the landowner's property unless that open dump is under a compliance schedule approved by the director."). Under this section, an "open dump" is "any solid waste disposal which does not have a permit under this article, or is in violation of state law, or where solid waste is disposed in a manner that does not protect the environment." W. Va. Code § 22-15-2(23).

UCC submits that Congress left requirements pertaining to the closing or upgrading of open dumps to the States. See ECF 382 at 24 (citing 40 C.F.R. 256.23 ("In meeting the requirement of section 4003(3) for closing or upgrading open dumps . . . [t]he State plan shall provide for the classification of existing solid waste disposal facilities according to the criteria. This classification shall be submitted to EPA, and facilities classified as open dumps shall be published in the inventory of open dumps")). UCC avers that pursuant to the rules promulgated to carry out the provisions of the WVSWMA, "Permittees or applicants of solid waste landfills (SWLF), or portions thereof, that stopped receiving waste before June 2, 1996 must close their SWLF in accordance with the terms and conditions of their solid waste permit, order, and/or the

laws, rules and regulations in place on May 1, 1990 unless the permit requirements are otherwise required by the Secretary." ECF 297 at 58; ECF No. 382 at 25 (quoting W. Va. Code St. R. § 33 1.1.a.1).  UCC opines that "[c]redible evidence shows that the final cap was put on the Filmont site in 1987, pursuant to its existing permit, nearly 10 years before the [WV]SWMA applied, making it clear that the site needed to be closed pursuant only to the existing permit."  ECF 382 at 26; ECF 297 at 56.

Courtland makes three arguments in response.  First, it states that "Filmont received solid waste after June 2, 1996 when contaminated fill soil was moved from Tech Park to Filmont in 2014."  ECF 380 at 61.  Second, it argues that UCC has failed to prove the "existence, terms, and conditions of the alleged Filmont permit."  Id.  Third, it notes that RCRA came into force prior to May 1, 1990, which suggests that UCC was required to close Filmont not only pursuant to its alleged permit but also pursuant to RCRA as it existed at that time.  Id.

As previously mentioned, while UCC has limited evidence suggesting that some type of state permit was once in existence for Filmont, neither the contents nor quality of such permit have been established.  The court is thus unable to conclude that UCC closed Filmont in accord with the terms and

163

conditions thereof, precluding summary judgment in favor of UCC

on this basis.[63]  Additionally, as with Courtland's alleged

violations of RCRA Subtitle C, the court is unable to conclude

at this juncture that Courtland is entitled to judgment as a

matter of law with respect to UCC's alleged violation of RCRA

Subtitle D on the evidentiary record as it has been herein

presented.  It thus appears that genuine disputes of material

fact remain surrounding the relevance of UCC's purported state

permit and the closure of Filmont in 1987, rendering summary

judgment in favor of either party inappropriate.

Consequently, the court finds that neither party is

entitled to summary judgment as to Courtland's claims in Count

---

[63] To the extent that UCC attempts to argue that RCRA does
not govern inactive landfills, see ECF 382 at 21, the court
notes that in a per curiam opinion, the D.C. Circuit Court of
Appeals rejected the contention that inactive sites "that
contain but no longer receive new, solid waste . . . cannot be
'open dumps' within the EPA's regulatory ambit." Utility Solid
Waste Activities Group v. Environmental Protection Agency, 901
F.3d 414, 439-442 (D.C. Cir. 2018).  Indeed, the court concluded
that, when properly translated, RCRA's plain text demonstrates
that "an open dump includes any facility (other than a sanitary
landfill or hazardous waste disposal facility), where solid
waste still 'is deposited,' 'is dumped,' 'is spilled,' 'is
leaked,' or 'is placed,' regardless of when it might have
originally been dropped off.  See 42 U.S.C. 6903(3), (14).  In
other words, the waste in inactive impoundments 'is disposed of'
at a site no longer receiving new waste in just the same way
that it 'is disposed of' . . . at a site that is still
operating." Id. at 440.

II of Courtland II that the Filmont site constitutes an open dump.

Based upon the forgoing discussion, the entirety of Courtland's RCRA Section (a)(1)(A) claim asserted in Courtland II (Filmont and the Massey Railyard) will proceed to trial, and the court makes no definitive findings respecting the same herein.

### 4. Section 6972(a)(1)(B) Claim: Filmont/Massey

The parties have likewise cross moved for summary judgment on Courtland's RCRA Section 6972(a)(1)(B) claim alleged in Count III of Courtland's complaint in Courtland II respecting Filmont and the Massey Railyard.

As previously noted, the elements Courtland must prevail on to prove a claim pursuant to Section 6972(a)(1)(B) are:

> (1) that the defendant is a person, including, but not limited to, one who was or is an . . . owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the defendant has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of a solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment."

**Parker**, 386 F.3d at 1014.

Courtland submits that it has established all three elements: (1) "UCC is a person who is a past or present owner and operator of Filmont[,] which is a disposal facility"; (2) "UCC admits that it contributed to the past or present handling and disposal of solid and hazardous waste at Filmont"; and (3) relying on UCC's VRP application, ECF 288-6 at 19, that "UCC admits . . . that there are current and future exposure pathways for VOCs, metals, SVOCs, and chlorinated solvents to harm both human receptors and ecological receptors," which Courtland estimates means "there is reasonable cause of concern that humans and the environment, including aquatic and terrestrial species, may be exposed to a risk of harm caused by the release or threatened release of hazardous substances at Filmont."  ECF 291 at 37-38.

UCC's motion for summary judgment only attacks Courtland's claim under Section 6972(a)(1)(B) by arguing that Filmont and Massey are "appropriately addressed under CERCLA, and not RCRA."  ECF 297 at 24-28.  As discussed above with regard to Courtland's claim under Section 6972(a)(1)(A), summary judgment cannot properly be granted on that basis and UCC's motion for summary judgment on this claim is therefore denied.

As to Courtland's motion for summary judgment on this claim, UCC briefly argues in its response brief that Courtland's claim under Section 6972(a)(1)(B) fails because Courtland "cannot establish that there is an imminent threat to the public that is required in order [to sustain] . . . an enforcement action against UCC[,] and the "best that Courtland can claim is that Filmont 'presents _or_ may present an imminent and substantial endangerment to health _or_ the environment,' . . . but this vague allegation cannot serve as sufficient evidence to prove that an enforcement action is appropriate." ECF 382 at 30 (emphasis in original). Such assertion is peculiar inasmuch as this is precisely what the third element of a Section 6972(a)(1)(B) claim demands. See Parker, 386 F.3d at 1015 (it must be shown that "the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment").

As previously noted, to satisfy the third element under this section "there must be a threat which is present now, although the impact of the threat may not be felt until later." Meghrig, 516 U.S. at 486 (internal citation omitted).

Neither party devotes significant space to addressing the threat that the waste at the Filmont and Massey sites currently pose to human health or the environment. Relying on

the checked boxes on UCC's VRP application, wherein UCC identifies that inhalation, dermal contact, and ingestion exposure pathways exist on the Filmont and Massey sites, as well as identifying both human and ecological receptors, Courtland posits that UCC has "admitted," that the sites "present conditions which may present an imminent and substantial endangerment to human health or the environment." ECF 291 at 38. UCC does not expressly provide any evidence to rebut this contention aside from contending that the VRP application relies on historical documents and cannot be construed as an admission of liability. The court notes, however, in the "Statement of Facts," section of UCC's briefings, UCC declares that its "Human Health Risk Assessment" and "Ecological Risk Evaluation," undertaken with respect to Filmont "found no risk of harm to humans or the environment." ECF 382 at 15.[64] Nonetheless, UCC fails to explain the contents of either assessment, and one of the cited documents contains 100 pages of data without elaboration or a summary.

---

[64] As noted in footnote nineteen herein, the document that UCC cites as a "Human Health Risk Assessment," appears to actually be the "Ecological Risk Evaluation," See ECF 292-11. The court could not ascertain which document, if any, is the actual Human Health Risk Assessment. As previously noted, the Ecological Risk Evaluation concludes that "based on the lines of evidence presented here, no further action is recommended to address ecological resources at the site." Id. at 26.

While it is uncertain whether these assessments will ultimately be sufficient to rebut UCC's VRP application demonstrating that the waste buried at Filmont is impacting the soil, groundwater, surface water, sediments, and air, viewing the facts in the light most favorable to UCC, the court finds that disputed facts remain respecting Courtland's imminent and substantial endangerment claims respecting Filmont and the Massey Railyard.  Accordingly, the court denies Courtland's motion for summary judgment as to the Section 6972(a)(1)(B) claim in Courtland II regarding the Filmont and Massey sites.

D. **Remaining State Law Claims**

As previously mentioned, Courtland alleges the following state law claims in Courtland I, respecting the Tech Park:  Public Nuisance (Count IV); Private Nuisance (Count V); Negligence (Count VI); Gross Negligence (Count VIII); and Strict Liability (Count IX).  In Courtland II, respecting Filmont and the Massey Railyard, Courtland alleges these same claims, in addition to a public nuisance per se claim (Count V). Courtland also seeks an award of punitive damages in Courtland II.

Upon review of the evidentiary record, the parties' briefings, and in light of the extensive discussion herein, the court concludes that disputes of material fact remain on these claims and that neither party has demonstrated that judgment as

a matter of law is warranted thereon, thus precluding an award of summary judgment in favor of either party.  Accordingly, all such claims will proceed to trial.[65]

### IV.   Conclusion

Based on the forgoing discussion, it is ORDERED as follows:

1. Courtland's consolidated motion for summary judgment (ECF Nos. 299, 288 in Courtland I and II) is DENIED;

2. Courtland's motion for summary judgment as to counterclaimant UCC's counterclaims (ECF 359 in Courtland II), is GRANTED with respect to UCC's negligence claim (Counterclaim IV) and DENIED as to its residue;

3. UCC's motion for summary judgment (ECF Nos. 301, 296 in Courtland I and II) is DENIED.

---

[65] In its consolidated motion for summary judgment, Courtland also seeks a permanent injunction "directing that UCC abate the RCRA § [6972](a)(1)(A) violations and on-going Per Se Public Nuisance conditions at and from UCC's Filmont facility." ECF 291 at 53.  Inasmuch as liability for these claims has yet to be determined as explained herein, such request is deemed premature at this time.

The Clerk is requested to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: July 1, 2022

John T. Copenhaver, Jr.
Senior United States District Judge

171